No. 15-1458, No. 15-1515

# United States Court of Appeals
# for the First Circuit

KIMBERLY P. DECAMBRE
Plaintiff - Appellant/Cross-Appellee

v.

BROOKLINE HOUSING AUTHORITY;
MATTHEW S. BARONAS; JANICE MCNIFF; CAROLE BROWN
Defendants - Appellees/Cross-Appellants

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIEF OF PLAINTIFF-APPELLANT
KIMBERLY DECAMBRE

J. WHITFIELD LARRABEE
COA #1050744
LAW OFFICES OF J. WHITFIELD LARRABEE
251 Harvard Street, Suite 9
Brookline, Massachusetts 02446
(617) 566-3670
jw.larrabee@verizon.net

*Counsel for Plaintiff-Appellant*

Dated: September 28, 2015

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD. . . . . . . . . . . . . xii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.     STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          A.    Review Of The Case Stated. . . . . . . . . . . . . . . . . . . . . . . . . 16

          B.    Review Of Denial Of Requests
                For Preliminary and Permanent Injunctions. . . . . . . . . . . . . 16

          C.    Review Of The Hearing Officer's Decision. . . . . . . . . . . . . . 17

    II.    THE BROOKLINE HOUSING AUTHORITY
          VIOLATED HUD REGULATIONS IN
          DETERMINING DECAMBRE'S ADJUSTED
          ANNUAL AND MONTHLY INCOME. . . . . . . . . . . . . . . . . . . . . . 20

          A.    Lump Sum Settlements Were Not Excluded
                from DeCambre's Annual Income.. . . . . . . . . . . . . . . . . . . . 20

i

B.   A Lump Sum Is Not Converted to Income
     Simply By Being Placed In A Trust.. . . . . . . . . . . . . . . . . . . 23

C.   It Was Clear Error To Include Trust Expenditures
     In DeCambre's Income Where They Did Not Satisfy
     The Definition Of Income Under § 5.609(a).. . . . . . . . . . . . 24

D.   HUD Guidance Did Not Provide A Basis For
     The Brookline Housing Authority's Decision.. . . . . . . . . . . 26

E.   The Brookline Housing Authority Violated
     HUD Regulations by Including "Temporary,
     Nonrecurring or Sporadic Income (Including Gifts)"
     in Decambre's Income.. . . . . . . . . . . . . . . . . . . . . . . . . . . 28

F.   The Brookline Housing Authority violated
     HUD regulations by including Medical Expenses
     In DeCambre's Income.. . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.   THE BROOKLINE HOUSING AUTHORITY
       IS LIABLE UNDER 42 U.S.C. §1983 FOR
       VIOLATING THE RENT CEILING SET
       FORTH AT 42 U.S.C. § 1437f(o)(2).. . . . . . . . . . . . . . . . . . . . . . 30

A.   The Basis for Decambre's Claim That The
     Brookline Housing Authority Violated § 1983... . . . . . . . . . . 30

B.   The Brookline Housing Authority Improperly
     Included Trust Property (Automobiles) In
     DeCambre's Annual Income With The Result
     That It Violated The Rent Ceiling... . . . . . . . . . . . . . . . . . 33

C.   By Failing To Exclude Lump Sums, Medical
     Expenses, and Temporary, Sporadic or
     Nonrecurring Income (Including Gifts) From
     DeCambre's Annual Income, The Brookline
     Housing Authority Violated The Rent Ceiling... . . . . . . . . . . 35

ii

IV.  THE LOWER COURT ERRED IN CONDUCTING AN
     INDEPENDENT INVESTIGATION, WITHOUT
     NOTICE TO THE PARTIES, AND IN TAKING
     JUDICIAL NOTICE OF THE WRONG INCOME
     ELIGIBILITY LIMITS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

V.   THE BROOKLINE HOUSING AUTHORITY
     DISCRIMINATED AGAINST DECAMBRE
     BY REASON OF HER DISABILITY.. . . . . . . . . . . . . . . . . . . . . . 38

     A.   The Basis For DeCambre's Claims of
          Discrimination.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     B.   The Brookline Housing Authority Discriminated
          Against DeCambre By Reason Of Her Disabilities
          By Failing To Make Reasonable and Necessary
          Modifications To Its Policies, Practices, Methods
          of Administration, Rules and Procedures.. . . . . . . . . . . . . . . 41

          1.   The Brookline Housing Authority Is a
               Public Entity Subject to State and Federal
               Anti-discrimination Laws.. . . . . . . . . . . . . . . . . . . . . . 43

          2.   Decambre Is a Person with a Disability.. . . . . . . . . . . 43

          3.   DeCambre Is "Qualified" To Participate
               In The Section 8 Program Administered
               By The Brookline Housing Authority.. . . . . . . . . . . . 44

          4.   DeCambre Informed The Brookline Housing
               Authority of Her Disabilities and Repeatedly
               Requested Modifications.. . . . . . . . . . . . . . . . . . . . . . 44

          5.   The Modifications Requested By
               DeCambre Were Reasonable.. . . . . . . . . . . . . . . . . . . 45

6.   The Brookline Housing Authority
Refused To Grant DeCambre's Reasonable
Requests For Modifications.. . . . . . . . . . . . . . . . . . . 52

7.   Decambre Was Not Able to Participate
in or Enjoy the Benefits of the Brookline
Housing Authority's Services, Programs
or Activities Because of the Denial of Her
Requests for Reasonable Accommodation.. . . . . . . . . . 52

C.   The Brookline Housing Authority Waived the
Fundamental Alteration Defense and Failed
to Demonstrate That Making the Requested
Modifications Would Fundamentally Alter
the Nature of the Program.. . . . . . . . . . . . . . . . . . . . . . . . . 53

D.   The Brookline Housing Authority Discriminated
Against Decambre by Unnecessarily Imposing or
Applying Eligibility Criteria That Excluded
Decambre from Fully and Equally Enjoying the
Section 8 Program Because She Is an Individual
with Disabilities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

VI.   THE LOWER COURT ERRED IN DENYING
DECAMBRE'S REQUESTS FOR A PRELIMINARY
INJUNCTION AND FOR A PERMANENT
INJUNCTION OR MANDAMUS RESTORING
HER SECTION 8 BENEFITS.. . . . . . . . . . . . . . . . . . . . . . . . . . 60

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

iv

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alexander v. Choate*,
    469 U.S. 287 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ang v. Gonzales*,
    430 F.3d 50 (1st Cir.2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Amisub (PSL), Inc. v. State of Colorado Dept. of Social Services*,
    879 F.2d 789 (10th Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Arrieta-Agressot v. US*,
    3 F. 3d 525 (1st. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Astralis Condominium Ass'n v. Secretary, HUD*,
    620 F. 3d 62 (1st Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Bercovitch v. Baldwin School, Inc.*,
    133 F.3d 141 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Bowers v. National Collegiate Athletic Ass'n*,
    *9 F. Supp. 2d 460 (Dist. N.J. 1998)*. . . . . . . . . . . . . . . . . . . . . . . . . *59*

*Bronk v. Ineichen*,
    54 F.3d 425 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Caulder v. Durham Housing Authority*,
    433 F.2d 998, 1003 (4th Cir.1970). . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Cox v. New England Telephone & Telegraph Co.*,
    414 Mass. 375 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Crowder v. Kitagawa*,
    81 F. 3d 1480 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Currie v. Group Insurance Commission*,
    290 F.3d 1 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Daniels v. Housing Auth. Of Prince George's Cty.*,
    940 F. Supp. 2d 248 (Dist. Maryland 2013). . . . . . . . . . . . . . . . . . . . . . . . 32

*Fair Housing of the Dakotas, Inc. v. Goldmark Prop. Mgmt., Inc.*,
    778 F. Supp. 2d 1028 (Dist. N.D. 2011). . . . . . . . . . . . . . . . . . . . . . . . 49, 53

*Farley v. Philadelphia Housing Authority*,
    102 F. 3d 697  (3rd Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Finley v. The City of Santa Monica*,
    Superior Court of California, BS127077 (2011). . . . . . . . . . . . . . . . .  passim

*Garcia-Ayala v. Lederle Parenterals, Inc.*,
    212 F. 3d 638 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 54

*Gordon v. United States*,
    178 F. 2d 896 (6th Cir. 1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

 *Gorman v. Bartch*,
    152 F.3d 907 (8th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
    290 F.3d 63 (1st Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hazen Paper Co. v. Biggins*,
    507 US 604 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Henderson v. Thomas*,
    913 F. Supp. 2d 1267 (Dist. Alabama 2012). . . . . . . . . . . . . . . . . . . . . . . 57

*Higgins v. New Balance Athletic Shoe, Inc.*,
    194 F.3d 252 (1st Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In re McDonough,*
    457 Mass. 512 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Johnson v. Housing Authority of Jefferson Parish,*
    442 F. 3d 356 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kenaitze Indian Tribe v. Alaska,*
    860 F.2d 312 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kiman v. N.H. Department of Corrections.,*
    451 F.3d 274 (1st Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Maine v. Thiboutot,*
    448 U.S. 1 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Majors v. Housing Authority of DeKalb County,*
    652 F.2d 454 (5th Cir. Unit B Aug. 1981). . . . . . . . . . . . . . . . . . . . . . 49

*Nieves-Marquez v. Puerto Rico,*
    353 F.3d 108 (1st Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Nunes v. Massachusetts Dept. Of Correction,*
    766 F. 3d 136 (1st Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Orthopaedic Hosp. v. Belshe,*
    103 F. 3d 1491 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Overlook Mut. Homes, Inc. v. Spencer,*
    666 F. Supp. 2d 850 (S.D. Ohio 2009). . . . . . . . . . . . . . . . . . . . . . . . 49

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Popovich v. Court of Common Pleas Domestic Relations Div.,*
    227 F.3d 627 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Reed v. LePage Bakeries, Inc.*,
 244 F.3d 254 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 45, 46

*Regional Economic Community Action Program, Inc. v. City of Middletown*,
 294 F.3d 35 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rio Grande Community Health Center, Inc. v. Rullan*,
 397 F. 3d 56 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Ritter v. Cecil County Office of Hous. & Community Dev.*,
 33 F.3d 323 (4th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rosario-Urdaz v. Rivera-Hernandez*,
 350 F.3d 219 (1st Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
 102 F.3d 12 (1st Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Seavey v. Barnhart*, 276 F. 3d 1, 9 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . 17

*Society of Holy Transfiguration v. Gregory*,
 689 F. 3d 29 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Toledo v. Sanchez*,
 454 F. 3d 24 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Turner v. Perales*,
 869 F.2d 140 (2nd Cir.1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United Paperworkers Intern. Union v. Intern. Paper*,
 64 F.3d 28 (1st. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. California Mobile Home Park Management. Co.*,
 29 F.3d 1413 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*U.S. Airways v. Barnett*,
 535 U.S. 391 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*US v. Torres-Galindo*,
206 F. 3d 136, (1st. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Ward v. Massachusetts Health Research Institute, Inc.*,
209 F.3d 29 (1st Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Wright v. Roanoke Redevelopment and Housing Authority*,
479 US 418 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32

**FEDERAL STATUTES**

5 U.S.C. § 706(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1292(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 794. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 12102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

42 U.S.C. § 12131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

42 U.S.C. § 12131(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 44

42 U.S.C. § 12134(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1437d(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. § 1437f(o)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1437f(o)(2)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

42 U.S.C. § 1437f(y). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. § 1396p(d)(4)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 3604. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**MASSACHUSETTS STATUTES**

G.L. ch. 30A § 14(7)(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

G.L. ch. 93 § 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

G.L. ch. 151B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

G.L. ch. 151B § 4(3C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

G.L. ch. 151B § 4(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

G.L. ch. 151B § 4(7A)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

G.L. ch. 151B § 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**REGULATIONS**

20 C.F.R. § 416.1205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

24 C.F.R. § 5.303(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

24 C.F.R. § 5.603(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 37

24 C.F.R. § 5.603(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

24 C.F.R. § 5.603(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 23

24 C.F.R. § 5.609(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 34

24 C.F.R. § 5.609(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

24 C.F.R. § 5.609(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

24 C.F.R. § 5.609 (b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

24 C.F.R. § 5.609(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25, 32

24 C.F.R. § 5.609(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

24 C.F.R. § 5.609(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

24 C.F.R. § 5.609(c)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

24 C.F.R. § 5.611. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

24 C.F.R. § 5.628. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

24 C.F.R. § 8.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 49

24 C.F.R. § 8.33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

24 C.F.R. § 9.130(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

24 C.F.R. §100.204(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

24 C.F.R. § 960.705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

24 C.F.R § 982.201(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

28 C.F.R § 35.130(b)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 C.F.R § 35.130(b)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**RULES**

Fed. R. Civ. P. 8(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 59

L.R. 34.0. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

**MASSACHUSETTS CONSTITUTION**

Article 114 of the Amendments to the Massachusetts Constitution.. . . . . . . . . . . 40

**OTHER AUTHORITIES**

Economic and Market Analysis Division, HUD,
*FY 2014 Income Limits Summary For Brookline, Massachusetts*.. . . . . . . 37

Quadel Consulting Corp., Housing Choice Voucher Program Guidebook,
§ 5.2, (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Joint Statement of the Department of Housing and
Urban Development and the Department of Justice,
*Reasonable Accommodations Under the Fair Housing Act,*
(May 14, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Pursuant to L.R. 34.0, Plaintiff-Appellant Kimberly DeCambre ("DeCambre") requests oral argument. The question of whether lump sums expended through special needs trusts are included in the income of Section 8 participants has not been decided by any federal or state appellate court.  In light of the importance of this issue, the complexity of the factual record and DeCambre's multiple liability theories, oral argument will assist the Court's review.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §1343 (civil rights).  It also had pendant or ancillary jurisdiction over DeCambre's state law claims under 28 U.S.C. § 1367.

Appellate jurisdiction rests on 28 U.S.C. § 1291 over the final decision of the lower court as well as on 28 U.S.C. § 1292(a)(1) with regard to denial of DeCambre's request for a preliminary injunction.

On March 25, 2015, Judge William G. Young rendered a final decision in favor of the Defendant-Appellee Brookline Housing Authority ("BHA") on Counts 1, 2, 3, 4 and 7 of the Amended Complaint.  Joint Appendix 485-525 ("App.") .  On March 26, 2015, the lower court entered a final judgment ordering that DeCambre's motion for a preliminary injunction was denied and that her appeal of her Section 8 eligibility was remanded to the BHA.  App. 526.   It also ordered the cased to be closed on March 26, 2015.   App. 1.

DeCambre filed her notice of appeal on April 14, 2015.  App. 527.

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the BHA violated regulations of the United States Department of Housing and Urban Development ("HUD") in determining DeCambre's income by including expenditures from her special needs trust that originated as lump sum settlements, and by failing to exclude certain other trust property and expenditures in calculating her Annual Income.

2. Whether the lower court erred in failing to find that the BHA's incorrect calculation of DeCambre's annual income and resulting incorrect determination of her Total Tenant Payment ("TTP") violated the rent ceiling provision of the Housing Act, and, if so, whether the court erred in failing on the basis of this violation to render a judgment for DeCambre under 42 U.S.C. § 1983.

3. Whether the lower court erred in failing to find that the BHA discriminated against DeCambre by reason of her disability in violation state or federal anti-discrimination laws by denying DeCambre's requests for reasonable modifications of its rules, policies, practices, procedures and methods of administration so as to exclude expenditures from her special needs trust in determining her income, TTP and Section 8 benefits.

4. Whether the lower court erred in failing to find that the BHA violated state or federal anti-discrimination laws by imposing or applying eligibility criteria

2

that screened out or tended to screen out DeCambre and other similarly situated

people with disabilities who utilize special needs trusts that are funded with lump

sums from fully and equally enjoying housing and the Section 8 program.

    5.  Whether the lower court erred in basing its decision on the wrong

eligibility criteria taken from the BHA's website.

    6.  Whether the lower court erred in denying DeCambre's requests for a

preliminary injunction or for a permanent injunction or mandamus restoring her

Section 8 benefits.

## STATEMENT OF THE CASE

    This is an appeal of the district court's judgment in favor of the defendant

BHA on DeCambre's claims for 1) deprivation of rights under the United States

Housing Act of 1937, 42 U.S.C. § 1437f (o)(2)(A)(i) ("The Housing Act") in

violation of 42 U.S.C. § 1983 ("§ 1983"), 2) disability discrimination violation of

section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504"), violation

of section 202 of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132

("ADA"), violation of the Fair Housing Act, Title VIII of the Civil Rights Act of

1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §

3604 ("FHA"), and violation of G. L. ch. 93 § 103, Massachusetts Equal Rights

Act ("MERA"), and, 3) denial of DeCambre's request for a preliminary injunction,

a permanent injunction and other equitable relief restoring her Section 8 benefits.
App. 85.  This is also an appeal of DeCambre's request for review under state law.

On May 27, 2014, the BHA held an informal hearing to review its decision
of December 18, 2013 increasing DeCambre's TTP, as of February 1, 2014, from
$435.00 per month to $1,560.00 per month (the full contract rent), thus
eliminating her Section 8 subsidy.  App. 553-356 (hearing officer's decision).  On
June 9, 2014, the hearing officer at the BHA rendered his decision, affirming the
BHA's calculation DeCambre's rent contribution.  *Id*.  He also opined that the
BHA correctly denied DeCambre's reasonable accommodation request.  *Id*.  On
June 27, 2014, DeCambre dual-filed a complaint with the Massachusetts
Commission Against Discrimination ("MCAD") and HUD against the BHA and
its employees alleging disability discrimination.   App. 360;  Dkt. # 12, p. 33.
DeCambre filed suit in the Norfolk Superior Court challenging the BHA's actions
on or about July 9, 2014.  Dkt. # 1; Dkt. # 12, p. 33.  The BHA removed the case
from state court on August 21, 2104.  *Id*.  On September 4, 2014, the parties
agreed to submit the matter to the court for judgment as a case stated on the issue
of liability.  App. 221, n. 1.  Argument was heard on September 19, 2014.   App. 3.
On March 25, 2016, the Court entered its Memorandum of Decision, Findings of
Fact and Rulings of Law, rendering a judgment in favor of the BHA on

DeCambre's claims for violation of § 1983 (Count 1), disability discrimination (Count 2), Breach of Lease (Count 3) and Interference with Quiet Use and Enjoyment (Count 4).  App. 485-525. The Court denied DeCambre's motion for a preliminary injunction restoring her Section 8 benefits, and it ordered that DeCambre's appeal of her Section 8 eligibility be remanded to the BHA for reconsideration in light of the court's findings.  *Id*.  On March 26, 2016, the Court entered an order of remand, denying DeCambre's motion for a preliminary injunction and ordering that DeCambre's appeal of her Section 8 eligibility be remanded to the BHA.  App. 526.  The court also terminated DeCambre's case in the district court on March 26, 2016, closing the case.  App. 1.  On April 14, 2015, DeCambre appealed the Court's judgments of March 25, 2016 and March 26, 2015.  App. 527.  The BHA filed its notice of cross appeal on April 27, 2015.  App. 528.  The BHA declined to reconsider its decision on DeCambre's eligibility as instructed by the lower court in its remand order.  App. 591, ¶ 8.  DeCambre refiled her case against the BHA in the lower court, seeking enforcement of the remand order.  Add. 4; Add. 5.   The lower court declined to act in the case, and ordered it administratively closed, subject to being reopened upon the appeal being withdrawn or exhausted or a mandate being issued.  *Id*.  On July 8, 2015, the lower re-opened the instant case for the limited purpose of considering

5

DeCambre's Motion For Entry of Judgment under Rule 54(b) and Motion For Entry of Judgment On Separate Document under Rule 58.  Dkt. # 44.  The Court allowed the DeCambre's motions.  Dkt. #s 45 and 46.   The parties submitted proposed judgments.  Dkt. #s  47 and 48.

## STATEMENT OF THE FACTS

DeCambre participated in the Section 8 Housing Choice Voucher Program administered by the BHA from 2005 to 2014.  App. 222, ¶ 5.  The BHA administers the Section 8 program on behalf of HUD under federal law.  App. 221, ¶ 1.

DeCambre was and is a person with disabilities who derives her income primarily from Supplemental Security Income ("SSI").  App. 222, ¶ 8.  She received $835.39 per month from SSI at the time of the case stated hearing in the lower court and even less at the time of her re-certification in August of 2013.  App. 486; App. 237.  DeCambre's disabilities include kidney disease, medullary sponge disease and/or Gittlemen's syndrome, severe hypokalemia, post traumatic stress disorder, torn labrum in hips and shoulder, elbow injuries, arthritis and a history of depression.  App. 361, ¶¶ 1, 4 and 5; App. 377-379; App. 379; App. 485, pp. 4-5 (Memorandum of Decision).

In 2010, DeCambre became the beneficiary of a special needs trust established by Suffolk Superior Court pursuant to 42 U.S.C. § 1396p(d)(4)(A). App. 222, ¶ 7. The trust was funded by settlements for personal injuries and property losses obtained by DeCambre. *Id*. In the fall of 2013, the BHA reviewed DeCambre's trust expenditures as part of a periodic re-certification. App. 223, ¶ 9. As of December 1, 2013, DeCambre's contribution to her, known as her "Total Tenant Payment," ("TTP") was $435.00, and the BHA paid a "Housing Assistance Payment" ("HAP") of $1,125.00. App. 241. On January 11, 2014, DeCambre received "Notice of Rent Adjustment," indicating the HAP, paid by the BHA on behalf of HUD, was reduced to $0.00, and DeCambre's TTP was increased to $1,560.00, the full contract rent. App. 255. In a letter that accompanied the "Notice of Rent Adjustment," the BHA indicated that the increase was based on expenditures from DeCambre's special needs trust. App. 257. DeCambre timely appealed the "Notice of Rent Adjustment" *Id*., App. 259. DeCambre and J. Whitfield Larrabee ("Larrabee"), her trustee and attorney, repeatedly took steps to notify the BHA that: 1) DeCambre is a person with disabilities, 2) that the assets and expenditures of DeCambre's special needs trust were excluded from income under HUD regulations, 3) that, by including trust expenditures in DeCambre's income, the BHA was discriminating against DeCambre by reason of her disability

7

in violation of state and federal law, and, 4) that DeCambre requested reasonable accommodations excluding her special needs trust expenditures so that she could participate in the Section 8 program and because of the physical and mental limitations resulting from her disabilities.  App. 237;  App. 245; App. 267-268; App. 282-283; App. 285; App. 288; App. 290; App. 430-432.  As part of the re-certification process, on November 12, 2013, Larrabee notified the BHA that DeCambre was a recipient of SSI, that she was a person with a disability, and that the trust expenditures should not have any effect on her Section 8 benefit. App. 245.  On February 7, 2014, Larrabee specifically requested reasonable accommodations, asking that the BHA exclude all trust expenditures in calculating DeCambre's income, and that it specifically exclude the cost of her car, which was needed as protection from heat due to her medical conditions.  App. 267-268, ¶¶ 11-14.  Larrabee stated: "the automobile was needed to prevent Mrs. DeCambre from overheating in the summer."  *Id*.  On March 14, 2014, Larrabee made a more detailed request for reasonable accommodation, supported by letters from DeCambre's physicians describing her disabilities and need for accommodations. App. 282-283; App. 288; App. 290.  In March 2014, DeCambre's physician verified that she has "numerous medical conditions that require her to have access to heat and central air conditioning to ensure temperature regulation" and that

8

require her to have access to cell phones and a lifeline in case of emergency. App.

290.  Also on March 14, 2014, Larrabee offered to allow the BHA to inspect over

500 pages of medical records detailing DeCambre's medical problems and

disabilities.  App. 387.   On July 17, 2014, Larrabee submitted on DeCambre's

behalf a Certification of Need For Reasonable Accommodation that he signed.

App. 367-387.  On July 18, 2014, the BHA notified Larrabee that it required

additional medical or expert certification of DeCambre's need for reasonable

accommodation by August 7, 2014.  App. 390.   In response, on August 6, 2015,

Larrabee provided a certification from DeCambre's physician that the requested

accommodations were needed "because of" her disabilities.  App. 428-432.  Her

physician certified that she needed the following reasonable accommodations

because of her disabilities: 1) exclusion of trust expenditures that have enabled her

to have automobiles and therefore avoid heat and cold; 2) exclusion of trust

expenditures for her cell phone that she needs to call for help in case of an

emergency when she is away from home; 3)  exclusion of trust expenditures for

her landline so that she can use lifeline and have access to help in case of an

emergency at home; 4) exclusion of trust expenditures so as to enable her to

participate in the Section 8 Program; 5) exclusion of expenditures on treatment,

care and boarding of cats as they provide emotional support to DeCambre and help

her in coping with the limitations resulting from her disabilities.  App. 430-432.

The BHA failed to make any accommodations in accordance with those identified

as necessary by her physician.  App. 213, ¶ 30.

On May 27, 2014, the BHA held a hearing on DeCambre's appeal.  App.

353.  The hearing officer limited the appeal to DeCambre's appeal of her "rent

calculation" in accordance with the notice of rent adjustment.  App. 353;

Accordingly, only the income between December 1, 2012 and November 30, 2013

was considered.  App. 188, n. 10; App. 124; App. 224, ¶ 14; App. 227, ¶ 23; App.

248-253; App. 255.  DeCambre presented evidence and argument that the

expenditures from the special needs trust should be excluded from her family's

annual income as a reasonable accommodation for her disabilities and based on

HUD regulations, excluding trust assets, lump sum settlements and "temporary,

nonrecurring or sporadic income" from annual income.  App. 248-253; App. 353.

DeCambre presented undisputed evidence that $37,601 of the 2013 expenditures

was for acquisition of automobiles to which the trust held title.  App. 251; App.

267, ¶ 11; The BHA argued that DeCambre's requests for a reasonable

accommodation to exclude as income the trust's vehicle, cell phone and landline

expenses, and expenditures for her cats were not reasonable.  App. 353, p. 3.

DeCambre also presented undisputed evidence that the trust was exclusively

10

funded with her lump sum settlements for personal injuries and property losses.

App. 266, ¶ 7. The undisputed evidence was that distributions from the trust were

solely of principal, and that there was no substantial interest income in the trust.

*Id*. The BHA argued that, based on a 2007 New England HUD advisory letter and

an email from a HUD employee, the lump sum settlement exclusion did not apply

and that DeCambre's other trust expenditures did not fall within the exclusions set

forth at 24 C.F.R. § 5.609(c). App. 452; App. 353. On June 9, 2014, the hearing

officer upheld the BHA's rent adjustment, based in part on the New England HUD

advisory letter and email, and also determined that the BHA correctly denied

DeCambre's reasonable accommodation request. App. 353, pp. 4-5.

On July 8, 2014, Larrabee sent an email to BHA's attorneys renewing her

requests for reasonable accommodation excluding all SNT expenditures,

requesting the BHA to reconsider its decision because of potential liability under

"federal anti-discrimination laws." App. 365. The BHA's Administrative Plan

provides that a hearing officer's decision is not binding on the housing authority if

it "[i]s contrary to HUD regulations or requirements, or otherwise contrary to

federal, State or local law." App. 315. The Administrative Plan also allows the

housing authority to overturn a hearing that was "upheld" if the reason for the

termination was discretionary. *Id*.

11

With the loss of her Section 8 subsidy on February 1, 2014, DeCambre fell behind on her rent and received a notice to quit in March of 2014.  App. 463, ¶ 2. App. 464.  By borrowing and depleting family assets, she was able to pay her rent but again fell behind on her rent in August and received another notice to quit. App. 463, ¶ 3; App. 466.  It was undisputed that, because of the lack of funds, DeCambre cut back on food purchases and did not have enough money for food, clothing, rent, utilities, drug co-payments, medical supplies, charges for over the counter drugs and other necessities.  App. 464, ¶ 7; App. 465-466.

The lower court independently consulted the website of the BHA and based its findings of fact and conclusions of law on income limits set forth on the website related to person's eligibility for admission to the Section 8 program. App. 492; App. 524.  DeCambre, who was a continuing participant in the Section 8 program, and was not applying to be admitted to the program, was not subject to the eligibility limits identified by the court.  App. 222, ¶ 5; App. 237-240.

## SUMMARY OF THE ARGUMENT

The BHA wrongly counted distributions of DeCambre's lump sum settlement money as "income" simply because she put the lump sum settlements into a special needs trust.  Under the BHA's logic (upheld by the lower court), had DeCambre not used a trust, and simply spent the money, the expenditures would

12

not have been counted, and DeCambre would still be eligible to receive her full

Section 8 subsidy.  As the lower court stated, "DeCambre could have taken her

personal injury settlement and placed it under her mattress,... from which she

could have freely used it for any purpose without reporting her expenditures as

Section 8 income." App. 503-504.   As explained below, a lump sum settlement

remains a lump sum settlement when put into trust, and HUD regulations exclude

lump sum settlements from income, whether they are put under a mattress,

deposited in the bank, or placed in a special needs trust. 24 C.F.R. § 5.609(c)(3).

People with disabilities such as DeCambre, who receive lump sums, must

use special needs trusts in order to remain eligible for Supplemental Security

Income ("SSI").  App. 221, ¶¶ 7-8.  Under the Social Security Act, only people

who have assets less than $2,000 or $3,000 can qualify for SSI.  20 C.F.R. §

416.1205.  However, under § 1396p(d)(4)(A), individuals with disabilities are

permitted to place their assets in a special needs trust and avoid this asset

limitation. 42 U.S.C. § 1396p(d)(4)(A).  Accordingly, when DeCambre received a

series of lump settlements as part of civil suit, she followed the procedure

established by Congress in creating a special needs trust and she then lawfully

placed the settlement funds in the trust so that she could continue receiving SSI.

App. 222, ¶ 7.

13

By excluding DeCambre from the Section 8 programs because of DeCambre's use of a special needs trust, the BHA engaged in disability discrimination in violation of the ADA, § 504, the FHA and G.L. ch. 93 § 103. 28 C.F.R § 35.130(b)(8). The lower court found that, under the interpretation given to HUD regulations by the BHA, "special needs trust beneficiaries like DeCambre are unfairly disadvantaged in regards to federal housing assistance simply by their choice to place their settlement funds in a special needs trust." App. 503.  The BHA failed to consider the unique dependence individuals with disabilities have on special needs trusts, and the BHA's practices denied DeCambre equal access to the Section 8 program and to housing in violation of state and federal law. App. 255; App. 257; App. 358.

The BHA further erred by failing to provide DeCambre reasonable accommodations.  Although DeCambre supplied medical proof of her need for reasonable accommodations excluding trust expenditures that were medically necessary on account of her physical and mental limitations, and she even provided her physician's certification that the accommodations were needed "because of" her disabilities, the BHA denied her requests.  App. 353; App. 430-432. The lower court erred in failing to conduct an individualized assessment of the DeCambre's right to reasonable accommodations and in failing to find that the

14

BHA violated the ADA, § 504, the FHA and G.L. ch. 93 § 103. 28 C.F.R §

35.130(b)(7).

Two other factors, one occurring at the BHA, and another in the lower

court, caused this case to go awry. The first error occurred when the BHA, without

explanation, decided to include the cost of the DeCambre trust's acquisition of two

automobiles for $37,601, in DeCambre's income, even though the trust held title

to the automobiles. App. 353. Nothing in HUD regulations allows trust principal

of this sort to be included in a participant's income. The lower court recognized

this obvious error in holding that the automobile expenditure should not be

included in DeCambre's income. App. 521.  The second error resulted from the

lower court independently gathering facts by visiting the website of the BHA.

App. 492.  The lower court took judicial notice of the eligibility criteria from the

BHA website. *Id*.  In doing so, the lower court selected eligibility criteria for

admission to the Section 8 program, 30% of the area's median income. *Id*. As a

continuing participant in the Section 8 program, DeCambre was subject to higher

eligibility criteria, 80% of the area's median income. 24 C.F.R. § 5.603(b); App.

222, ¶ 5; App. 237-240.  Based on its selection of the wrong eligibility criteria, the

lower court incorrectly found that DeCambre was not eligible for the Section 8

program, even with the exclusion of the cost of the automobiles. App. 492, App.

15

521, App. 523.   On the basis of these findings, the lower court incorrectly

concluded that the BHA did not violate the rent ceiling contained in the Housing

Act and it ruled against DeCambre on her claims under § 1983. App. 485-526.

## ARGUMENT

I.    STANDARD OF REVIEW

A.    Review of the Case Stated

The standard for appellate review of the lower court's decision on the

parties' case stated is one for clear-error; that is, the district court's factual

inferences should be set aside only if they are clearly erroneous, but, the court's

legal conclusions are reviewed de novo.  *United Paperworkers Intern. Union v.*

*Intern. Paper*, 64 F.3d 28, 31-32 (1st. Cir. 1995).

B.    Review Of Denial of Requests For Preliminary and Permanent
       Injunctions.

Review of the denial of DeCambre's requests for preliminary and permanent

injunctive relief is for abuse of discretion.  *Ross-Simons of Warwick, Inc. v.*

*Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir.1996).  The district court's answers to

abstract questions of law are subject to de novo review. *Goya Foods, Inc. v.*

*Wallack Mgmt. Co.*, 290 F.3d 63, 71 (1st Cir.), cert. denied, 537 U.S. 974, 123

S.Ct. 434, 154 L.Ed.2d 330 (2002). An error of law is always an abuse of

discretion. *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir.2003).

16

C.  Review Of The Hearing Officer's Decision.

In deciding DeCambre's cause of action under § 1983, the hearing officer's findings of fact in the lower court are reviewed under the "substantial evidence" standard.  *Ang v. Gonzales*, 430 F.3d 50, 54 (1st Cir.2005); Cf.  G. L. ch. 30A, § 14(7)(e) (applying substantial evidence standard to review of state agency decisions); 5. U.S.C. § 706(2)(E) (applying substantial evidence standard to review of federal agency decisions).

Questions of law, including interpretation of federal regulations, are subject to de novo review, both in the lower court and in this court, without deference to the conclusions of the local hearing officer.  *Seavey v. Barnhart*, 276 F. 3d 1, 9 (1st Cir. 2001).  No deference should ever be afforded a local agency's interpretation that is contrary to a federal statute or regulation. *Ritter v. Cecil County Office of Hous. & Community Dev.*,  33 F.3d 323, 328 (4th Cir.1994).  The decision of a hearing officer at a local agency interpreting federal statutes and regulations is not entitled to the deference afforded a federal agency's interpretation of its own statutes or regulations.  *Orthopaedic Hosp. v. Belshe*, 103 F. 3d 1491, 1495 (9th Cir. 1997).  The court should not defer to the local hearing officer's interpretations of federal law and regulations because neither the hearing officer nor the BHA are subject to Congressional oversight and they lack expertise

17

in interpreting and implementing federal law. *Amisub (PSL), Inc. v. State of Colorado Dept. of Social Services*, 879 F.2d 789 (10th Cir.1989), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 316 (9th Cir. 1988), cert. denied, 491 U.S. 905, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989). Furthermore, giving deference to local hearing officers' interpretations of federal regulations will inevitably result in a lack of coherent, uniform and consistent construction of federal law and regulations nationwide. *Turner v. Perales*, 869 F.2d 140, 141 (2nd Cir.1989). Deference to local housing agencies' interpretations of federal law and regulations will also necessarily lead to inconsistent application between different localities within the states.

The lower court erred in using an excessively deferential standard of review in evaluating the BHA's interpretation of HUD regulations. In deferring to the BHA, the Court cited *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). It specifically quoted *Chevron* as follows:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation . . . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. *Id*.

18

The lower court erred in giving the interpretation of the hearing officer *Chevron* deference because the BHA is not the administrator of HUD, and there is no indication that Congress has explicitly left a gap for a local officials to fill.  It is not the purview of a local hearing officer to interpret federal law and regulations. The case by case determinations made by the staff of a local housing agency have none of the stature afforded regulations and other interpretive guidelines issued by cabinet level leaders of federal agencies and other ranking federal policy-makers.

The lower court,  in applying the *Chevron* rule to the decision of the BHA, erred in concluding that the BHA's interpretation was reasonable.  App. 504. *Chevron* only prohibits the court from substituting its own construction for the interpretation made by the agency if it is "reasonable." *Id*. While much of the remainder of this brief explains why the BHA's decision was not reasonable, the lower court itself listed a number of concerns that lead to the conclusion that including distributions of lump sum settlements forming the principal of self-settled special needs trusts in the income of Section 8 participants is quite unreasonable.  The lower court:

- acknowledged the underlying problem of losing housing benefits due to use of a special needs trust designed to protect needs-based benefits;

19

- acknowledged that if DeCambre had put her lump sum settlements under her mattress, the withdrawal of them would not be counted as income, and,

- held that "special needs trust beneficiaries like DeCambre are unfairly disadvantaged in regards to federal housing assistance simply by their choice to place their settlement funds in a special needs trust.

App. 502-503.

## II. THE BHA VIOLATED HUD REGULATIONS IN DETERMINING DECAMBRE'S ADJUSTED ANNUAL AND MONTHLY INCOME.

### A. Lump Sum Settlements Were Not Excluded from DeCambre's Annual Income

HUD specifically excludes lump sum additions to family assets in the calculation of Annual Income.  HUD regulations provide in relevant part: Annual income does not include the following:...(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and settlement for personal or property losses (except as provided in paragraph (b)(5) of this section). 24 C.F.R. § 5.609(c)(3).  Except for de minimus interest, all of the funds contained in the DeCambre SNT were derived from "lump sums received as part of her personal injury and property damage suit" and therefore fall within the

20

exclusion set forth at 24 C.F.R. 5.609(c)(3).  App. 266, ¶ 7; App. 490.

The lower court erroneously concluded that the BHA could include DeCambre's

lump sum settlements in her annual income based on 24 C.F.R. § 5.603(b)(2),

which provides:

> In cases where a trust fund has been established and the
> trust is not revocable by, or under the control of, any
> member of the family or household, the value of the trust
> fund will not be considered an asset so long as the fund
> continues to be held in trust. Any income distributed
> from the trust fund shall be counted when determining
> annual income under § 5.609. *Id.*

In making its determination, the lower court erred in failing to draw a distinction

between assets, principal and income.  App. 502. Although the trust fund is not

considered an asset, "any income distributed from the trust fund shall be

counted..." Id.  Importantly, not all distributions are counted, only "income" that

is distributed is counted.  Id.  Income includes, among other things, "interest,

dividends, and other net income of any kind from real or personal property." 24

C.F.R. § 5.609(b)(3).   The lump sum settlements deposited in the DeCambre's

trust did not meet this definition.   App. 266, ¶ 7; App. 302, ¶ 7.  The lump sum

settlements, at the time they were deposited in the trust, were assets, not income.

The lower court recognized this in holding, "DeCambre could have taken her

personal injury settlement and placed it under her mattress, Finley Op. 6, from

which she could have freely used it for any purpose without reporting her expenditures as Section 8 income." App. 503-504. The hearing officer also concluded that DeCambre's settlements were assets that were excluded from income. App. 353. Because the funds were not income when placed in the trust, the funds were not income when they were disbursed from the trust as that term is intended under § 5.603(b)(2).

The logical purpose of § 5.603(b)(2) is to ensure that income that is simply passed through a irrevocable trust shall be included in annual income and that any interest and dividends produced by the trust should be included in annual income. *Id*. Accordingly, to the extent that DeCambre's Trust produced and distributed interest or dividends, or that DeCambre tried to pass other money that met the definition of income under § 5.609 through the trust, the BHA was required to include this in income under HUD regulations. 24 C.F.R. § 5.609(b)(3), *Finley v. The City of Santa Monica, et. al.*, Superior Court of California, BS127077 (2011); App. 271. Here, however, the un-rebutted evidence was that "[b]ecause Mrs. DeCambre had no substantial interest income on the trust, all of the disbursements were from the principal and none can be counted as income...." App. 266, ¶ 7.

The construction of § 5.603(b)(2), to exclude from income lump sums distributed from a trust, is consistent with 24 C.F.R. § 5.609(b)(3), because the

22

placement of the lump sum asset in a trust involves the investment of the money in a trust within the meaning of HUD's regulations.  Under § 5.609 (b)(3), "Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family."  *Id*.  DeCambre's trust expenditures were merely a re-imbursement of cash that was invested by DeCambre, and should not have been included in DeCambre's income.

B.    A Lump Sum Is Not Converted To Income Simply By Being Placed In A Trust

The hearing officer erroneously concluded that the lump sum settlements ceased being lump sums when they were "converted" into a special needs trust, despite the fact that none of the relevant HUD regulations provide or make reference to property being "converted" in these circumstances.  App. 355.  This concept that lump sums are "converted" when placed in a trust was invented out of whole cloth by the BHA hearing officer.  *Id*.  In addition to being baseless, the theory that property placed in a trust is "converted" in this manner is illogical.  Things do not normally lose their inherent properties simply by being moved into a trust.   An automobile placed in a trust remains an automobile.  A stock certificate placed in a trust remains a stock certificate.  For the same reason, a "settlement for personal injury or property losses" placed in a trust remains a

"settlement for personal injury or property losses" under § 5.609(c)(3), and is excluded from income.  24 C.F.R. § 5.609 (c)(3).  The lower court's ruling for the BHA, based on the lack of "regulatory support" that DeCambre's "Trust corpus remained a lump-sum settlement" was not reasonable.  App. 510.  Whether a property is a settlement relates to its origin to a recipient.  Because the origin of a settlement to a recipient does not change, it is not reasonable to assume that it changes when placed in a trust, where, as here, HUD regulations are silent on the matter.

> C.    It Was Clear Error To Include Trust Expenditures In DeCambre's Income Where They Did Not Satisfy The Definition Of Income Under § 5.609(a)

In a well reasoned decision, a California court concluded that a distribution of principal from a irrevocable trust is not annual income as defined by § 5.609(a) where the principal, composed of a lump sum settlement, is excluded from annual income under § 5.609(c)(3). *Finley*, *supra*; App. 335.  In order for trust expenditures to qualify as income to DeCambre, § 5.609(a) requires that the expenditures "Go to, or on behalf of, the family head or spouse (even if temporarily absent) or to any other family member…and" are "not specifically excluded in paragraph (c) of this section."  24 C.F.R. § 5.609(a)(1) and § 5.609(a)(3).  While the expenditures satisfied the requirement of § 5.609(a)(1), in

24

that they benefitted DeCambre, they did not satisfy the requirement of §

5.609(a)(3) because they fell under the exclusion set forth at § 5.609(c)(3).

Because both requirements were not met, it was error for the hearing officer to

uphold BHA's inclusion of trust expenditures in DeCambre's income and it was

error for the lower court to affirm the hearing officer's determination. *Finley*,

*supra*.

In construing § 5.603(b)(2) , the lower court erroneously concluded that the

lump sum settlement exclusion under § 5.609(c)(3) was inapplicable because

"nothing in the regulations instruct that certain exclusions prevail over income

inclusions."  App. 502.  Contrary to the lower court's conclusion, the definition of

annual income set forth in § 5.609(a) does provide that the exclusions in §

5.609(c) prevail over what would otherwise be considered income. The

regulation's specification that annual income is all amounts that benefit the family

members and that are not excluded under 24 C.F.R. § 5.609(c) indicates that the

exclusions prevail over monetary amounts received.  24 C.F.R. § 5.609(a)(1) and

§ 5.609(a)(3).  The judge in *Finle*y was able to easily reconcile § 5.603(b)(2) with

§ 5.609 by concluding that expenditures of principal under a special needs trust

"must be 'counted' in the annual income calculation as funds benefitting the

family head under § 5.603(b)(2), but they remain excluded under section

5.609(c)." *Finley*, supra; App. 343.

> D.    HUD Guidance Did Not Provide A Basis For The BHA's
>        Decision

The hearing officer's decision cannot stand because it was based on an

erroneous reading of HUD guidance as set forth in an advisory letter and email

from the New England HUD office.  The hearing officer concluded that "the BHA

followed HUD regulations and guidance regarding SNTs as stated in New

England PIH Advisory Letter dated April 18, 2017 (sic) and in HUD Portfolio

Management Specialist, Benjamin Palmer 's April 20, 2012 correspondence to

Carole Brown..."[1] App. 355.  While the 2007 Advisory Letter states, "Distributions

from the trust will be counted when determining income under 24 CFR 5.609," it

also states that "[n]ot all distributions from a SNT should be counted toward an

applicant's annual income."  App. 452-453.  In particular, the advisory letter,

which is exclusively focused on "Special-Needs Trusts (SNT) Disbursements,"

states that "Annual Income does not include items such as income

from....Lump-sum additions to family assets, such as...settlement for personal

---

[1] The Benjamin Palmer letter does not address the issue of excluding
settlements from income and does not seem to provide any guidance on this issue
beyond that contained in the New England PIH Advisory Letter.  App. 351; App.
452-454.

injury or property losses." *Id*. The reference to the § 5.609(c)(3) exclusion, in context letter focused on "Special-Needs Trusts (SNT) Disbursements," indicates that the exclusion does apply to disbursements from a Special needs trusts, as there is no other reason to mention the exclusion in this context. App. 452-453. Based on the record evidence, was error for the lower court to affirm the unfounded and erroneous conclusions of the hearing officer.

The lower court erred in concluding that, "because there is no guarantee of reimbursement from the excess principal upon a beneficiary's death, HUD chose to impose a more stringent income requirement on federal housing voucher participants." App. 507. The lower court looked to a statement in the New England HUD advisory letter, which states that "Unlike Medicaid, HUD is not reimbursed for benefits provided with excess trust corpus at the end of the beneficiary's lifetime; this accounts for some differences in the treatment of SNT income between the HUD and Medicaid regulations." App. 506-507. While this distinction might provide a reason for HUD to treat some SNT expenditures differently than Medicaid would, it provides no reason whatsoever for the HUD to target individuals who happen to use special needs trusts or other irrevocable trusts for less favorable treatment than other individuals who receive lump sums. Reliance on this distinction is speculative and unreasonable.

27

E.    The BHA Violated HUD Regulations by Including
      "Temporary, Nonrecurring or Sporadic Income (Including
      Gifts)" in Decambre's Income.

The BHA erred in failing to exclude numerous "temporary, nonrecurring or

sporadic" expenditures made by DeCambre's trust from her annual income as

required by the income exclusion set forth at 24 C.F. R. §5.609(c)(9). In the year

under review, there were two travel expenses for DeCambre, $3,875.12 on

February 13, 2013, and $2,366.80 on March 26, 2013, that should have been

excluded as sporadic income.  *Id*; App. 250-251.   Excepting a $50 reimbursement

for a luggage fee on April 10, 2013, related to the earlier travel, there no other

expenditures for travel in the record.  App. 250.  These expenditures, which were

irregular, scattered, isolated, occasional and infrequent, met the common

understanding of the sporadic and were thus improperly included in DeCambre's

income.

DeCambre had sick cats that required cancer treatment.  App. 249.  In his

affidavit submitted to the BHA, DeCambre's trustee stated, "DeCambre's pet

required emergency veterinary treatment. By its nature, veterinary treatment is

temporary."  App. 267, ¶ 9.  There was no evidence that the veterinary care was

more than temporary.  The $3,806.21 in expenditures on the cats should have been

excluded as temporary. *Id*; 24 C.F. R. §5.609(c)(9).   The automobile purchase

28

occurred on one date, May 29, 2013, and was effectuated by a single $37,601

check payment.   App. 251; App. 267, ¶ 11.  Since the expenditure did not recur,

and it was not shown that it was likely to recur in 2014, the expenditure fell under

the exclusion for nonrecurring income or sporadic income set forth at 24 C.F. R.

§5.609(c)(9).  According to the New England HUD office, "[t]hose amounts and

expenditures that do not fall under an exclusion or deduction are presumed by the

regulations to be available for housing expenses and are therefore counted toward

annual income."  App. 453.   As the automobile expenditure was not the type of

payment that either recurred or was likely to recur, it was unreasonable to presume

that it would be available for housing expenses, and consequently this type of

expenditure is excluded from annual income by HUD.  24 C.F. R. §5.609(c)(9).

There was a single $3,549 expenditure on automobile insurance on June 19, 2013.

App. 251.   This expenditure should also have been excluded as non-recurring and

sporadic.  *Id*.  Although the trial court ordered the BHA to reconsider many of

these expenditures, the BHA has evaded complying by with the Court's

instructions by appealing this order and refusing to reconsider. App. 528; App.

591, ¶ 8.  DeCambre submits that the BHA must not only be compelled to comply

with the Court's order, but that the Court must find that the improper inclusion of

these expenditures in DeCambre's income resulted in a violation of the rent ceiling

set forth at 42 U.S.C. § 1437f(o)(2).

      F.    The BHA Violated HUD Regulations by Including Necessary
             Medical Expenses in Decambre's Income.

The inclusion of trust expenditures for the trust's automobile purchase, for

DeCambre's cell phone and landline, and for the care and support of DeCambre's

pets violated 24 C.F. R. § 5.609(c)(4). § 5.609(c)(4) excludes from annual income:

"Amounts received by the family that are specifically for, or in reimbursement of,

the cost of medical expenses for any family member." *Id.*  This exclusion of

income under The Housing Act overlaps with DeCambre's requests for reasonable

accommodation under state and federal anti-discrimination laws, as discussed,

infra.  Reasonable accommodations required by state and federal laws prohibiting

discrimination against individuals with disabilities fall within the exclusion for

medical expenses in the instant case. 24 C.F. R. § 5.609(c)(4).

      III.    THE BHA IS LIABLE UNDER 42 U.S.C. §1983 FOR VIOLATING
              THE RENT CEILING SET FORTH AT 42 U.S.C. § 1437f(o)(2).

          A.    The Basis for Decambre's Claim That the BHA Violated
                 § 1983

In order for DeCambre to prevail, on her claims under 42 U.S.C. § 1983,

against the BHA, she must show that the BHA, acting under color of law, deprived

her of a right secured by a federal statute.  *Wright v. Roanoke Redevelopment and*

*Housing Authority*, 479 US 418, 423-424 (1987)(by violating the rent ceiling for public housing tenants set forth in the Brooke Amendment of the Housing Act, the defendant violated § 1983.) "[P]rivate individuals may bring lawsuits against state actors under 42 U.S.C. § 1983 to enforce not only constitutional rights but also rights created by federal statutes." *Johnson v. Housing Authority of Jefferson Parish*, 442 F. 3d 356, 359 (5th Cir. 2006)(referring to *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)). However, to enforce a violation of a federal statute by means of § 1983, the statute must "unambiguously give rise to privately enforceable, substantive rights." *Johnson v. Housing Authority of Jefferson Parish*, *supra*.

The BHA violated DeCambre's unambiguous right under 42 U.S.C. § 1437f(o)(2) not to be required to pay more than 30% of her adjusted family income in rent in violation of the "rent ceiling" set forth at § 1437f(o)(2)(A)(i), and this gives rise to an enforceable claim under 42 U.S.C. § 1983. The Fifth Circuit has found that when a housing authority violates the rent ceiling set forth at § 1437f(o)(2), tenants have an unambiguous right under the Housing Act that they may enforce by means of a private suit under § 1983. *Johnson v. Housing Authority of Jefferson Parish*, *supra*. Furthermore, the Supreme Court has found that public housing tenants, under the similar provisions of 42 U.S.C. § 1437a(a), have a private right of action under § 1983 for violations of the rent ceiling

31

provisions set forth in the Brooke Amendments.  *Wright ,* 479 U.S. 418.  Other

court's have reached similar outcomes in analogous circumstances.  *Daniels V.*

*Housing Auth. Of Prince George's Cty.*, 940 F. Supp. 2d 248, 259 (Dist. Maryland

2013)(right to properly calculated subsidy found under the Homeownership

Option of the Housing Choice Voucher Program at 42 U.S.C. § 1437f(y));  See

Also, *Farley v. Philadelphia Housing Authority*, 102 F. 3d 697  (3rd Cir. 1996) (§

1983 held to be appropriate means to enforce right to rent abatement and repair of

apartment under the Housing Act, 42 U.S.C. § 1437d(k)) .

In addition to incorrectly including expenditures of trust principal as

income, the BHA violated the rent ceiling by improperly including trust property

in DeCambre's income (automobiles), and by failing to exclude trust expenditures

from income as required by exclusions set forth at 24 C.F.R. § 5.609(c).  The

BHA's erroneous inflation of DeCambre's annual income resulted in the

elimination of DeCambre's Section 8 subsidy and the requirement that she pay

more than 30% of her monthly adjusted family income in rent, in violation of the

rent ceiling imposed by § 1437f(o)(2) and the regulations of the Department of

Housing and Urban Development (HUD) implementing the Section 8 Program. 24

C.F.R. § 5.628.

B.    The BHA Improperly Included Trust Property (Automobiles)
In DeCambre's Annual Income With The Result That It
Violated The Rent Ceiling.

The lower court correctly found that the DeCambre trust's $37,601

automobile purchase should not be included in DeCambre's income because title

was held by the trust as an asset.  App. 521-522.  It was plainly erroneous and

inconsistent with HUD regulations for the BHA to include the value of

automobiles owned by DeCambre's SNT in her income.  24 C.F.R. §§ 5.603

(b)(2), 5.609(a), 5.609(c)(3), 5.609(c)(4), 5.609(c)(9); App. 353-356.  No HUD

regulation provides for the inclusion of any part of the principal of a

non-revocable trust in the income of Section 8 participants, and the regulations

defining income do not encompass trust principal.  In relevant part, 24 C.F.R. §

5.603(b)(2) provides:  "income distributed from the trust fund shall be counted

when determining annual income under § 5.609." *Id*.  On May 29, 2013, the trust

obtained title to two automobiles by payment of $37,601 by check.  App. 251;

App. 267, ¶ 11.  One automobile was sold, with the funds of the sale returned to

the trust bank account.  App. 11, ¶ 2.  The money expended by the trust to acquire

ownership of the automobiles was neither "income" as that word is defined by

HUD, nor was it "distributed from the trust" within the meaning of § 5.603 (b)(2),

and therefore, it should not have been included in DeCambre's income.  24 C.F.R.

33

§§ 5.603 (b)(2); 24 C.F.R. § 5.609(a). The exchange of money for an automobile involves a distribution within the trust, not a distribution "from the trust." In purchasing the automobiles, money was taken out of the trust, but commodities of equal value were returned. No value was distributed from the trust to DeCambre in this situation. The term "annual income" is defined as all amounts, monetary or not, which: (1) Go to, or on behalf of, the family head. . . and (3) which are not specifically excluded in section 5.609(c). 24 C.F. R. §5.609(a). Because the value of the automobile and title to it remained within the trust, and did not move from the trust to DeCambre, it did not "go to" DeCambre. Because the value of the automobile did not "go to" DeCambre, it was not income within the meaning of §5.609(a). *Id*. Where one automobile remains an asset of the trust, and proceeds from the sale of the other automobile are held in the trust bank account, the expenditure on the automobiles does not fit within the definition of income under §5.609(a). 24 C.F.R. § 5.609 (a).

Based on the erroneous inclusion of the value of automobiles in DeCambre's income, the rent ceiling was violated. 42 U.S.C. § 1437f(o)(2). With the exclusion of $37,601 for the automobile purchase from DeCambre's income, the maximum TTP allowable under § 1437f(o)(2), 30% of DeCambre's adjusted

34

monthly family income, was $930.62. *Id.*[2]  By establishing DeCambre's TTP at $1,560, the BHA set her TTP at more than 50% of her family's adjusted monthly income, thereby violating the rent ceiling.  The lower court erred in failing to conclude, based on its own findings and conclusions that the cost of the automobiles were excluded from DeCambre's income, that the BHA violated the rent ceiling and § 1983.

> C.    By Failing To Exclude Lump Sums, Medical Expenses, and Temporary, Sporadic or Nonrecurring Income (Including Gifts) From DeCambre's Annual Income, The BHA Violated The Rent Ceiling.

As previously discussed, the BHA unlawfully failed to exclude lump sums, medical expenses, and temporary, sporadic or nonrecurring income (including gifts) from Decambre's annual income.   The BHA's failure to exclude all trust expenditures under 24 C.F. R. § 5.609(c)(3) as lump sums resulted in a 350% increase in DeCambre's rent contribution, and an obvious violation of the rent

---

[2] Based on the lower court's findings, DeCambre's TTP could not be higher than $930.62 calculated as follows: $12,397.00 (annual income) - $400 (deduction for disabled family under 24 C.F.R. § 5.611(a)(2)) + $62,828.99 (amount of trust expenditures and assets attributed to DeCambre's income by the BHA) - $37,601 (automobile purchase) = $37,224.99 (adjusted annual family income) ÷ 12 = $3,102.08 (adjusted monthly family income) × .30 = $ 930.62.

ceiling.[3]  In combination with its erroneous inclusion of trust property in
DeCambre's income, the unlawful inclusion of medical expenses, and temporary,
sporadic or nonrecurring income in her income inflated her annual income and
caused her to pay more than 30% of her monthly income in rent in violation of the
rent ceiling. 24 C.F. R. § 5.609(c)(4); 24 C.F. R. § 5.609(c)(9).

### IV.    THE LOWER COURT ERRED IN CONDUCTING AN INDEPENDENT INVESTIGATION, WITHOUT NOTICE TO THE PARTIES, AND IN TAKING JUDICIAL NOTICE OF THE WRONG INCOME ELIGIBILITY LIMITS

The lower court erred when, in writing its decision, it independently
consulted the website of the BHA, took judicial notice of the wrong eligibility
criteria from the site, and based its findings of fact and conclusions of law on the
wrong criteria.  Citing the web page of the BHA, the lower court found that "the
BHA's yearly gross household income limit for a two-person household is
$22,600."  App. 492;  http://www.brooklinehousing.org/sect8.html.[4]   Based on
the eligibility limit for initial admission to the Section 8 program set forth on the

---

[3] If all trust expenditures were excluded from DeCambre's annual income
based on the lump sum exclusion, DeCambre's TTP should not have exceeded
$299.92, calculated as follows: $12,397.00 (annual income) - $400 (deduction for
disabled family under 24 C.F.R. § 5.611(a)(2)) = $11,997.00 (adjusted annual
family income) ÷ 12 = $999.75 (adjusted monthly family income) × .30 = $299.92.

[4] The BHA was incorrect when it stated on the website the $22,600
eligibility limit for admission to the Section 8 program was the "very low income"
limit.  DeCambre contends this is the "extremely low income" limit.

website, the lower court concluded "that DeCambre's income, as calculated by the

BHA, exceeded the outlined limits of Section 8 housing eligibility."  App. 524.

DeCambre was subject to the eligibility limit for families "<u>continuously assisted</u>"

in the Section 8 program.   24 C.F.R. § 982.201(b)(1)(ii); 24 C.F.R. § 5.603(b);

App. 222, ¶ 5;  App. 237-240.  This limit is set by HUD at 80% of area median

income, or according to HUD, $52,400 for Brookline in 2014.  24 C.F.R. §

5.603(b); 24 C.F.R. § 982.201(b)(1)(ii); Economic and Market Analysis Division,

HUD, *FY 2014 Income Limits Summary For Brookline, Massachusetts*,

http://www.huduser.org/portal/datasets/il/il14/index.html (HUD's online tool at

this URL provides eligibility limits by area); Quadel Consulting Corp., *Housing

Choice Voucher Program Guidebook* § 5.2, (2001).

http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_11749.pdf.  The

lower court's factual findings and conclusions based on the wrong eligibility limit

were clearly erroneous and were improperly based on incorrect information that

was outside of the agreed upon record.  Errors of this sort "invariably" have been

held to be "reversible error." *Gordon v. United States*, 178 F. 2d 896, 901 (6th Cir.

1949).  The lower court missed the crux of the issue in the case, violation of the

rent ceiling, and was led astray, by its unnecessary focus on the eligibility limit, a

matter that was not even addressed in the informal hearing.  App. 353-356.

V.     THE BHA DISCRIMINATED AGAINST DECAMBRE BY
       REASON OF HER DISABILITY

    A.     The Basis For DeCambre's Claims of Discrimination

DeCambre's claims of disability discrimination are based in particular on

two theories of liability: 1) that the BHA unlawfully denied of her requests for

reasonable modification of its rules, policies, practices, and methods of

administration with the result that it, a) excluded her from the Section 8 program,

b) denied her the full and equal benefits of the Section 8 program, and, c) denied

her an equal opportunity to use and enjoy housing, and, 2) that the BHA imposed

or applied eligibility criteria that, by reason of her disabilities, unlawfully

excluded her from the Section 8 program, denied Section 8 benefits, and deprived

her of equal use and enjoyment of housing .  42 U.S.C. §§ 12131(2), 12132; 28

C.F.R § 35.130(b)(7);  28 C.F.R § 35.130(b)(8); 42 U.S.C. § 3604.

More generally, DeCambre contends that the BHA violated three distinct

clauses in Title II's core anti-discrimination provision that protects people with

disabilities from being 1) "excluded from participation in . . . the services,

programs, or activities of a public entity"; (2) "denied the benefits of the services,

programs, or activities of a public entity"; and (3) "subjected to discrimination" by

a public entity. See 42 U.S.C. § 12132. The third "catch-all" clause can fairly be

read to cover discrimination against a recipient of "services, programs, or

38

activities" offered by a public entity, and tends to broaden the breadth of the statute. *Currie v. Group Insurance Commission*, 290 F.3d 1, 6-7 (1st Cir. 2002). It is undisputed that the BHA discriminated against DeCambre based on her use of a special needs trust. App. 353-355. Discriminating soley the basis of an individual's use of a special needs trust by definition discriminates by reason of disability; for it is the fact of an individual's disability that is required for a person to have a special needs trust. 42 U.S.C. § 1396p(d)(4)(A).

This case concerns Title II, commonly referred to as the public services portion of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.  § 12131(2), in pertinent part, defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices...meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. Id. (emphasis added).

In addition to her claims for disability discrimination in violation the ADA, DeCambre has brought claims for violation of § 504, the FHAA, G.L.ch. 151B and G.L. ch. 93 §103.  Except as explicitly indicated in this brief, DeCambre contends

39

that these statutes can be analyzed in tandem, and that a violation of any one of the statutes amounts to a violation of all the statutes. *Cox v. New England Telephone & Telegraph Co.*, 414 Mass. 375, 382 (1993)(in the area of disability discrimination, the court looks to decisions under § 504, and analysis of a discrimination claim under state and federal law is essentially the same).

In the case of Massachusetts anti-discrimination laws, DeCambre asserts that the BHA is liable for violating G. L. ch. 93 § 103 ("MERA"), or, in the alternative, G. L. ch. 151B. G. L. ch. 93 § 103; G.L. ch. 151B §§ 4(3C), 4(7A)(2), 4(10); Lopez v. Commonwealth, 463 Mass. 696, 715 (2012). MERA, more readily than ch. 151B, encompasses the plaintiff's claims in the present case, because it incorporates Article 114 of the Amendments to the Massachusetts Constitution, which provides: "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." G. L. ch. 93 § 103; art. 114 of the Amendments to the Constitution of the Commonwealth. Article 114 mirrors § 504. MERA and ch. 151B potentially provide more expansive remedies, including punitive damages and damages for emotional distress, than do some of DeCambre's federal claims. G.L. ch. 151B § 9; G.L. ch. 93 § 103.

In disability discrimination cases, a plaintiff "may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable Accommodation." *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002).  DeCambre proceeded under all three theories at trial, and now does so on appeal.  App. 23; App. 85-86, App. 105-106.

      B.    The BHA Discriminated Against DeCambre By Reason Of Her Disabilities By Failing To Make Reasonable and Necessary Modifications To Its Policies, Practices, Methods of Administration, Rules and Procedures

The BHA, in failing to make modifications to its rules, policies, methods of administration and practices, has unfairly and unnecessarily excluded DeCambre from the Section 8 program because of her disability, it has unfairly relegated her to an inferior status in society, it has caused her economic disadvantage, and it has caused her psychological harm, contrary to the purposes of the ADA, § 504, the FHAA, G.L.ch. 151B and G.L. ch. 93 § 103.  App. 463-466; App. 360-363.

The Attorney General, at the instruction of Congress, has issued regulations implementing Title II. 42 U.S.C. § 12134(a).  The Title II regulation that sets forth the duty of a public entity to reasonably accommodate the disabled provides:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

Failure to grant a request for a reasonable modification is an independent basis for liability under Title II, § 504, the FHA, ch. 151B and ch. 93 § 103. *Nunes v. Massachusetts Dept. Of Correction*, 766 F. 3d 136, 145 (1st Cir. 2014); *Alexander v. Choate*, 469 U.S. 287, 301 (1985). DeCambre's right to reasonable accommodation under state law arises under the Massachusetts Equal Rights Act, G. L. Ch. 93 § 103, and G.L. ch. 151B §§ 4(3C), 4(7A)(2), 4(10); *In re McDonough*, 457 Mass. 512, 522 (2010). App. 86-87; App. 105-106 (Amended Complaint).

To prevail on a claim for denial of reasonable modifications under Title II of the ADA, ch. 151B, § 504 and ch. 93 § 103, a plaintiff generally bears the burden of establishing: (1) that the defendant is a "public entity"; (2) that the plaintiff is a person with a "disability"; (3) that the plaintiff is "qualified" to participate in or receive the benefits of the defendant's services, programs, or activities; (3) that the plaintiff informed the defendant of his or her disability and requested a modification of the defendant's rules, policies or practices (or that the

42

plaintiff's disability and need for a modification was obvious); (4) that the

requested modification was "reasonable"; (5) that the defendant nonetheless

refused; and (6) that, as a result, the plaintiff was not able to "to participat[e] in" or

enjoy "the benefits of the [defendant's] services, programs, or activities," or was

otherwise "subjected to discrimination." 42 U.S.C. §§ 12102, 12131, 12132;

*Kiman v. N.H. Department of Corrections*., 451 F.3d 274, 283 (1st Cir. 2006);

*Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258 (1st Cir. 2001) (Title I

"reasonable accommodation" case); *Higgins v. New Balance Athletic Shoe, Inc.*,

194 F.3d 252, 265 (1st Cir. 1999) (Title I "reasonable accommodation" case);

*Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 152 (1st Cir. 1998).

1. The BHA Is a Public Entity Subject to State and Federal Anti-discrimination Laws.

It is undisputed that the BHA is a public entity and recipient of federal

funds that is subject to both the ADA and § 504.  App. 221, ¶ 1; App. 85, ¶ 3

(Complaint); App. 210, ¶ 3 (Answer); App. 488.

2. Decambre Is a Person with a Disability.

It is agreed that DeCambre is a person with a disability and that the primary

source of her income is Supplemental Security Income ("SSI") which she receives

from the Social Security Administration as a person with disabilities.  App. 222, ¶

8.

43

3.     DeCambre Is "Qualified" To Participate In The Section 8
Program Administered By The BHA.

DeCambre is "qualified" because she met "the eligibility requirements for

...for the receipt of services or the participation in programs or activities provided

by" the BHA with or without reasonable modifications to its rules, policies, or

practices.  42 U.S.C. § 12131(2).   When DeCambre existed only on her meager

income from social security, about $835.39 per month, she was permitted to

participate in the Section 8 program as administered by the BHA for many years.

App. 222, ¶ 8; App. 488.  The basis given by the BHA hearing officer for

upholding the decision to raise DeCambre's TTP and thereby terminate her

subsidy was the expenditures from the special needs trust.   App. 355-356.

Accordingly, but for the expenditures from her special needs trust, her TTP would

not have been increased, her subsidy would not have been terminated, and she

would not have been rendered ineligible for the Section 8 subsidy.  *Id*.; App. 358.

4.     DeCambre Informed The BHA of Her Disabilities and
Repeatedly Requested Modifications.

Based on DeCambre's numerous written requests, the undisputed evidence

establishes that the BHA knew of DeCambre's disabilities and her requests for

reasonable modifications of its rules, policies, practices and procedures. App.225,

¶¶ 18-20, App. 225-226, ¶ 22 App. App. 229, ¶ 28- 31; App. 245-246, App. 266-

269; App. 282-283; App. 290; App. 369-370; App. 372; App. 377-394, App. 428-432.

> 5. The Modifications Requested By DeCambre Were Reasonable.

In order to meet her burden to a proposed "reasonable" modification, a plaintiff must show that the proposed modification would enable her to have access to the services, activities or programs provided by the public entity and "at least on the face of things, it is feasible for the [the public entity] under the circumstances."[5] *Reed*, 244 F. 3d at 259. (addressing the burden of an employee under Title I of the ADA).

The factual findings of the lower court established that many of the accommodations requested by DeCambre were feasible and reasonable. App. 519-522. The lower court found that several of the accommodations requested by DeCambre, such as excluding expenditures for the care of her emotional support animals, seemed to have been made in accordance with HUD's handbook or regulations, and should have been excluded from the BHA's calculation of her income. App. 520-522. The lower court found that the acquisition of automobiles

---

[5] Under the Fair Housing Act, a reasonable accommodation is a change in a rule, policy, practice, or service that may be necessary to allow a person with a disability the equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

by the trust could not be included in income under HUD regulations.  App. 521.

The lower court also found that expenditures for costs to maintain a telephone

line, internet connection and cable television "seem to fall under acceptable

expenditures."  Id.  The judge identified DeCambre's travel costs as expenditures

that "could also fall within allowable SNT expenditures" which would exclude it

from annual income.  App. 520-522.  The requested accommodations were

feasible and reasonable because the lower court found grounds by which the BHA

could lawfully exclude most or all of the trust expenditures, and the requested

accommodations were of a type ordinarily made in the run of cases.  *Id.*,  *Reed*,

244 F. 3d at 259 (1st Cir. 2001); *U.S. Airways v. Barnett*, 535 U.S. 391, 401-402

(2002).

　　While the lower court made some assessment of whether expenditures were

excluded under  24 C.F.R. § 5.609(c)(9) as temporary, nonrecurring or sporadic

income, it appears to have given very little consideration to the question of

whether DeCambre's requests for accommodations were reasonable.  App. 516-

518. It is "essential" that a court make an "individual assessment of the facts" in

determining whether a requested accommodation is reasonable.  *Garcia-Ayala v.*

*Lederle Parenterals, Inc.*, 212 F. 3d 638, 647 (1st Cir. 2000); see also, *PGA Tour,*

*Inc. v. Martin*, 532 U.S. 661, 688 (2001).  In determining that "the BHA did not

46

act in a discriminatory manner and that DeCambre's discrimination claims against

the BHA cannot stand," the lower court failed properly consider in its opinion

whether DeCambre's requests for modification were reasonable or whether a

reasonable modification of the BHA's rules, policies, practices or activities would

have enabled her to equally participate in the Section 8 program or have equal

opportunity in housing.  App. 516-518.

The exclusion of expenditures necessary to accommodate DeCambre's

disabilities were feasible and were required by HUD regulations promulgated

pursuant to the Housing Act, § 504 and the FHAA.  24 C.F.R. § 5.609(c)(4); 24

C.F.R. §100.204(a); 24 C.F.R. § 8.4, et. cet., 24 C.F.R. § 8.33.   HUD regulations

exclude from annual income: "Amounts received by the family that are

specifically for, or in reimbursement of, the cost of medical expenses for any

family member." 24 C.F.R. § 5.609(c)(4).  The BHA explicitly recognized that

medically needed expenditures were excluded from income when it excluded the

$169.99 expended by the trust on air conditioner.   App. 224, ¶ 14.  Expenditures

necessary to accommodate her disabilities were medical expenses because they

were based on her "numerous medical conditions."  App. 290.  In her requests for

reasonable accommodation, DeCambre described the medical necessity of the

requested accommodations, and she supported those descriptions with

47

certifications and other medical documentation from her physicians.  App.225, ¶ ¶ 18-20, App. 225-226, ¶ 22 App. App. 229, ¶ 28- 31; App. 245-246, App. 266-269; App. 282-283; App. 290; App. 369-370; App. 372; App. 377-394, App. 428-432. HUD regulations, promulgated pursuant to § 504, provide: "A recipient shall modify its housing policies and practices to ensure that these policies and practices do not discriminate, on the basis of handicap, against a qualified individual with handicaps" unless the modifications would result in a fundamental alteration of the program or an undue administrative burden.  24 C.F.R. § 8.33.  HUD regulations promulgated under the FHAA provide: "It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas."  24 C.F.R. §100.204(a).  By denying DeCambre's request that it exclude her trust expenditures as a reasonable accommodation for her disabilities, The BHA not only violated HUD regulations, but it also violated the Housing Act, § 1983, § 504, the FHAA, the ADA and G.L. ch. 93 § 103.  The lower court erred in disregarding these violations and in finding for the BHA on these claims.

48

The costs for the care and support of DeCambre's cats were necessary medical expenses that should have been excluded as a reasonable accommodation. See *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995); *United States v. California. Mobile Home Park Management. Co.*, 29 F.3d 1413, 1417 (9th Cir.1994). Courts have concluded under the FHA and § 504 that an emotional-support animal may be a reasonable accommodation when the animal is necessary for a person with a disability to enjoy equal housing rights.[6] *Majors v. Housing Authority of DeKalb County.*, 652 F.2d 454, 457-58 (5th Cir. Unit B Aug. 1981) (reversing grant of summary judgment to housing authority on Rehabilitation Act claim concerning emotional-support animal for person with a disability, and remanding for trial on factual issues); *Fair Housing of the Dakotas, Inc. v. Goldmark Prop. Mgmt., Inc.*, 778 F. Supp. 2d 1028, 1035-36 (D.N.D. 2011); *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 858-61 (S.D. Ohio 2009). Furthermore, at least in the context of public housing projects, HUD requires public housing authorities not to apply or enforce any policies "against animals that are necessary as a reasonable accommodation to assist, support, or

---

[6] The expansive regulations that HUD has issued under § 504 encompass disability discrimination by public entities administering HUD programs and also explicitly prohibit the most or all of the types of housing discrimination forbidden by the FHA. 24 C.F.R. § 8.4, et. seq.

49

provide service to persons with disabilities."  24 C.F.R. § 5.303(a);  see also 24

C.F.R. § 960.705 (stating that regulations authorizing public housing agency to

charge pet deposit in public housing does not apply to animals "necessary as a

reasonable accommodation to assist, support or provide service to persons with

disabilities").  The lower court found, "[t]he HUD Occupancy Handbook covers

the cost of 'assistance animal and its upkeep' as a deductible medical expense."

Add. 522.  Under HUD guidelines, a "housing provider may not require the

applicant to pay a fee or a security deposit as a condition of allowing the applicant

to keep the assistance animal." Joint Statement of the Department of Housing and

Urban Development and the Department of Justice, *Reasonable Accommodations*

*Under the Fair Housing Act*, p. 9, ¶ 11. (May 14, 2004),

http://www.hud.gov/offices/fheo/ library/huddojstatement.pdf.  By including the

expenditures for the care and support of DeCambre's emotonal-support animals in

DeCambre's income, the BHA discriminated against her by diminishing her

subsidy and penalizing her for keeping the animals.  App. 355-356.  The lower

court's conclusion, that the BHA did not act in a discriminatory manner with

regard to its treatment of DeCambre's pet expenses, is contradicted by its own

findings and was error.  App. 522-523.

50

Although DeCambre's automobiles were owned by the trust and could not be considered income, and she had an obvious medical need for the an automobile as protection against heat and cold because of limitations on her ability to regulate her body temperature, the BHA unreasonably refused to grant DeCambre's request that automobile purchase and insurance be excluded from income. Based on the uncontradicted evidence, DeCambre's mobility was significantly impaired due to hip injuries, impairments regulating her body temperature, and consequent intolerance for heat and cold. App. 229-230, ¶ 31; App. 267-268, ¶ 11. App. 332-33; App. 392-385; App. 430-432; Courts have frequently recognized that accommodations for people with disabilities involving mobility impairments are reasonable. *Astralis Condominium Ass'n v. Secretary, HUD*, 620 F. 3d 62 (1st Cir. 2010)(finding the plaintiffs, who were handicapped because of their "significant mobility problems" where entitled to a designated parking space). The requested accommodation excluding the cost of the automobiles and insurance from income entailed no expense to the BHA and it was reasonable. The lower court erred in failing to find disability discrimination based on the BHA's denial of this request.

DeCambre's requests for exclusion of expenses for her cell phone and landline as accommodations were reasonable in light of the undisputed medical documentation provided and other undisputed explanations of this need provided

51

in her requests for accommodation.   App.225, ¶ ¶ 18-20, App. 225-226, ¶ 22 App.

App. 229, ¶ 28- 31; App. 245-246, App. 266-269; App. 282-283; App. 290; App.

369-370; App. 372; App. 377-394, App. 428-432.    Her physician certified that

she required these accommodations because of her disability in case of emergency

to that she can get help while at home, by means of lifeline, and while away from

home by means of her cell.   App. 332-333; App. 430-432: App. 377-378.  The

lower court favorably cited to arguments and case law that support "excluding

these payments from annual income." App. 520.  Plaintiff contends that these

accommodation requests were reasonable because they were shown to be

medically necessary because of her disabilities in that they provided her with

access to potentially life saving help in the event of an emergency.  App. 332-333;

App. 430-432: App. 377-378.

> 6.    The BHA Refused To Grant DeCambre's Reasonable
>        Requests For Modifications.

It is undisputed that the BHA refused to grant DeCambre the modifications

she requested, except for the exclusion of less than $175.00 from her income for

the cost of an air conditioner.  App. 213, ¶ 30; App. 192-193; App. 356-357.

> 7.    Decambre Was Not Able to Participate in or Enjoy the
>        Benefits of the BHA's Services, Programs or Activities
>        Because of the Denial of Her Requests for Reasonable
>        Accommodation.

52

It is undisputed that DeCambre's subsidy was eliminated and that she was completely excluded from the Section 8 program because of the denial of her requests for reasonable accommodations.  App. 254; App. 257; App. 353-356; App. 358.

> C.    The BHA Waived the Fundamental Alteration Defense and Failed to Demonstrate That Making the Requested Modifications Would Fundamentally Alter the Nature of the Service, Program, or Activity.

The BHA waived any defense it may have had under § 35.130(b)(7), "that making the modifications [requested by DeCambre] would fundamentally alter the nature of the service, program, or activity,"  by failing to raise this affirmative defense in its answer.  28 C.F.R § 35.130(b)(7); Fed. R. Civ. P. 8(c); App. 218-219.  "A claim that a requested accommodation would constitute an undue burden is an affirmative defense." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir.1998). Generally, affirmative defenses are required to be raised in a pleading. Fed. R. Civ. P. 8(c)." *Fair Housing of the Dakotas v. Goldmark Property*, 778 F. Supp. 2d 1028, 1039, note 3 (Dist. N. Dakota 2011).  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603-604 (1999) (Ginsburg, J., plurality opinion) (discussing the reasonable modification regulation as the State's "fundamental-alteration defense"); id. at 607, 119 S.Ct. 2176 (Stevens, J., concurring) (explaining that a "state may assert, as an affirmative defense, that the

requested modification would cause a fundamental alteration of a State's services and programs").

Even if the BHA did not waive the "fundamental alteration defense," it failed to meet its burden of establishing this defense. *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29 (1st Cir.2000) (reversing summary judgment in an ADA case where the employer had produced no evidence of undue hardship); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F. 3d 638, 649 (1st Cir. 2000) (after case stated trial where employer did not contest reasonableness of accommodation, and presented no evidence of undue hardship, judgment was entered for the employee); *Popovich v. Court of Common Pleas Domestic Relations Div.*, 227 F.3d 627, 639 (6th Cir. 2000), rev'd on other grounds, 276 F.3d 808 (6th Cir.2002) (en banc). The arguments of BHA's attorney, that the modifications would fundamentally alter the program, were not evidence, and did not meet the BHA's burden. App. 192-193; *US v. Torres-Galindo*, 206 F. 3d 136, 142 (1st. Cir. 2000). It is very well established that "the statements and arguments of counsel are not evidence," as this is a standard jury instruction. *Id.*; *Arrieta-Agressot v. US*, 3 F. 3d 525, 529 (1st. Cir. 1993). Except for the arguments of defense counsel, there was no basis in the record that the modifications requested by DeCambre would result in a fundamental alteration.

The Court's finding, that "DeCambre could have taken her personal injury settlement and placed it under her mattress....from which she could freely have used it for any purpose without reporting her expenditures as Section 8 income," demonstrates that exclusion of the trust expenditures as requested by DeCambre would not "fundamentally alter" the program.   App. 503-504.  The BHA's action, in excluding from DeCambre's income the trust expenditure on the air conditioner, demonstrated that the exclusion of other trust expenditures because of DeCambre's medical conditions/disabilities would not fundamentally alter the program.  24 C.F.R. § 5.609(c)(4); App. 224, ¶ 14.  Because DeCambre's disabilities are medical conditions, the expenses associated with accommodating her disabilities are medical expenses.  As the exclusion provided for by § 5.609(c)(4) is part of the Section 8 Program, applying it to DeCambre's trust expenditures results in no fundamental alteration.  There was no evidence of any disruption of BHA operations or undue administrative burden falling upon the BHA if it were to grant DeCambre the requested accommodations. *Toledo v. Sanchez*, 454 F. 3d 24, 39-40 (1st Cir. 2006).

> D.    The BHA Discriminated Against Decambre by Unnecessarily Imposing or Applying Eligibility Criteria That Excluded Decambre from Fully and Equally Enjoying the Section 8 Program Because She Is an Individual with Disabilities.

55

The policy, practice and method of administration of the BHA to include expenditures of lump sums in the annual income of Section 8 participants who use special needs trusts is unlawful because the practice falls more harshly on people with disabilities and was not justified by necessity. *Hazen Paper Co. v. Biggins*, 507 US 604, 609 (1993). Unlike other people with revocable trusts, the beneficiaries of Special needs trusts have disability related needs for SSI, SSDI and Medicaid that Congress recognized in enacting 42 U.S.C. sec. 1396p(d)(4)(A). Where a practice imposes a burden on people with disabilities that is "different and greater" than for others, it violates the ADA. *Crowder v. Kitagawa*, 81 F. 3d 1480, 1484 (9th Cir. 1996). Because of their unique dependence on special needs trusts, individuals with disabilities are effectively denied equal access to the Section 8 program by the policy or practice of a housing authority that includes the expenditure of lump sums in their income simply because of their use of special needs trust.

The BHA violated the regulations of the Attorney General in the present case by relying on a disability-linked classification, the use of a special needs trust, to unfairly disadvantage, deny benefits to and exclude DeCambre from the Section 8 program. 28 C.F.R § 35.130(b)(8); App. 485-486; App. 353-356, 16-34. Pursuant to regulations promulgated under Title II:

56

A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R § 35.130(b)(8).

§ 35.130(b)(8) "prohibits the unnecessary exclusion of disabled individuals" from public services, programs and activities. *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1310  (Dist. Alabama 2012); see also, 24 C.F.R. 9.130(b)(4).  The BHA violated § 35.130(b)(8) by 1) imposing or applying discriminatory eligibility criteria, and 2) by refusing to modify this discriminatory practice and method of operation when asked to do so by DeCambre.

In order to establish a violation of § 35.130(b)(8), DeCambre had the burden of showing that 1) the BHA was a public entity, 2) she was a person with a disability, 3) the BHA imposed or applied eligibility criteria to her that screened out or tended to screen her out from fully and equally enjoying any service, program, or activity, or,  the BHA imposed or applied eligibility criteria to her that screened out or tended to screen out any class of individuals with disabilities from fully and equally enjoying any service, program, or activity.   28 C.F.R § 35.130(b)(8).  The parties stipulated that DeCambre was disabled and that the

57

BHA was a public entity, thus satisfying the first two elements.  App. 221-222, ¶¶

1, 8.  It is undisputed that the BHA imposed or applied eligibility criteria and that

DeCambre was excluded from the Section 8 program.  App. 228, ¶ 25; App. 485;

App. 490-491; App. 495; App. 508.   The lower court found, "special needs trust

beneficiaries like DeCambre are unfairly disadvantaged in regards to federal

housing assistance simply by their choice to place their settlement funds in a

special needs trust."  App. 503.  As all (100% of) special needs trust beneficiaries

are disabled, the court could have more precisely stated that "disabled individuals

like DeCambre are unfairly disadvantaged in regards to federal housing assistance

simply by their choice to place their settlement funds in a special needs trust."

*Id.*; 42 U.S.C. 1396p(d)(4)(A).   Based on the undisputed facts in the present case,

DeCambre established that she was screened out from fully and equally enjoying

the Section 8 program because of the BHA's use of eligibility criteria that screen

out the class of disabled people who use special needs trusts.

   In concluding that the BHA did not violate § 35.130(b)(8), the lower court

erred in equating DeCambre's circumstance with "beneficiaries of all

non-revocable trusts, including non-disabled persons."  App. 516-517.  The

comparison was inapt, in the context of the present case, because people without a

disability usually have no need for an irrevocable trust.   Furthermore, they never

require, and are ineligible for, a special needs trust under 42 U.S.C. sec.

1396p(d)(4)(A).

Although § 35.130(b)(8) would permit the BHA to use eligibility criteria

that exclude people with disabilities if "such criteria can be shown to be necessary

for the provision of the service, program, or activity being offered," the BHA

waived this defense.   28 C.F.R § 35.130(b)(8); App. 218-219, ¶¶ 94-103.  Fed. R.

Civ. P. 8(c).  "The law is clear that if an affirmative defense is not pleaded

pursuant to Fed.R.Civ.P. 8(c)'s requirements, it is waived." *Society of Holy*

*Transfiguration v. Gregory*, 689 F. 3d 29, 58 (1st Cir. 2012).  The BHA did not

plead the affirmative defense in its answer.  App. 218-219, ¶¶ 94-103.

Even if the BHA did not waive the necessity defense, it failed to offer any

evidence in support of such a defense.  28 C.F.R § 35.130(b)(8).  App. 221-466.

Because DeCambre satisfied her burden under § 35.130(b)(8), the BHA had the

burden of showing that the criteria were "necessary for the provision of the

service, program or activity being offered."   28 C.F.R § 35.130(b)(8); *Bowers v.*

*National Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 478 (Dist. New Jersey

1998).  The BHA offered no such evidence, and the record evidence established

that the BHA's inclusion of distributions from the SNT were not necessary.   With

regard to expenditures on automobiles in particular, the Court found that "the fact

59

that title [to the automobile] is held by her Trust as an asset should preclude it from being counted towards income." App. 521-522. Where the BHA's policy of counting the automobiles owned by the trust in DeCambre's income was contrary to HUD regulations, it was not necessary. *Id*. Furthermore, HUD regulations recognized that "The value of necessary items of personal property such as furniture and automobiles shall be excluded" in determining net family assets. 24 C.F.R. § 5.603(b)(1). Allowing DeCambre the benefit of using the trust's automobiles without having them counted as income was in no way necessary for the provision of the Section 8 subsidy, and the BHA offered no evidence supporting such a claim in the case stated.

VI.    THE LOWER COURT ERRED IN DENYING DECAMBRE'S REQUESTS FOR A PRELIMINARY INJUNCTION AND FOR A PERMANENT INJUNCTION OR MANDAMUS RESTORING HER SECTION 8 BENEFITS.

For the reasons previously set forth in this brief, DeCambre has established that she should prevail on the merits of her case. A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit between the injunction and the public interest. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The trial judge erred in denying DeCambre's request for

60

injunctive relief based on its conclusion that she failed to show a likelihood of success on the merits of her § 1983 and discrimination claims. App. 523-524. DeCambre submitted a 20 page brief detailing her need for injunctive relief, and she requested a permanent injunction in her Amended Complaint that was implicitly denied by the judge. App. 8-84; App. 110-111. It was undisputed that, with the loss of her subsidy, she was threatened with eviction, and she cut back of food purchases and did not have enough money for food, clothing, rent, utilities, drug co-payments, medical supplies, charges for over the counter drugs and other necessities. App. 463-466. She also demonstrated an ongoing violation of her rights not to be subjected to excessive rent in violation of the rent ceiling set forth in the housing act. These are the sort of injuries that are needed to support a preliminary injunction. *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F. 3d 56, 76 (1st Cir. 2005)(falling eight or nine months behind on a mortgage and facing imminent foreclosure proceedings were the sort of irreparable injury needed to support a preliminary injunction). The balance of hardships and the public interest also tended to favor the plaintiff. The provision of subsidies for low income people serves a variety of state interests, including the prevention of poverty. "Should an eligible tenant be wrongfully evicted, some frustration of these interests will result." *Caulder v. Durham Housing Authority*, 433 F.2d 998,

61

1003 (4th Cir.1970). DeCambre is in a class of people who cannot afford acceptable housing, and she faced extreme deprivation without her Section 8 subsidy and grievous loss were she to be evicted. Id.

## CONCLUSION

The District Court's decision granting judgment to the BHA on the plaintiff's claims for disability discrimination and violation of § 1983 should be reversed and judgment should be granted to DeCambre.  The District Court's decision denying DeCambre's requests for preliminary and permanent injunctions should be reversed and DeCambre should be granted preliminary and permanent injunctive relief restoring her Section 8 benefits.

62

Dated:  September 28, 2015

Respectfully submitted,
Kimberly P. DeCambre,
By her attorney,


/s/ J. Whitfield Larrabee
J. Whitfield Larrabee, No. 1050744
251 Harvard Street, Suite 9
Brookline, MA 02446
(617) 566-3670

### CERTIFICATE OF COMPLIANCE
### WITH TYPE-VOLUME LIMITATION, TYPEFACE
### REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B), because this brief contains no more than 13,992 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the

Wordperfect X3 program.

2. This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Wordperfect X3

version 2005 in 14 point Times New Roman.

/s/ J. Whitfield Larrabee
J. Whitfield Larrabee
Dated: September 28, 2015

## <u>CERTIFICATE OF SERVICE</u>

I, J. Whitfield Larrabee, certify that on September 28, 2015, the document(s) filed through the ECF system will be sent electronically to the below registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

John Egan, Esq.
Amy McCallen, Esq.
Rubin & Rudman
50 Rowes Wharf
Boston, MA 02110


/s/ J. Whitfield Larrabee
J. Whitfield Larrabee, No. 1050744
251 Harvard Street, Suite 9
Brookline, MA 02446
(617) 566-3670

No. 15-1458, No. 15-1515

# United States Court of Appeals
# for the First Circuit

KIMBERLY P. DECAMBRE
Plaintiff - Appellant/Cross-Appellee

v.

BROOKLINE HOUSING AUTHORITY;
MATTHEW S. BARONAS; JANICE MCNIFF; CAROLE BROWN
Defendants - Appellees/Cross-Appellants

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## ADDENDUM

J. WHITFIELD LARRABEE
COA #1050744
LAW OFFICES OF J. WHITFIELD LARRABEE
251 Harvard Street, Suite 9
Brookline, Massachusetts 02446
(617) 566-3670
jw.larrabee@verizon.net

*Counsel for Plaintiff-Appellant*

Dated: September 28, 2015

# TABLE OF CONTENTS TO ADDENDUM

                                                                                    Page

Memorandum of Decision
Findings of Fact and Rulings of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 1

Order of Remand. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 42

Decision of Brookline Housing Authority. . . . . . . . . . . . . . . . . . . . . . . . . ADD 43

Electronic Clerk's Notes, Case No. 15-cv-12204-WGY. . . . . . . . . . . . . . ADD 47

Order For Closure, Case No. 15-cv-12204-WGY. . . . . . . . . . . . . . . . . . . ADD 48

5 U.S.C. § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 49

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 51

28 U.S.C. § 1292. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 52

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 53

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 54

29 U.S.C. § 794. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 56

42 U.S.C. § 12102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 58

42 U.S.C. § 12131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 60

42 U.S.C. § 12132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 61

42 U.S.C. § 12134(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 61

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 62

42 U.S.C. § 1437d(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 63

42 U.S.C. § 1437f(o)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 64

42 U.S.C. § 1437f(y) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 67

42 U.S.C. § 1396p(d)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 70

42 U.S.C. § 3604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 72

G.L. ch. 30A § 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 75

G.L. ch. 93 § 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 78

G.L. ch. 151B § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 79

G.L. ch. 151B § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 87

20 C.F.R. § 416.1205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 89

24 C.F.R. § 5.303(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 90

24 C.F.R. § 5.603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 91

24 C.F.R. § 5.609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 93

24 C.F.R. § 5.611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 95

24 C.F.R. § 5.628 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 97

24 C.F.R. § 8.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 98

24 C.F.R. § 8.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 100

24 C.F.R. 9.130 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 101

24 C.F.R. §100.204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 103

24 C.F.R. § 960.705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 104

24 C.F.R § 982.201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 105

28 C.F.R § 35.130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 108

Fed. R. Civ. P. 8(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 110

L.R. 34.0. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD 34.0

Article 114 of the Amendments to the Massachusetts Constitution.. . . . . ADD 113

BHA Website, http://www.brooklinehousing.org/sect8.html . . . . . . . . . . ADD 114

Economic and Market Analysis Division, HUD,
*FY 2014 HUD Income Limits Documentation System, Brookline*. . . . . . . ADD 117

Quadel Consulting Corp.,
*Housing Choice Voucher Program Guidebook § 5.1-5.3*, (2001). . . . . . . ADD 119

New England PIH Advisory Letter dated April 18, 2007.. . . . . . . . . . . . ADD 124

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIMBERLY DECAMBRE, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | NO. 14-13425-WGY |
| ) | |
| BROOKLINE HOUSING AUTHORITY, ) | |
| MATTHEW BARONAS, JANICE MCNIFF ) | |
| and CAROLE BROWN, ) | |
| ) | |
| Defendants. ) | |

YOUNG, D.J.                                                  March 25, 2015

MEMORANDUM OF DECISION
FINDINGS OF FACT AND RULINGS OF LAW

**I.    INTRODUCTION**

In a case involving a beneficiary's special needs trust and
federal housing benefits, this Court is faced with determining
whether such a trust, designed to prevent beneficiaries from
losing their Medicaid and Social Security eligibility, should
also protect beneficiaries from losing their income-based
federal housing vouchers despite statutory language to the
contrary.  The issue before the Court turns on the
interpretation of HUD regulations for calculating annual income
for housing assistance eligibility purposes; specifically,

1

whether income should include disbursements from a special needs trust that was funded by lump-sum settlements from a personal injury lawsuit. The plaintiff before the Court, Kimberly DeCambre ("DeCambre"), a Brookline, Massachusetts resident and participant in the Section 8 Housing Choice Voucher Program ("Section 8"), alleges that the Brookline Housing Authority ("BHA") unlawfully calculated her annual income in violation of the federal regulations pertaining to Section 8, as well as in violation of her substantive due process rights under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 3604(c) (the Fair Housing Act), 29 U.S.C. § 701 (the Rehabilitation Act), and 42 U.S.C. § 12131 (the Americans with Disability Act). Her allegations of disability-based discrimination were also raised against three BHA employees: Matthew Baronas (Assistant Executive Director), Janice McNiff (Leased Housing Representative), and Carole Brown (Director of the Leased Housing Department) (collectively with BHA, "Defendants"). DeCambre further requested a preliminary injunction against the BHA to stop it from including certain trust disbursements towards the calculation of her income for Section 8 eligibility. This Court heard oral arguments at a case stated hearing[1] on September 19, 2014, which greatly

---

[1]    Rather than holding oral arguments on the motion for preliminary injunction, the parties agreed to have a case stated

2

**2**

assisted the Court in assessing the parties' claims.  The Court, first, rules that DeCambre does not have a section 1983 claim because the BHA's income determination was not arbitrary and capricious, and further denies DeCambre's motion for a preliminary injunction, with an order that her case be remanded for reconsideration before the BHA.  The Court's reasoning is laid out below as required by Federal Rule of Civil Procedure 52(a).

## II.  FINDINGS OF FACT

### A.  DeCambre's Disability Status

DeCambre is fifty-nine years old, and presently lives with her adult son in a Brookline, Massachusetts apartment.  See First Am. Verified Compl. & Demand Trial Jury ("Compl.") ¶ 11, ECF No. 9; see also Pl.'s Mem. Supp. Mot. Emergency Prelim. Inj. ("Pl.'s Mem."), Ex. G, Aff. Kimberly P. DeCambre ¶ 2, ECF No. 5-7.  Since 2005, DeCambre has been a recipient of housing vouchers through her participation in Section 8, which is administered locally by the BHA and directly funded by HUD.  As described on its website, Section 8 provides housing vouchers to

---

hearing, delivering final arguments on the merits of the case and allowing the Court to make a judgment based on the record. See TLT Const. Corp. v. RI, Inc., 484 F. 3d 130, 135 n.6 (1st Cir. 2007) ("In a case stated, the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record. The court is then entitled to "engage in a certain amount of factfinding, including the drawing of inferences.") (citing United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir.1995)).

3

"low-income families, the elderly, and the disabled to afford

decent, safe, and sanitary housing in the private market."

Housing Choice Vouchers Fact Sheet, HUD.gov (Sept. 17, 2014),

http://portal.hud.gov/hudportal/HUD?src=/topics/housing_choice_v

oucher_program_section_8; see also 42 U.S.C. § 1437(f) et seq.

These vouchers are administered by local agencies and housing

subsidies are paid directly to landlords by the agencies.  See

42 U.S.C. § 1437(f) et seq.  The amount of the rent subsidy

typically is the amount of the gross rent, "minus 30 percent of

monthly adjusted income."  Id.  The BHA, which issues these rent

subsidies in vouchers, is a local housing authority pursuant to

Massachusetts General Law, chapter 121B, section 3, and a

recipient of federal funding for subsidizing rent for its

participants through an Annual Contributions Contract with HUD.

Compl. ¶ 3.

It is undisputed that DeCambre is disabled as she is

currently a recipient of Medicaid and Social Security benefits.

Stipulated Factual R.: Case Stated ("Stip. Factual R.") ¶ 8, ECF

No. 16.  She currently receives Supplemental Security Income

("SSI") in the amount of $835.39 per month from the Social

Security Administration, which provides supplemental income for

"aged, blind, or disabled individual[s]."  42 U.S.C.

§§ 1382c(a)(1), (a)(3); see Pl.'s Mem. 2.  She also receives

Medicaid administered by MassHealth.  Id. at 5.  DeCambre's

4

"major disabilities" stem from kidney disease, which her
treating physician describes as "recurrent kidney stones, severe
hypokalemia (low potassium) requiring high dose daily potassium
supplements, which is thought due to medullary sponge disease
and/or Gitelman's syndrome." Pl.'s Mem., Ex. C2, Dr. Hsiao
Letter, ECF No. 5-1. Her physician also stated that DeCambre
suffered from "unusual skin patterns, which is presumed to be
primary/secondary erythromelalgia," id., while a second
physician noted that DeCambre required "access to heat and
central air conditioning to ensure temperature regulation" due
to her "numerous medical conditions," Pl.'s Mem., Ex. C2, Dr.
Crombie Letter, ECF No. 5-3. In her complaint, DeCambre further
elaborates on her ailments as also including post traumatic
stress disorder, fibromyalgia, arthritis, torn labrum in the
hips, shoulder and elbow injuries, and a history of depression.
See State Ct. R., Ex. A, Verified Compl. & Demand Trial Jury 5,
ECF No. 12.

   B.   **Special Needs Trust**

   DeCambre is the beneficiary of an irrevocable Special Needs
Trust ("Trust") under 42 U.S.C. § 1396p(d)(4)(A) and (C), which
is defined as a trust "containing the assets of an individual
under age 65 who is disabled . . . and which is established for
the benefit of such individual by . . . a court." Pl.'s Mem. 2.
As an irrevocable trust under section 1396p(d)(4)(C), DeCambre

has no control over the Trust corpus, and the Trust itself earns
"little or no interest." Id. The Trust was funded entirely
from a series of lump-sum settlements from a personal injury and
property damage lawsuit, and created by the Suffolk Superior
Court for DeCambre in 2010. Id. at 3; see also Defs.' Opp'n
Pl.'s Mot. Prelim. Inj. ("Defs.' Mem.") 3, ECF No. 10. The
total amount of the settlement is estimated to be $330,000.
Stip. Factual R. ¶ 7. DeCambre's counsel in this case, J.
Whitfield Larrabee ("Larrabee"), is also the trustee of the
Trust. Pl.'s Mem., Ex. C1, Letter to Joseph, ECF No. 5-3.
Based on an expenses chart submitted by DeCambre, principal from
the Trust has been used to pay for administrative trustee fees;
cell phone, cable, and internet bills; veterinary care for cats;
dental and medical costs; and travel expenses. See Pl.'s Mem.,
Ex. F, Kimberly DeCambre Supplemental Needs Trust Payments 12-1-
2012 to 11-04-2013 ("Trust Expenses"), ECF No. 5-6.

   C.   **DeCambre's Section 8 Eligibility**

   DeCambre has been a participant in the Section 8 housing
assistance program since 2005, and effective December 1, 2012,
her monthly rental payment for her apartment was $312.00. Pl.'s
Mem., Ex. A, Notice Rent Adjustment 2012, ECF No. 5-1. The fair
market or contract rent totaled $1,595.00 per month, and she
received $1,283.00 in housing assistance program payments. Id.
On October 28, 2013, the BHA adjusted DeCambre's rent to $435

per month, explaining that certain disbursements from her Trust

could not be classified as exempt medical expenses.  Stip.

Factual R., Ex. 4, Notice Rent Adjustment 2013, ECF No. 16-4.

Upon request for the submission of statements from the Trust for

their annual re-certification process, Stip. Factual R., Ex. 5,

Letter from Lea Luz Rios, ECF No. 16-5, DeCambre submitted

various trust-related documents to the BHA on November 12, 2013,

Stip. Factual R., Ex. 6, Letter from Larrabee to Dalia Joseph,

ECF No. 16-6.

Upon conducting their annual recertification in the fall of

2013, the BHA determined that DeCambre was no longer eligible to

receive housing assistance because her income was too high.

Defs.' Mem. 3.  DeCambre self-reported her gross annual income

to include $2,004 from food stamps, $9,748.68 from social

security, $200 from her son's earnings, and $445 from ABCD Fuel

Assistance, totaling $12,397.68 for 2013.  Stipulated Factual

R., Ex. 3, Appl. for Continued Occupancy, Sept. 10, 2013, ECF

No. 16-3.  The BHA, however, based on submitted income tax

returns from DeCambre's attorney, found that DeCambre received

approximately $200,000 in distributions from the Trust between

2011 and 2013, and that her 2011 income tax return reported an

income of $108,322.  Defs.' Mem. 4.  Further, the BHA found that

the Trust disbursements totaled $31,749.01 in 2012 and totaled

$62,828.99 between January and November 2013 - which they

determined should have been reported as income for purposes of recertification.  Id.  The BHA's yearly gross household income limit for a two-person household is $22,600.  Section 8 – Housing Choice Vouchers, Brookline Housing Authority (Oct. 31, 2014), http://www.brooklinehousing.org/sect8.html.  As a result, DeCambre was notified in a letter dated December 18, 2013, that effective February 1, 2014, she would be responsible for the full amount of her contract rent, totaling $1,560.00, and would no longer be eligible for housing assistance.  Pl.'s Mem., Ex. B, Notice Rent Adjustment 2013, ECF No. 5-2.  On January 13, 2014, DeCambre's counsel emailed the BHA indicating that she would appeal the rent adjustment decision.  Stip. Factual R., Ex. 10, Larrabee Email of Jan. 14, ECF No. 16-10.  A meeting was scheduled between the parties for February 7 to review her file. Stip. Factual R., Ex. 11, McNiff Letter of Jan. 24, ECF No. 16-11.  Meanwhile, DeCambre failed to pay the total amount of her adjusted rent ($2,200.00 in arrears), and received a notice to quit for non-payment of rent from her landlord in March 2014. Pl.'s Mem., Ex. G, Mar. Notice to Quit, ECF No. 5-7.

**D.    Request for Reasonable Accommodation and Hearing
       Officer's Decision**

On March 14, 2014, DeCambre submitted a Request for

Reasonable Accommodation[2] to the BHA, as well as a request for a

hearing.  Pl.'s Mem., Ex. C2, Req. Reasonable Accom., ECF No. 5-

3; see also Stip. Factual R., Ex. 16, Req. for Hearing, ECF No.

16-16.  In it, she requested that "[the BHA] exclude from

counting the expenditure of trust money" that was used towards

DeCambre's car purchase, her cell phone and landline bills, and

veterinary costs for the care of her cats, which she argued

should be categorized as medical expenses, and thus be exempt

from income calculation.  Req. Reasonable Accom.  DeCambre

argued her car was a medical necessity because she could not be

exposed to hot or cold temperatures outdoors, her cell phone and

landline were needed in case of an emergency due to her

"medically precarious condition," and her cats were necessary as

"companion animals for her mental health, mental and physical

disabilities."  Id.

---

[2] Pursuant to HUD provisions, any person with a disability
is afforded the right to request reasonable accommodation from
housing providers to change its "rules, policies, practices, or
services so that a person with a disability will have an equal
opportunity to use and enjoy a dwelling unit or common space."
Disability Rights in Housing, U.S. Department of Housing and
Urban Development (Oct. 30, 2014),
http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_ho
using_equal_opp/disabilities/inhousing.

9

An informal hearing was held at the BHA on May 27, 2014, with counsel for both sides present.  Def.'s Mem. 5.  The Assistant Executive Director of the BHA, Matthew Baronas, served as a hearing officer and issued a written decision on June 9, 2014.  Id.  In his decision, Baronas determined that the BHA had correctly calculated DeCambre's income and rental share, based upon their interpretation of HUD regulations.  Stip. Factual R., Ex. 33, Baronas Decision, ECF No. 16-33.  Citing to 42 C.F.R. § 5.609, he ruled that, although DeCambre's personal injury settlement is not considered income under HUD regulation, when these assets were placed in an irrevocable trust, the distributions from the trust must then be "considered income unless specifically excluded by regulation."  Id.  Baronas also determined that the BHA provided a timely hearing in good faith. Id. at 5-6.

DeCambre made a second Reasonable Accommodation Request on July 8, 2014, upon which she was notified by the BHA that she was missing a medical professional certification "attesting to the nexus between Ms. DeCambre's disability and the accommodation she claims to need."  Defs.' Mem. 6.  Initially, Larrabee signed this certification himself, arguing that no medical professional was needed, Stip. Factual R., Ex. 45, Larrabee Email of July 21, ECF No. 16-45, and submitted a certification from another physician who treated DeCambre for a

10

hip and shoulder injury in May 2010, Stip. Factual R., Ex. 25,
Certification of Med. R. John Doherty, Jr. M.D., ECF No. 16-25.
Larrabee eventually submitted a certification from DeCambre's
primary care physician on August 6, 2014.  Stip. Factual R., Ex.
52, Larrabee Email of Aug. 6, ECF No. 16-52.  On August 12,
2014, DeCambre received another notice to quit, stating that she
was $1,502.00 in arrears.  Pl.'s Mem., Ex. G, Aug. Notice to
Quit, ECF No. 5-7.

### E.   Procedural History

DeCambre filed a complaint against the Defendants with the
Massachusetts Commission Against Discrimination ("MCAD") on June
19, 2014, Stip. Factual R., Ex. 23, Mass. Comm'n Against
Discrimination Charge Discrimination, ECF No. 16-35, and
subsequently withdrew the complaint on August 26, 2014 as a
result of pursuing her claims in court, Stip. Factual R., Ex.
30, Dismissal & Notification of Rights, ECF No. 16-30.  On
August 8, 2014, DeCambre filed this lawsuit against the BHA in
the Massachusetts Superior Court sitting in and for the County
of Norfolk, seeking $1,000,000 for damages, judicial review, and
declaratory and injunctive relief arising from the BHA's
decision to withhold her Section 8 Housing Assistance Program
("HAP") payments.  State Ct. R., Ex. A, Verified Compl. & Demand
Trial Jury 1, ECF No. 12.  This action was removed to this Court

on August 21, 2014.  See State Ct. R., Notice of Removal 3, ECF
No. 12.

DeCambre filed her motion for preliminary injunction on
August 22, 2014.  Pl.'s Mot. Prelim. Inj., ECF No. 4.  The case
stated hearing was heard on September 4, 2014.  Elec. Clerk's
Notes, ECF No. 11.

**F.   Claims Raised**

Along with the allegations that BHA miscalculated the
amount of her Total Tenant Payment and refused to make
reasonable accommodations for her disability upon request, in
violation of the federal regulations governing Section 8 and her
substantive due process rights, DeCambre also asserts breach of
lease, interference with quiet use and enjoyment, declaratory
and injunctive relief, and a writ of mandamus and judicial
review.  Def.'s Mem. 7.  Both parties' arguments, however, were
limited to the motion for preliminary injunction based on just
her first two counts: (1) violation of federal civil rights
under section 1983, and (2) disability discrimination under
Massachusetts General Law chapter 151B as well as the related
federal statutes.  Id.  As a preliminary matter, this Court
finds that DeCambre did not adequately prove each element of her
breach of lease and interference with quiet use and enjoyment
claims, and therefore cannot prevail on these causes of action.

12

Adjacent to the central dispute over the HUD provisions and regulations, DeCambre claims that the BHA's determination "knowingly and willfully" violated her federal civil rights because it arbitrarily terminated her participation in Section 8 housing in a decision that was "not based on a preponderance of the evidence." Compl. ¶¶ 54-60. Second, she claims that the BHA denied her benefits "by reason of her disability" in violation of the Rehabilitation Act, Title II of the ADA, and the Fair Housing Act. Id. ¶¶ 65-68. Third, she moves for a preliminary injunction to enjoin the BHA from counting her Trust disbursements towards the calculation of her total tenant rent, and to resume payment of her housing vouchers in the amount of $1,283 per month, retroactive to July 1, 2014. Pl.'s Mot. Prelim. Inj.

## III. RULINGS OF LAW

### A. Regulatory Interpretation and HUD Guidance

Central to the core issues before the Court is the interpretation of several HUD regulatory provisions regarding the treatment of trust disbursements with regard to calculating annual income. HUD regulation 24 C.F.R. § 5.609 addresses exclusions and inclusions of "annual income" with regard to financial eligibility for Section 8 housing assistance, while 24 C.F.R. § 5.603 provides further definitions of "net family assets" and "total tenant payment," and explicitly excludes

13

lump-sum personal settlement payments from the definition of annual income. The parties' differing applications of these regulations result in their opposing positions.

The salient facts can be summarized as follows: (1) DeCambre received a series of settlements totaling approximately $330,000 from a personal and property injury lawsuit between June 2010 and December 2012, (2) this settlement was deposited into an irrevocable Special Needs Trust created by the Suffolk Superior Court in June 2010, and (3) DeCambre has used principal from the Trust to pay for an automobile, travel expenses, cat veterinary care, and dental and medical fees. See Stip. Factual R. ¶ 7. DeCambre argues that the Trust disbursements used to pay for these items should not be counted towards her annual income, because the source of her funds are from income-exempt lump-sum settlements and, in the alternative, her expenditures should still be income-exempt under a separate exclusion for "temporary, nonrecurring, and sporadic" payments, see 24 CFR § 5.609(c)(9).

### 1. HUD Regulations on Section 8 Income

Analysis begins by examining the plain meaning of the language of the applicable regulations.[3] Annual adjusted income

---

[3] See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) ("The starting point in every case involving construction of a statute is the language itself."); see also Laracuente v. Chase Manhattan Bank, 891 F. 2d 17, 22 (1st Cir.

14

for Section 8 purposes is defined as "all amounts, monetary or
not, which: (1) Go to . . . the family head . . . or (2) Are
anticipated to be received from a source outside the family
during a 12-month period following admission . . . and (3) Which
are not specifically excluded in paragraph (c) of this section."
24 C.F.R. § 5.609(a) (1)-(3).

Specifically excluded from annual income are: "Lump-sum
additions to family assets, such as inheritances, insurance
payments (including payments under health and accident insurance
and worker's compensation), capital gains and <u>settlement for
personal or property losses</u> (except as provided in paragraph
(b)(5) of this section)." 25 CFR § 5.609(c) (3) (emphasis
added). Applied to DeCambre's initial lump-sum settlement, it
is indisputable that this amount is excluded from calculation of
annual income.

Complicating this analysis, however, is an adjacent
provision under section 5.609. Section 5.609(b)(3) provides
that annual income can include: "Interest, dividends, and other
net income of any kind . . . . [w]here the family has net family
assets in excess of $5,000, annual income shall include the
greater of the actual income derived from all net family assets
or a percentage of the value of such assets based on the current

1989) ("The ordinary meaning of words expresses the underlying
legislative purpose of the statute.") (internal citations
omitted).

15

passbook savings rate, as determined by HUD."  25 CFR §

5.609(b)(3).  Net family assets,

> [i]n cases where a trust fund has been established and
> the trust is not revocable by, or under the control
> of, any member of the family or household, the value
> of the trust fund will not be considered an asset so
> long as the fund continues to be held in trust.  <u>Any
> income distributed from the trust fund shall be
> counted when determining annual income under [section]
> 5.609</u>.

24 CFR § 5.603(b)(2)(emphasis added).  Under a straightforward

application of this provision, DeCambre's Trust disbursements

would be counted towards her annual income, notwithstanding

expenditures falling under separate exclusions such as medical

expenses or temporary, nonrecurring spending.  As these

regulations do not address a situation where an irrevocable

trust is funded by lump-sum settlements, this Court turns to

other resources to glean guidance on this matter.

### 2.  <u>Finley</u> v. <u>City of Santa Monica</u>

The core issue is whether a settlement loses its identity

as a lump-sum settlement once it is placed in an irrevocable

trust.  One state court has addressed this question.  In 2011, a

Los Angeles County Superior Court held that distributions from a

special needs trust were excluded from Section 8 annual income.

<u>Finley</u> v. <u>City of Santa Monica</u>, No. BS127077, 2011 WL 7116184

(Cal. Super. Ct. May 25, 2011); <u>see also</u> Pl.'s Mem., Ex. D,

Finley Op., ECF No. 5-4.  The court in <u>Finley</u> held that both

sections 5.609 and 5.603(b)(2) could be "harmoniously applied to
determine that distribution of principal from the [trust] is not
income." Id. at 6. This is because under 24 CFR § 5.609(a)(1)-
(3), annual income includes both monetary and non-monetary
amounts that "go to, or on behalf of, the family head" and
"paragraph (c)" income exclusions. Ruling that "[the special
needs trust] principal . . . . remain[s] excluded under
5.609(c)," Finley Op. 6, the Finley court concluded that the
"distribution of principal from an irrevocable trust, which is
not a family asset, is not annual income where the principal was
excluded from annual income under section 5.609(c)(3),"[4] id. at
7.

Reading these provisions "harmoniously," however, does not
exactly explain how a lump-sum remains a lump-sum, even when

---

[4]  The Finley court explains that this statutory reading
comports with HUD's treatment of interest and principal. Finley
Op. 6-7 (citing to the HUD Housing Choice Voucher Guidebook, AR
161-200, available at
http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_11749.pd
f). Under Exhibit 5-2 of the Guidebook, a lump-sum settlement
is considered a family asset and interest earned on the
settlement is counted as income. Id. at 7. An irrevocable
trust, however, is not categorized as an asset, so interest
generated by the trust is only counted as income when it is
distributed to the beneficiary, under section 5.603(b)(2). Id.
As a result, sections 5.609(c) and 5.603(b)(3) "place[] interest
distributions from an irrevocable trust on the same level field
with distributions from family assets, including settlements.
It also means that distribution of principal from an irrevocable
trust, which is not a family asset, is not annual income where
the principal was excluded from annual income under section
5.609(c)(3)." Id.

17

ADD.

Case:Case515-1456cumeDepturDe00ta2P050Pags-Page-1DateDatedFiledFiled8209028/2015tryIEntry59ID5944085241097
Case 1:14-cv-13425-WGY   Document 26   Filed 03/25/15   Page 18 of 41

poured into an irrevocable trust.  Rather, it only suggests that certain income exclusions predominate over other provisions. Here, the Finley court's statutory reading makes sense only if the annual income exclusions under 5.609(c) were deemed to override the net family assets definitions provision under 5.603(2), which includes distributions from an irrevocable trust in the calculation of annual income.  To be clear, nothing in the regulations instruct that certain exclusions prevail over income inclusions, nor do they specifically address settlement-funded irrevocable trusts.  When determining which regulatory provisions apply to DeCambre's expenditures, the Court cannot arbitrarily impose a reading which would impute greater weight to certain income provisions over others.[5]  As a result, this Court does not follow the line of reasoning in Finley (noting that this Court was not bound by this decision to begin with).

Understanding, however, that the Finley court's reasoning addressed an equitable issue as well as a statutory one, the Court acknowledges the underlying problem of losing housing benefits due to use of a special needs trusts -- especially when

---

[5]    Congress has expressly delegated rule-making authority to HUD to establish procedures for income verification.  See McGann v. United States, No. 98 CIV. 2192 SAS, 1999 WL 173596, at *6 (S.D.N.Y. Mar. 29, 1999) aff'd, 205 F.3d 1323 (2d Cir. 1999) ("Here, Congress delegated rule-making authority to HUD to establish procedures for income verification in 42 U.S.C. § 1437f(k) (1994) and HUD promulgated regulations to define and verify income in 24 C.F.R. §§ 5.609, 5.617 (1998).").

18

ADD. 19

such trusts are established to protect disabled beneficiaries'

access to Medicaid and Social Security benefits.[6]  As cogently

argued before this Court, special needs trust beneficiaries like

DeCambre are unfairly disadvantaged in regards to federal

housing assistance simply by their choice to place their

settlement funds in a special needs trust.  Tr. 23:1-15  ("The

problem with this situation is . . . not only is the Brookline

Housing Authority not treating people, and Ms. DeCambre, equally

with other nondisabled people, they're treating her

worse . . . . So you can have a trust, but you can't have any

benefit from it.").  As noted in Finley, DeCambre could have

taken her personal injury settlement and placed it under her

mattress, Finley Op. 6, from which she could freely have used it

---

[6]     This Court is not the first to note this special needs
trust problem.  Multiple legal publications and guidebooks
caution trustees and attorneys on structuring special needs
trust to protect beneficiaries from losing their federal housing
benefits.  See generally Thomas D. Begley, Jr. & Andrew H. Hook,
Drafting Issues in Self-Settled Special Needs Trusts, Elder Law
2004, 31 ESTPLN 510, 514 ("[d]rafting a special needs trust is a
complex undertaking involving a knowledge of public benefit law
and many considerations pertaining to the beneficiary.  These
trusts do not readily lend themselves to forms and must be
individually tailored to each situation."); Gregory Wilcox,
Esq., Special Needs Trust v. Section 8, California Advocates For
Nursing Home Reform (Nov. 1, 2014),
http://www.canhr.org/publications/
newsletters/NetNews/Feature_Article/NN_2007Q4.htm (noting that
"it is becoming increasingly apparent that most SNTs often
overlook a major problem . . . . In contrast to [Social
Security] and [Medicaid], the Section 8 housing assistance
program has no language in its rules that expressly recognizes
and protects SNTs.").

for any purpose without reporting her expenditures as Section 8
income.

Still, the BHA's decision to treat DeCambre's expenditures
as disbursements from an irrevocable trust, counting it towards
income under section 5.603, was a reasonable application of what
this Court reads to be clear and unambiguous HUD rules.
Revision of agency regulation is not in the district courts'
repertoire, and HUD's interpretive rules on income calculation
ought be given deference where they are a "reasonable
interpretation." See Chevron, U.S.A., Inc. v. Natural Res. Def.
Council, Inc., 467 U.S. 837, 843-44 (1984) ("If Congress has
explicitly left a gap for the agency to fill, there is an
express delegation of authority to the agency to elucidate a
specific provision of the statute by regulation . . . . a court
may not substitute its own construction of a statutory provision
for a reasonable interpretation made by the administrator of an
agency."); see also McGann v. United States, No. 98 CIV. 2192
SAS, 1999 WL 173596, at *7 (S.D.N.Y. Mar. 29, 1999) aff'd, 205
F.3d 1323 (2d Cir. 1999) (explaining that the "plaintiff
[cannot] challenge an interpretive rule, such as HUD's
procedures on calculating the Section 8 subsidy pursuant to 24
C.F.R. §§ 5.609 and 5.617" because "[i]nterpretative rules . . .
do not create rights, but merely 'clarify an existing statute or
regulation.'") (internal citations omitted); see generally Linda

20

ADD.

Case:14-1515 Document:00116850502 Page:103 Date Filed:03/08/2015 Entry ID:5941097
Case 1:14-cv-13425-WGY Document 26 Filed 03/25/15 Page 21 of 41

D. Jellum, The Impact of the Rise and Fall of Chevron on the
Executive's Power to Make and Interpret Law, 44 Loy. U. Chi.
L.J. 141 (2012).

DeCambre's expenditures were from her Trust, which happened
to be funded by her lump-sum settlement, and HUD income-counting
rules reasonably were applied to her Trust disbursements.  This
is not to say that further guidance and clarification from HUD
is not needed; addressing this very specific issue of
settlement-funded special needs trusts are, to say the least,
critically necessary to address this growing issue in federal
housing and disability law.

Understanding the compelling equitable arguments raised by
DeCambre, the Court considered HUD advisory letters and
handbooks for further guidance.

### 3.  2007 New England HUD Advisory Letter

The BHA relies on a HUD Advisory Letter from 2007, which
was sent to them by Benjamin Palmer, a HUD Portfolio Management
Specialist, in April 2012.  Defs.' Mem. 12.  The Advisory Letter
was provided by HUD's Boston Office of Public Housing, and
specifically addressed Special Needs Trust ("SNT") disbursements
and income calculations.  Defs.' Mem., Ex. D, HUD Advisory
Letter, ECF No. 10-4.  Citing section 5.603(b)(2), the letter
states "the corpus (principal) of an applicant's . . . SNT is
not considered an asset," which comports with the plain reading

21

of the provision. <u>Id.</u> at 1. The letter continues, "[d]istributions from the trust will be counted when determining annual income under 24 CFR 5.609," <u>id.</u>, unless specifically excluded or included under sections 5.609(c) and 6.611, and that "[t]he ultimate determination of whether each of the above expenditures counts towards annual income or falls within an exclusion or deduction is to be made by the Public Housing Authority," <u>id.</u> at 2.

While the letter provides examples of SNT distributions that are excluded or counted, it does not provide separate guidance as to whether the source of an SNT could potentially exclude its distributions from being counted towards annual income. <u>Id.</u> at 1-2 (providing only that "[a]nnual income does not include items such as . . . [l]ump-sum additions to family assets such as . . . settlement for personal or property losses.").

What can be gleaned from this letter, however, is an explanation for why SNT income is treated differently by HUD as compared to Medicaid: "Unlike Medicaid,[7] HUD is not reimbursed

---

[7] Under Medicaid regulations, special needs trusts are defined so that "the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter." 42 U.S.C. § 1396p(d)(4)(A). No such provision exists under the HUD regulations on annual income.

Case: 15-1504    Document: 00116950037    Page: 105    Date Filed: 08/28/2015    Entry ID: 5941097
Case: 14-1458    Document: 00116850041    Page: 105    Date Filed: 09/29/2015    Entry ID: 5940852
Case 1:14-cv-13425-WGY    Document 26    Filed 03/25/15    Page 25 of 41

ADD

for benefits provided with excess trust corpus at the end of the
beneficiary's lifetime; this accounts for some differences in
the treatment of SNT income between the HUD and Medicaid
regulations." Id. at 2. This is offered to explain why SNT
expenditures "that do not fall under an exclusion or deduction
are presumed by the regulations to be available for housing
expenses and are therefore counted towards annual income." Id.
(emphasis added). This seems logical enough – because there is
no guarantee of reimbursement from the excess principal upon a
beneficiary's death, HUD chose to impose a more stringent income
requirement on federal housing voucher participants.[8] The
question remains whether this policy justifies the result of
denying federal housing assistance to disabled SNT

---

[8] For context, to become eligible for Medicaid, a recipient
must meet the asset requirement for Supplemental Security
Income. See 42 U.S.C. § 1382(a)(1) (defining income and asset
requirements for disabled individuals). DeCambre currently
receives both.
    Medicaid and Social Security regulations explicitly exclude
special needs trusts from being counted towards a beneficiary's
resources. See 42 U.S.C. § 1396p(d)(4)(A) ("This subsection
shall not apply to . . . [a] trust containing the assets of an
individual under age 65 who is disabled . . . and which is
established for the benefit of such individual by a . . .
court."); see also 42 U.S.C. § 1396p(c)(2)(B)(iv) (preserving
eligibility for medical assistance if assets were transferred to
a special needs trust). HUD does not have an asset-based (nor
disability-based) eligibility requirement for Section 8, but
requires that a certain portion of a family's assets be counted
towards annual income. See 24 CFR § 5.603(b) (defining net
family assets); see also 24 CFR § 5.609(b) (listing what is
included in annual income, including the "[interest, dividends,
and other net income of any kind from real or personal
property.").

23

beneficiaries.  The Court thinks not, noting that the policy

does not directly speak to federal housing programs eligibility

requirements nor does it suggest that lump-sum settlements

should remain lump-sums regardless of the depository it is in.

At most, this policy seems to suggest that housing authorities,

who already carry "[t]he ultimate determination of whether each

of the above expenditures counts towards annual income or falls

within an exclusion or deduction," can choose to count certain

non-excluded expenditures towards annual income.  Id.

### 4.   HUD Handbook on Net Family Assets

While the Advisory Letter does not provide specific

guidance as to settlement-funded special needs trusts, a 2013

HUD Handbook on occupancy requirements confirms that settlement

funds placed in irrevocable trusts are not assets.  HUD Handbook

4350.3: Occupancy Requirements of Subsidized Multifamily Housing

Programs, U.S. Department of Housing and Urban Development ("HUD

Handbook") 5-39 (Nov. 3, 2014),

http://portal.hud.gov/hudportal/documents/huddoc?id=43503c5HSGH.

pdf ("Assets placed in nonrevocable trusts are considered as

assets disposed of for less than fair market value except when

the assets placed in trust were received through settlements or

judgments.") (emphasis added).  This clarifies the definition of

net family assets under 24 C.F.R. § 5.603(b)(3), which includes

"the value of any . . . assets disposed of by an applicant or

24

tenant for less than fair market value (including a disposition
in trust . . .) during the two years preceding the date of
application for the program." See also HUD Handbook 5-38
("Owners must count assets disposed of for less than fair market
value during the two years preceding certification or
recertification.").

At oral arguments, the BHA raised an argument that a lump-
sum is only a lump-sum for the year it was transferred into an
irrevocable trust,

> but once it's been sitting in a trust for two or three
> years, it's no longer a lump sum, it's now an amount
> of money that the plaintiff is actively . . . taking
> distributions from and it is not a fair
> characterization to call that money a 'lump sum' any
> longer than the one year period within which that
> money is first received.

Tr. 9:4-9 (emphasis added).  It is unclear whether the BHA was
referring to the two-year penalty period for under-market
transfer of assets, but this one-year characterization is not
supported by the regulations, nor is it supported by the HUD
Handbook on asset transfers.  The Court cannot accept BHA's
theory that a lump-sum is only a lump-sum for the first year, as
it simply has no basis in the regulations.

The only conclusion that can be drawn is that the
settlement funds which were placed into DeCambre's special needs
trust were not assets disposed of for less than fair market
value under section 5.603.  As a result, section 5.609(b)(3)'s

25

requirement that annual income includes interest generated by net family assets "in excess of $5000" does not apply, insofar as DeCambre's Trust is concerned.

### 5.   Conclusion on Regulatory Interpretation

Upon analysis of the relevant HUD regulations on annual income and net family assets, as well as HUD advisory publications and non-binding case law, the Court is unable to find any regulatory support for DeCambre's argument that her Trust expenditures must be excluded from annual income and that her Trust corpus remained a lump-sum settlement.  To the extent the BHA treated DeCambre's expenditures as spending from an irrevocable trust, rather than from a personal settlement fund, the Court holds that their determination was a reasonable one.

### B.   Due Process Claims

The following matters remain: whether the BHA violated DeCambre's due process rights on the basis of her disability, in their initial eligibility determination and their subsequent reasonable accommodation determination, and whether a preliminary injunction is warranted to enjoin the BHA from counting DeCambre's Trust disbursements towards the calculation of her total tenant rent.  This Court determines that the BHA did not violate DeCambre's substantive due process rights on the basis of a disability, and DENIES the motion for preliminary injunction.

Case:14-1517 Document:00116850873 Page:109 Date Filed:09/29/2015 Entry ID:5940852
Case 1:14-cv-13425-WGY Document 26 Filed 03/25/15 Page 27 of 41

**ADD**

## 1. Substantive Due Process Claim

DeCambre raises a substantive due process claim -- which was very sparsely briefed -- arguing that the BHA, acting under the color of law, violated the United States Housing Act of 1937, 42 U.S.C. § 1437f et seq., by incorrectly calculating her Total Tenant Payment at $1,560 per month, and forcing her to pay more than thirty percent of her monthly adjusted income in violation of federal regulations under Section 8.  Pl.'s Trial Br. 1-2, ECF No. 24.  She also alleges that her due process rights were violated on the basis of disability discrimination under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 3604(c) (the Fair Housing Act), 29 U.S.C. § 701 (the Rehabilitation Act), and 42 U.S.C. § 12131 (the Americans with Disability Act).  Id. at 8-11.

The Supreme Court has held that public housing authorities operating housing programs under federal housing law may be liable under section 1983.  See Wright v. City of Roanoke Redev. & Hous. Auth., 479 U.S. 418, 428 (1987) ("In sum, we conclude that nothing in the Housing Act or the Brooke Amendment evidences that Congress intended to preclude petitioners' [section] 1983 claim against respondent."); see also Clark v. Alexander, 85 F.3d 146, 150 (4th Cir. 1996) ("The civil rights cause of action against a state agency implementing a federal

27

program compels federal courts to uphold the letter of federal
law while allowing agencies the discretion to perform their
function of reasonably administering the federal program.").

Noting that DeCambre fails to name whether she is suing the
three named BHA employees in an individual or official capacity,
the BHA argued that her section 1983 claims fail under either
distinction. Defs.' Supplemental Br. Sept. 19, 2014 Hearing
("Defs.' Suppl. Br.") 2-3, ECF No. 17. First, if the employees
were sued in their official capacity, then no personal liability
is imposed and the claim is treated as against the BHA. See
Hafer v. Melo, 502 U.S. 21, 25 (1991) ("We emphasized that
official-capacity suits 'generally represent only another way of
pleading an action against an entity of which an officer is an
agent.'") (internal citations omitted). Second, if DeCambre
intended to sue the BHA employees in their individual capacity,
then the individual defendants would receive qualified immunity
"insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982); see also Mason v. Massachusetts Dep't of Envtl. Prot.,
774 F. Supp. 2d 349, 373 (D. Mass. 2011) (Tauro, J.). For
purposes of analysis, this Court assumes the BHA employees were
sued in their official capacity.

A substantive due process claim under the Fourteenth Amendment requires that a plaintiff "show a deprivation of life, liberty, or property," Connor B. ex rel. Vigurs v. Patrick, 771 F. Supp. 2d 142, 159-60 (D. Mass. 2011) (Ponsor, J.), aff'd, 774 F.3d 45 (1st Cir. 2014), and "generally confers no affirmative right to governmental aid, even when such aid may be necessary to protect . . . property interests," id. at 160.  The First Circuit has also upheld the use of a "shock the conscience" test for substantive due process claims against government actors. Martinez v. Cui, 608 F.3d 54, 65 (1st Cir. 2010).

DeCambre's argument is solely that the BHA, a "state created political body that administers the federal Section 8 program," improperly calculated her income, resulting in her having to pay more than one hundred percent of her income towards rent, in violation of 42 U.S.C. § 1437(o)(2), which limits a Section 8 tenant's rent payment to thirty percent of their monthly income.  Pl.'s Mem. 7-8.  No further argument was provided as to whether DeCambre has a constitutionally protected property right to the regulatory rent ceiling.  See Gammons v. Mass. Dep't of Hous. & Cmty. Dev., 523 F. Supp. 2d 76, 82 (D. Mass. 2007) (Saris, J.) ("[t]he threshold question is whether the plaintiffs have an enforceable right under section 1983 not to have their Section 8 benefits improperly terminated in violation of HUD regulations.").  Simply because DeCambre had

been an eligible Section 8 tenant prior to her SNT expenditures
does not create a property interest in Section 8 assistance, nor
has this Court been able to find any statutory or judicial
authority mandating that SNT distributions are excluded from
income calculations.  Finally, nothing in the factual record
outlining DeCambre's interactions with the BHA hints at any
conduct that would "shock the conscience."  As a result, this
Court rules that DeCambre does not have a substantive due
process claim against the BHA.

### 2.    Procedural Due Process Claim

DeCambre's allegations that the BHA hearing officer failed
"to find any facts or give any reason for denial of DeCambre's
request for reasonable accommodation," Compl. ¶ 41, were treated
as a de facto procedural due process claim by the BHA, Defs.'
Mem. 9.  In Goldberg v. Kelly, the Supreme Court laid out the
requisite procedural rights recipients of public assistance are
entitled to, including "timely and adequate notice detailing the
reasons for a proposed termination . . . an effective
opportunity to defend by confronting any adverse witnesses and
presenting his own arguments and evidence orally," an
opportunity to be represented by counsel before a hearing
officer, and the decision maker's conclusions, "stat[ing] the
reasons for his determination and indicate the evidence he
relied on."  397 U.S. 254, 266-71 (1970) (noting, however, that

30

30

the written decision "need not amount to a full opinion or even formal findings of fact and conclusions of law.").

It is undisputed and evident from the record that DeCambre received both timely notice and hearings throughout the past year. She first received written notice on December 19, 2013, and upon request for a hearing in January 2014, she received one on May 27, 2014, at which DeCambre was represented by counsel and had an opportunity to present argument and evidence. Defs.' Mem. 9.

The hearing officer's written determination on the request for reasonable accommodation was issued on June 9, 2014. Pl.'s Mem., Ex. E, BHA Decision, ECF No. 5-5. First, the BHA determined that DeCambre's Trust expenditures should be considered "income" for rent calculation purposes, because her expenditures did not fall under the seventeen listed income exclusions under section 5.609(c). Id. With regard to section 5.609(c)(3)'s income exclusion for lump-sum additions to family assets from personal or property losses, the BHA argued that although DeCambre's settlement was "originally considered income by HUD regulation," once it was converted to an irrevocable SNT, withdrawals therefrom became considered income and did not fall under any other exclusions. Id. (Section 5.603(b)(2) counts distribution of principal from these trusts towards income).

31

Case:14-515 Document:00116850 Page:114 Date Filed:08/09/2015 Entry ID:5940852
Case 1:14-cv-13425-WGY   Document 26   Filed 03/25/15   Page 32 of 41

**ADD**

DeCambre takes issue with the hearing officer's "arbitrary" and "whimsical" decision to include certain expenditures towards her annual income, giving "no plausible reason or explanation for the manner in which it seemed to apply some exclusions while disregarding others." Pl.'s Trial Br. 6. While this Court takes issue with the some of the BHA's explanations, the hearing officer's June 9, 2014 written decision provided sufficient explanation of the BHA's decision to deny DeCambre's appeal of her rent calculation, noting that this writing "need not amount to a full opinion or even formal findings of fact and conclusions of law." <u>Goldberg</u>, 397 U.S. at 271. Before critiquing the hearing officer's decision, the Court holds that DeCambre does not have a procedural due process claim against the BHA.

### 3.   **Discrimination Claim**

Finally, as to DeCambre's discrimination-based claims against the BHA, this Court is unable to find any evidence as to whether the BHA calculated her Section 8 income in an unlawful or discriminatory manner, based on her status as a disabled person. The Americans With Disabilities Act mandates:

> A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the

32

provision of the service, program, or activity being offered.

28 CFR § 35.130(b)(8).  The Court shares DeCambre's concern that beneficiaries of special needs trust, by definition including a disabled population, may face hurdles in securing Section 8 assistance.  But another facet of this argument is that the beneficiaries of all non-revocable trusts, including non-disabled persons, face the same risks as DeCambre (noting that the regulations only address "non-revocable trusts" rather than special needs trusts).  As multiple treatises and publications have instructed, SNTs require careful planning and structuring by trustees to avoid losing federal benefits.  See, e.g., Bernard A. Krooks, Special Needs Trusts: The Basics, The Benefits, and the Burdens, The American Law Institute, SR013 ALI-ABA 245, 270-271 (2009) (providing potential alternatives to an SNT for beneficiaries seeking to utilize funds a certain way, while maintaining SSI, Medicaid, and public housing assistance). Because special needs trusts are just one type of non-revocable trust, there is less potential concern for disability-based discrimination than there would be if the regulations had singled out special needs trusts.

The core problem lies in the lack of clarity in HUD provisions governing SNT beneficiaries for Section 8 benefits, and this issue should be addressed by HUD or Congress.

33

Reviewing the decision of the BHA as to the initial income calculation and subsequent denial of reasonable accommodation requests, i.e. its treatment of DeCambre's SNT as a trust, rather than as a lump-sum settlement, is reasonable under the existing regulatory scheme.  No evidence has been presented to this Court as to whether the BHA's interpretation tends to screen out disabled tenants – in fact, it appears that the BHA provided multiple opportunities for DeCambre to provide medical certification in her attempts to show a "nexus between her disability and the accommodation she claims to need."  Defs.' Mem. 10 (noting that DeCambre attempted to use her counsel Larrabee as a medical expert rather than her treating physicians).

Accordingly, this Court holds that the BHA did not act in a discriminatory manner and that DeCambre's discrimination claims against the BHA cannot stand.

### C.  Exclusions for Temporary or One-Time Expenses and Medical Costs

Before remanding this case to the BHA, the Court raises several issues found in the BHA's application of income exclusions under "temporary, nonrecurring or sporadic income," § 5.609(c)(9), and under "the cost of medical expenses" exclusion, § 5.609(c)(4).  In its written decision, the BHA argued that it followed HUD regulations properly excluding

34

medical expenses and attorney's fees paid for by the Trust from
its income calculation.  BHA Decision 3.  The BHA, however,
found it unreasonable that DeCambre tried to exclude her
vehicle, phone, and cat expenditures from income.  Id.  They
found that DeCambre's telephone and vehicle expenses were
"regular," id. at 2, supported by the fact that the Trust made
twelve phone/cable/internet payments, nine veterinary payments,
four travel payments, and two car purchase payments between
December 1, 2012 and November 30, 2013, Defs.' Mem. 13-14.  For
example, payments of $480 and $675 were paid for her phone and
internet bills in January 2013, $1,218.51 was paid in veterinary
expenses to the Boston Cat Hospital in February 2013, and
$3,875.12 was paid for airfare and hotel for DeCambre and a
travel companion in February 2013.  Trust Expenses 2-3.  Nearly
$5,000 more was paid for veterinary care through the spring of
2013, and $775 was paid to Comcast for phone, cable, and
internet in April 2013.  Id. at 3.  An automobile purchase in
the amount of $37,601 was paid for in May 2013.  Id. at 4.

The Court is compelled to point out that case law includes
"television, Internet, [and] travel" expenses as something SNTs
should cover.  The Third Circuit states:

> A supplemental needs trust is a discretionary trust
> established for the benefit of a person with a severe
> and chronic or persistent disability and is intended
> to provide for expenses that assistance programs such
> as Medicaid do not cover."  Sullivan v. County of

35

ADD

Suffolk, 174 F. 3d 282, 284 (2d Cir.1999) (internal
quotation marks omitted).  These expenses—books,
television, Internet, travel, and even such
necessities as clothing and toiletries—would rarely be
considered extravagant.

Lewis v. Alexander, 685 F.3d 325, 333 (3d Cir. 2012) cert.

denied, 133 S. Ct. 933 (U.S. 2013) (emphasis added); accord

Family Trust of Mass., Inc. v. United States, 722 F. 3d 355, 357

(D.C. Cir. 2013).  DeCambre's cable and internet expenses

certainly fit within this argument, supporting excluding these

payments from annual income, even though they may not be

"temporary."  Second, DeCambre's travel costs from February 2013

and March 2013 to visit family could also fall within allowable

SNT expenditures which would exclude it from annual income.

More problematic are DeCambre's purported medical expenses

(excluding her visits to the dentist and treating physicians,

which appear to be undisputed medical expenses).  DeCambre

argues that her car, landline, and veterinary payments should be

excluded from calculation of her income under section

5.609(c)(4).  Pl.'s Mem., Ex. C10, Certification of Need For

Reasonable Accom., ECF No. 5-3 (providing a certification from

DeCambre's treating physician, with an unsigned attachment

attesting to her medical need for a car, landline, and cat

companionship); see also Pl.'s Mem., Ex. C, Larrabee Aff., ECF

No. 5-3.  DeCambre purchased a car on May 28, 2013, with $37,601

from her SNT, Trust Expenses 4, but because the title was held

by her Trust, she argues that it is an asset of the Trust and
not regularly dispersed income.  Larrabee Aff. 2.  A separate
payment appears to have been made for car insurance totaling
$3,549.  Trust Expenses 4.  The HUD Occupancy Handbook provides
a chart of deductible medical expenses ("not exhaustive") which
includes the cost of transportation, like bus fare or car
mileage, to and from medical treatment, but does not list the
cost of an actual vehicle.  HUD Handbook, Ex. 5-3.  The Court
also found the IRS' list of medical and dental expense
deductions, which only provided for the cost of transportation,
like "actual fare for a taxi, bus, train, or ambulance," or for
"medical transportation by personal car, the amount of your
actual out-of-pocket expenses such as for gas and oil, or the
amount of the standard mileage rate for medical expenses, plus
the cost of tolls and parking fees."  IRS Topic 502- Medical and
Dental Expenses, IRS (Dec. 11, 2014),
http://irs.gov/taxtopics/tc502.html.  DeCambre's automobile
purchase likely cannot fall under these medical expenses, which
seem to be limited to public transportation and mileage costs,
but the fact that title is held by her Trust as an asset should
preclude it from being counted towards income.  See 24 C.F.R.
§ 5.603(b)(2) ("In cases where a trust fund has been established
and the trust is not revocable by, or under the control of, any
member of the family or household, the value of the trust fund

37

will not be considered an asset so long as the fund continues to be held in trust.").

What the HUD and IRS guidelines on deductible medical expenses do not cover are the costs to maintain a telephone line.  This expense, however, seems to fall under the acceptable expenditures outlined by the Third Circuit, and could be considered a non-extravagant spending under the same reasoning allowing spending on television and Internet.

More difficult is the issue of DeCambre's cat veterinary expenses, totaling approximately $6,000.  Tr. 34-35 ("she had some sick cats and . . . they became ill with cancer . . . . so there were a bunch of expenditures on these sick cats . . . . They were very expensive cats.").  The HUD Occupancy Handbook covers the cost of "assistance animal and its upkeep" as a deductible medical expense, HUD Handbook, Ex. 5-3, and HUD defines assistance animals as "animals that are used to assist, support, or provide service to persons with disabilities" including "providing emotional support to persons with disabilities who have a disability-related need for such support," id. at Glossary 4.  Noting that there is established HUD and FHA guidance on support animals, covering the right to have a service animal within a dwelling and veterinary costs of an animal, the BHA ought apply this guidance to determine whether DeCambre's cats could be categorized as emotional

Case: 14-1586 Document: 00116895015 Page: 121 Date Filed: 08/28/2015 Entry ID: 5940841097
Case 1:14-cv-13425-WGY   Document 26   Filed 03/25/15   Page 39 of 41

**ADD**

support animals, allowing their veterinary costs to be counted

towards deductible medical expenses in annual income

calculation.  No such analysis was provided as to veterinary

costs in the written decision, and should be provided on remand.

While this Court does not provide "a brand new hearing or

evaluate the facts de novo," Gammons, 523 F. Supp. 2d at 85, it

is clear that the BHA could perform a more thorough

determination of each potentially excludable expense proffered

by DeCambre.  By returning this matter to the BHA, the Court

urges the BHA to use some of the guidance provided above in

making their Section 8 income determinations.

### D.   Motion for Preliminary Injunction

Because the Court upholds the BHA's determination in

terminating DeCambre's Section 8 eligibility, a preliminary

injunction mandating that the BHA stop including trust expenses

towards her income calculation does not follow.  Under First

Circuit law, a plaintiff seeking a temporary restraining order

or preliminary injunction must demonstrate: (1) a substantial

likelihood of success on the merits, (2) a significant risk of

irreparable harm if the injunction is withheld, (3) a favorable

balance of hardships, and (4) a fit between the injunction and

the public interest.  Nieves-Marquez v. Puerto Rico, 353 F.3d

108, 120 (1st Cir. 2003).  "The sine qua non of this four-part

inquiry is likelihood of success on the merits: if the moving

Case: 14-1515 Document: 00116895021 Page: 122 Date Filed: 08/28/2015 Entry ID: 5941097
Case 1:14-cv-13425-WGY Document 26 Filed 03/25/15 Page 40 of 41

**ADD**

party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir.2002). Based upon the Court's rulings on DeCambre's discrimination and section 1983 claims, DeCambre does not meet a showing of likelihood of success on the merits of her federal due process and discrimination claims, and therefore the motion is denied.

### III. CONCLUSION

Understanding that HUD regulation and existing case law provide deference to the fact findings and conclusions of local housing authorities, this Court affirms the decision of the BHA in their income and rent calculations for DeCambre in regards to her Section 8 housing vouchers. Based upon its reasonable interpretation and application of HUD provisions defining special needs trusts principal in the determination of annual income, it can be concluded that DeCambre's income, as calculated by the BHA, exceeded the outlined limits of Section 8 housing eligibility.

At the same time, this case demonstrates the serious problem that beneficiaries of irrevocable trusts face; in particular, those that seek to pour lump-sum settlement funds into irrevocable trusts. But until the rules and regulations are clarified, public housing authorities should provide clear

guidance and instruction for potential tenants with regard to their financial planning and spending. A more thorough and thoughtful analysis is required by public housing authorities when determining Section 8 eligibility, until further guidance is provided by the HUD.

The motion for preliminary injunction is therefore DENIED, and DeCambre's appeal of her Section 8 eligibility is REMANDED to the BHA.

**SO ORDERED.**

/s/ William G. Young
William G. Young
District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Kimberly DeCambre

_____

Plaintiff

V.

Brookline Housing Authority et al

_____

Defendant

CIVIL ACTION

NO. <u>14cv13425-WGY</u>

## **ORDER OF REMAND**

<u>YOUNG, D.J.</u>

In accordance with the Court's Memorandum and Order dated March 25, 2015, the motion for preliminary injunction is therefore DENIED, and DeCambre's appeal of her Section 8 eligibility is REMANDED to the Brookline Housing Authority.

SO ORDERED...

By the Court,

March 26, 2015

/s/Matthew A. Paine

_____

Date

Deputy Clerk

# Brookline Housing Authority

90 Longwood Avenue

Brookline, Massachusetts 02446

617-277-2022

FAX 617-277-1462

TDD 1-800-545-1833 Extension 213

June 9, 2014

Kimberly DeCambre
1365 Boylston Street, #248
Boston, MA 02215

Re: Decision Relating to Appeal of Brookline Housing Authority's (BHA) Rent Calculation for Kimberly DeCambre's Section 8 Housing Choice Voucher

Dear Ms. DeCambre:

I am writing to you regarding the hearing held on May 27, 2014 related to your appeal of the BHA's calculation of your Section 8 Housing Choice Voucher rent share. The following is a summary of what I find to be the pertinent facts presented at the hearing as well as my decision:

- BHA Attorney, Jonathan Driscoll, indicated that Ms. DeCambre's appeal relates to a difference of opinion between the BHA and Ms. DeCambre, regarding the status of a Special Needs Trust (SNT) established on behalf of Ms. DeCambre. After researching this SNT, the BHA determined that expenditures from this trust should be considered income for rent calculation purposes. The BHA recalculated Ms. DeCambre's rent so that her share went to $1,560, or market rent for her unit. The regulations used for determining Ms. DeCambre's rent are found in 24 CFR 5.609, which defines income. These regulations state that disbursements from such trusts must be considered income. There are 17 income exclusions indicated in 5.609(c). Attorney Driscoll said that the expenditures from the SNT that the BHA used as income to calculate Ms. DeCambre's rent do not fall into any of these exclusion categories, particularly 5.609 (c)(9) "temporary, nonrecurring or sporadic income (including gifts)".

ADD.

Case:14-1556   Document:00116950   Page:126   Date Filed: 09/29/2016   Entry ID:5940852
Case 1:14-cv-13425-WGY   Document 9-14   Filed 09/01/14   Page 3 of 5

Attorney Driscoll said that the expenditures from the SNT that the BHA used as income were regular, and include an exhaustive array of items such as telephone and vehicle expenses.

- Ms. DeCambre's Attorney, Whitfield Larrabee said that he is the trustee of the SNT. He said that Ms. DeCambre has two sources of income: Social Security Disability Income and the SNT which stems from an injury settlement. He said that the BHA did not comply with the requirements to grant Ms. DeCambre an expeditious hearing. Attorney Larrabee said the SNT should not be a factor in calculating income because it should fall under the category of exclusions from income in 5.609 (c)(3) "Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and settlement for personal or property losses...". Attorney Larrabee referenced the court decision in Finley vs. the City of Santa Monica, in which the court ruled that the inclusion of the plaintiff's trust fund expenditures as income in her Section 8 rent calculation was improper because the source of income was from a personal injury settlement that should have been excluded. He said that Ms. DeCambre's issues are similar to the plaintiff in the Finley vs. the City of Santa Monica court case. Attorney Larrabee said that the BHA provided Ms. DeCambre with an interpretation from HUD regarding SNT matters, but this interpretation is vague and not very compelling. Attorney Larrabee provided the hearing officer with a number of exhibits, including two affidavits, the Finley vs. the City of Santa Monica decision, various correspondence between the BHA and the Ms. DeCambre, a March 14, 2014 request for reasonable accommodation on behalf of Ms. DeCambre, a HUD SNT Disbursements Advisory letter dated April 18, 2007, a listing of Bank of America SNT payments on behalf of Ms. DeCambre, and Ms. DeCambre's Declaration of Trust. Attorney Larrabee said that, even if the BHA did not agree with the logic that the SNT should be excluded as income because it falls under "lump-sum additions to family assets", the expenses from Ms. DeCambre's SNT should be excluded under 5.609 (c)(9) as "temporary, nonrecurring, and sporadic". He used as an example a computer equipment expenditure on October 19, 2010 which was due to Ms. DeCambre's pent-up need for computer access. Other examples he raised were the need for a telephone land line for "life alert", a cell phone for medical emergencies, a vehicle, and a plane ticket. Furthermore, Attorney Larrabee said that the vehicle is titled to the trust and not to Ms. DeCambre. Attorney Larrabee said that the BHA's letter of December 19, 2013 citing income of $108,322 was upsetting and harmful to Ms. DeCambre.
- Attorney Driscoll said that there was nothing antagonistic intended by any correspondence to Ms. DeCambre. He said that BHA staff did not include as income what it saw as medical expenses or attorney's fees related to the trust. He said that the BHA was simply following HUD regulations and guidance in determining Ms. DeCambre's rent. He said that the BHA received a confirmation email message from Ben Palmer at HUD on April 20, 2012 relating to the need to treat expenditures from an SNT as income. (Mr. Driscoll provided a copy of this

44

Case:15-1456 Document:00116895027 Page:127 Date Filed:09/29/2015 Entry ID:5940597
Case 1:14-cv-13425-WGY   Document 9-14   Filed 09/01/14   Page 4 of 5

ADD

April 20, 2012 correspondence to the hearing officer for the record). He said that this correspondence confirmed HUD's interpretation that SNT expenses are income, and it is consistent with the HUD Advisory Letter of April 18, 2007. He said that the HUD position outweighs the May 25, 2011 decision of one California Superior Court Judge, and added that HUD's position was confirmed by Mr. Palmer after the May 25, 2011 Finley vs. the city of Santa Monica decision. Attorney Driscoll said that the BHA and Ms. DeCambre have vastly different interpretations of what is a legitimate medical expense. Attorney Driscoll said that the BHA is not preventing Ms. DeCambre from having a cell phone or a land line or a vehicle, but it must follow HUD's instructions in determining that SNT payments for these expenses are income. Attorney Driscoll said that Ms. DeCambre's request for a reasonable accommodation to exclude as income her vehicle, telephone and expenditures for her cats are not reasonable.

- Attorney Larrabee said that neither the HUD Advisory Letter nor the Ben Palmer correspondence pertain to someone who had a lump-sum settlement.
- Attorney Driscoll said that the lump-sum definition is irrelevant because the money now operates through an SNT. If the money were not in a trust, the participant would have direct access to the money and it would be treated differently.

After listening to the testimony of the two parties and after examining the evidence presented at the hearing, I have concluded the following:

At issue is the money that was originally a lump-sum settlement on behalf of Ms. DeCambre and fell under 24 CFR 5.609 (c)(3) which excludes from annual income "Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and workers compensation), capital gains and settlement for personal or property losses...". Although this settlement was not originally considered income by HUD regulation, it was an asset that was subsequently converted by Ms. DeCambre into an SNT. Once converted into this irrevocable trust, the BHA followed HUD regulations and guidance regarding SNTs as stated in New England PIH Advisory Letter dated April 18, 2017 and in HUD Portfolio Management Specialist, Benjamin Palmer's April 20, 2012 correspondence to Carole Brown, BHA's Director of Leased Housing. These HUD opinions clarify that distributions from SNTs are considered income unless specifically excluded by regulation. I concur with the BHA's opinion that the HUD Advisory letter and the Ben Palmer correspondence outweigh the opinion of the Judge in the Finley vs. the City of Santa Monica court case. I believe that the BHA properly excluded certain disbursements from Ms. DeCambre's SNT and factored-in only those that needed to be included. It is, therefore, my opinion that the BHA calculated Ms. DeCambre's rent correctly.

It is also my opinion that the BHA acted in good faith in scheduling a hearing with Ms. DeCambre as expeditiously as possible. It is my opinion that the BHA did not act

**ADD.**

deliberately to upset or harm Ms. DeCambre. It is my opinion that the BHA correctly denied Ms. DeCambre's reasonable accommodation request.

Sincerely,

Matthew S. Baronas
Assistant Executive Director

## J. Whitfield Larrabee

| | |
|---|---|
| **From:** | <ECFnotice@mad.uscourts.gov> |
| **To:** | <CourtCopy@mad.uscourts.gov> |
| **Sent:** | Monday, August 03, 2015 11:12 AM |
| **Subject:** | Activity in Case 1:15-cv-12204-WGY DeCambre v. Brookline Housing Authority Motion Hearing |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 8/3/2015 at 11:12 AM EDT and filed on 7/22/2015

**Case Name:** DeCambre v. Brookline Housing Authority

**Case Number:** 1:15-cv-12204-WGY

**Filer:**

**Document Number:** 14(No document attached)

## Docket Text:

**ELECTRONIC Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 7/22/2015 re [6] MOTION to Dismiss filed by Brookline Housing Authority. The Court enters an Order administratively closing this matter until the related case currently before the Court of Appeals is addressed. This matter may be reopened upon the motion of any party when either a notice of the appeal being withdrawn or exhausted or a mandate issues. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Larrabee for the plaintiff, Egan for the defendant) (Gaudet, Jennifer)**

**1:15-cv-12204-WGY Notice has been electronically mailed to:**

John Egan     jegan@rubinrudman.com, bweadick@rubinrudman.com

J. Whitfield Larrabee     jw.larrabee@verizon.net

Amy M. McCallen     amccallen@rubinrudman.com, bweadick@rubinrudman.com

**1:15-cv-12204-WGY Notice will not be electronically mailed to:**

9/23/2015

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action
No: 15-cv-12204-WGY

DeCambre
Plaintiff

v.

Brookline Housing Authority
Defendant

## ORDER FOR CLOSURE

YOUNG, D.J.

      In order to avoid the necessity for counsel to appear at periodic status conferences, it is hereby ORDERED that the above-entitled action be and hereby is CLOSED without entry of judgment. All material statutes of limitation are tolled as of the date of the filing of the complaint herein as to all matters raised therein. The case may be reopened upon motion by any party demonstrating that the above-entitled impediment to trial has been removed. This closure is without prejudice to either party moving to restore it to the docket, if any further action is required.

By the Court,

    /s/ Jennifer Gaudet
Deputy Clerk

August 3, 2015

To: All Counsel

48

injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judi-

cial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

  (1) compel agency action unlawfully withheld or unreasonably delayed; and

  (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 "Precedence of cases in the United States Court of Appeals for the Federal Circuit".

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, "Bankruptcy appeals", which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 "Final decisions of Puerto Rico and Hawaii Supreme Courts".

## §1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.)

Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designation, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

AMENDMENTS

1982—Pub. L. 97–164, §124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

### EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

### TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

### § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

. (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in

Sec.
1345. United States as plaintiff.
1346. United States as defendant.
1347. Partition action where United States is joint tenant.
1348. Banking association as party.
1349. Corporation organized under federal law as party.
1350. Alien's action for tort.
1351. Consuls, vice consuls, and members of a diplomatic mission as defendant.
1352. Bonds executed under federal law.
1353. Indian allotments.
1354. Land grants from different states.
1355. Fine, penalty or forfeiture.
1356. Seizures not within admiralty and maritime jurisdiction.
1357. Injuries under Federal laws.
1358. Eminent domain.
1359. Parties collusively joined or made.
1360. State civil jurisdiction in actions to which Indians are parties.
1361. Action to compel an officer of the United States to perform his duty.
1362. Indian tribes.
1363. Jurors' employment rights.
1364. Direct actions against insurers of members of diplomatic missions and their families.
1365. Senate actions.
1366. Construction of references to laws of the United States or Acts of Congress.
1367. Supplemental jurisdiction.
1368. Counterclaims in unfair practices in international trade.
1369. Multiparty, multiforum jurisdiction.

AMENDMENTS

2002—Pub. L. 107–273, div. C, title I, §11020(b)(1)(B), Nov. 2, 2002, 116 Stat. 1827, added item 1369.

1999—Pub. L. 106–113, div. B, §1000(a)(9) [title III, §3009(2)], Nov. 29, 1999, 113 Stat. 1536, 1501A–552, substituted "trademarks" for "trade-marks" in item 1338.

1998—Pub. L. 105–304, title V, §503(b)(2)(B), Oct. 28, 1998, 112 Stat. 2917, inserted "designs," after "mask works," in item 1338.

1995—Pub. L. 104–88, title III, §305(a)(4), Dec. 29, 1995, 109 Stat. 944, substituted "Surface Transportation Board's" for "Interstate Commerce Commission's" in item 1336.

1994—Pub. L. 103–465, title III, §321(b)(3)(B), Dec. 8, 1994, 108 Stat. 4947, added item 1368.

1990—Pub. L. 101–650, title III, §310(b), Dec. 1, 1990, 104 Stat. 5114, added item 1367.

1988—Pub. L. 100–702, title X, §1020(a)(7), Nov. 19, 1988, 102 Stat. 4672, substituted "Actions" for "Action" in item 1330, inserted a period after "question" in item 1331, substituted "plant variety protection, copyrights, mask works, trade-marks," for "copyrights, and trade-marks" in item 1338, and inserted "and elective franchise" in item 1343.

1986—Pub. L. 99–336, §6(a)(1)(A), June 19, 1986, 100 Stat. 638, renumbered item 1364 "Senate actions" and item 1364 "Construction of references to laws of the United States or Acts of Congress" as items 1365 and 1366, respectively.

1984—Pub. L. 98–353, title I, §101(7), July 10, 1984, 98 Stat. 333, substituted "cases" for "matters" in item 1334.

1980—Pub. L. 96–486, §2(b), Dec. 1, 1980, 94 Stat. 2369, struck out "; amount in controversy; costs." after "question" in item 1331.

1978—Pub. L. 95–598, title II, §238(b), Nov. 6, 1978, 92 Stat. 2668, directed the substitution of "Bankruptcy appeals" for "Bankruptcy matters and proceedings" in item 1334, which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

Pub. L. 95–572, §6(b)(2), Nov. 2, 1978, 92 Stat. 2457, added item 1363 and redesignated former item 1363

"Construction of references to laws of the United States or Acts of Congress", as 1364.

Pub. L. 95–521, title VII, §705(f)(2), Oct. 26, 1978, 92 Stat. 1680, added item 1364 "Senate actions".

Pub. L. 95–486, §9(c), Oct. 20, 1978, 92 Stat. 1634, substituted "Commerce and antitrust regulations; amount in controversy, costs" for "Commerce and antitrust regulations" in item 1337.

Pub. L. 95–393, §§7(b), 8(a)(2), Sept. 30, 1978, 92 Stat. 810, substituted "Consuls, vice consuls, and members of a diplomatic mission as defendant" for "Consuls and vice consuls as defendants" in item 1351 and added item 1364 "Direct actions against insurers of members of diplomatic missions and their families".

1976—Pub. L. 94–583, §2(b), Oct. 21, 1976, 90 Stat. 2891, added item 1330.

1970—Pub. L. 91–358, title I, §172(c)(2), July 29, 1970, 84 Stat. 591, added item 1363.

1966—Pub. L. 89–635, §2, Oct. 10, 1966, 80 Stat. 880, added item 1362.

1962—Pub. L. 87–748, §1(b), Oct. 5, 1962, 76 Stat. 744, added item 1361.

1958—Pub. L. 85–554, §4, July 25, 1958, 72 Stat. 415, inserted "costs" in items 1331 and 1332.

1953—Act Aug. 15, 1953, ch. 505, §3, 67 Stat. 589, added item 1360.

§ 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

(Added Pub. L. 94–583, §2(a), Oct. 21, 1976, 90 Stat. 2891.)

EFFECTIVE DATE

Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94–583, set out as a note under section 1602 of this title.

§ 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, §1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, §2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, §2(a), Dec. 1, 1980, 94 Stat. 2369.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, §1, 48 Stat. 775; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§30–43. See, also, reviser's note under section 1332 of this title.)

revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade.

(June 25, 1948, ch. 646, 62 Stat. 932; Pub. L. 96–417, title V, § 501(21), Oct. 10, 1980, 94 Stat. 1742.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 41(5) (Mar. 3, 1911, ch. 231, § 24, par. 5, 36 Stat. 1092; Mar. 2, 1929, ch. 488, § 1, 45 Stat. 1475).

Words "Customs Court" were substituted for "Court of Customs and Patent Appeals." Section 41(5) of title 28, U.S.C., 1940 ed., is based on the Judicial Code of 1911. At that time the only court, other than the district courts, having jurisdiction of customs cases, was the Court of Customs Appeals which became the Court of Customs and Patent Appeals in 1929. The Customs Court was created in 1926 as a court of original jurisdiction over customs cases. (See reviser's note preceding section 251 of this title.)

Words "any civil action" were substituted for "all cases" in view of Rule 2 of the Federal Rules of Civil Procedure.

Changes were made in phraseology.

AMENDMENTS

1980—Pub. L. 96–417 redesignated the Customs Court as the Court of International Trade.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–417 effective Nov. 1, 1980, and applicable with respect to civil actions pending on or commenced on or after such date, see section 701(a) of Pub. L. 96–417, set out as a note under section 251 of this title.

§ 1341. Taxes by States

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

(June 25, 1948, ch. 646, 62 Stat. 932.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 41(1) (Mar. 3, 1911, ch. 231, § 24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, § 1, 48 Stat. 775; Aug. 21, 1937, ch. 726, § 1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

This section restates the last sentence of section 41(1) of title 28, U.S.C., 1940 ed.

Other provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1331, 1332, 1342, 1345, 1354, and 1359 of this title.

Words "at law or in equity" before "in the courts of such State" were omitted as unnecessary.

Words "civil action" were substituted for "suit" in view of Rule 2 of the Federal Rules of Civil Procedure.

Words "under State law" were substituted for "imposed by or pursuant to the laws of any State" for the same reason.

§ 1342. Rate orders of State agencies

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

(June 25, 1948, ch. 646, 62 Stat. 932.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 41(1) (Mar. 3, 1911, ch. 231, § 24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, § 1, 48 Stat. 775; Aug. 21, 1937, ch. 726, § 1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

This section rearranges and restates the fourth sentence of section 41(1) of title 28, U.S.C., 1940 ed.

Other provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1331, 1332, 1341, 1345, 1354, and 1359 of this title.

Words "at law or in equity" before "in the courts of such State" were omitted as unnecessary.

Words "civil action" were substituted for "suit," in view of Rule 2 of the Federal Rules of Civil Procedure.

Word "operation" was substituted for "enforcement, operation or execution" for the same reason.

§ 1343. Civil rights and elective franchise

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b) For purposes of this section—

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(June 25, 1948, ch. 646, 62 Stat. 932; Sept. 3, 1954, ch. 1263, § 42, 68 Stat. 1241; Pub. L. 85–315, part III, § 121, Sept. 9, 1957, 71 Stat. 637; Pub. L. 96–170, § 2, Dec. 29, 1979, 93 Stat. 1284.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 41(12), (13), and (14) (Mar. 3, 1911, ch. 231, § 24, pars. 12, 13, 14, 36 Stat. 1092).

Words "civil action" were substituted for "suits," "suits at law or in equity" in view of Rule 2 of the Federal Rules of Civil Procedure.

Numerous changes were made in arrangement and phraseology.

AMENDMENTS

1979—Pub. L. 96–170 designated existing provisions as subsec. (a) and added subsec. (b).

1957—Pub. L. 85–315 inserted "and elective franchise" in section catchline and added par. (4).
1954—Act Sept. 3, 1954, substituted "section 1985 of Title 42" for "section 47 of Title 8" wherever appearing.

EFFECTIVE DATE OF 1979 AMENDMENT

Section 3 of Pub. L. 96–170 provided that: "The amendments made by this Act [amending this section and section 1983 of Title 42, The Public Health and Welfare] shall apply with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after the date of the enactment of this Act [Dec. 29, 1979]."

§ 1344. Election disputes

The district courts shall have original jurisdiction of any civil action to recover possession of any office, except that of elector of President or Vice President, United States Senator, Representative in or delegate to Congress, or member of a state legislature, authorized by law to be commenced, where in it appears that the sole question touching the title to office arises out of denial of the right to vote, to any citizen offering to vote, on account of race, color or previous condition of servitude.

The jurisdiction under this section shall extend only so far as to determine the rights of the parties to office by reason of the denial of the right, guaranteed by the Constitution of the United States and secured by any law, to enforce the right of citizens of the United States to vote in all the States.

(June 25, 1948, ch. 646, 62 Stat. 932.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 41(15) (Mar. 3, 1911, ch. 231, § 24, par. 15, 36 Stat. 1092).

Words "civil action" were substituted for "suits," in view of Rule 2 of the Federal Rules of Civil Procedure.

Words "United States Senator" were added, as no reason appears for including Representatives and excluding Senators. Moreover, the Seventeenth amendment, providing for the popular election of Senators, was adopted after the passage of the 1911 law on which this section is based.

Changes were made in phraseology.

§ 1345. United States as plaintiff

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

(June 25, 1948, ch. 646, 62 Stat. 933.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 41(1) (Mar. 3, 1911, ch. 231, § 24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, § 1, 48 Stat. 775; Aug. 21, 1937, ch. 726, § 1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

Other provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1331, 1332, 1341, 1342, 1354, and 1359 of this title.

Words "civil actions, suits or proceedings" were substituted for "suits of a civil nature, at common law or in equity" in view of Rules 2 and 81(a)(7) of the Federal Rules of Civil Procedure.

Word "agency" was inserted in order that this section shall apply to actions by agencies of the Government and to conform with special acts authorizing such actions. (See definitive section 451 of this title.)

The phrase "Except as otherwise provided by Act of Congress," at the beginning of the section was inserted to make clear that jurisdiction exists generally in district courts in the absence of special provisions conferring it elsewhere.

Changes were made in phraseology.

§ 1346. United States as defendant

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(b)(1) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

(2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

(c) The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section.

(d) The district courts shall not have jurisdiction under this section of any civil action or claim for a pension.

55

Subsec. (b). Pub. L. 99–506, §§103(d)(2)(B), (C), 1001(f)(2), substituted "individual with handicaps" for "handicapped individual", "individuals with handicaps" for "handicapped individuals", and "a contract" for "his contract".

Subsec. (c). Pub. L. 99–506, §1001(f)(3), substituted "The President" for "he" in two places and substituted "the reasons" for "his reasons".

1978—Subsec. (a). Pub. L. 95–602 substituted "section 706(7) of this title" for "section 706(6) of this title".

## § 794. Nondiscrimination under Federal grants and programs

### (a) Promulgation of rules and regulations

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

### (b) "Program or activity" defined

For the purposes of this section, the term "program or activity" means all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 7801 of title 20), system of vocational education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

### (c) Significant structural alterations by small providers

Small providers are not required by subsection (a) of this section to make significant structural alterations to their existing facilities for the purpose of assuring program accessibility, if alternative means of providing the services are available. The terms used in this subsection shall be construed with reference to the regulations existing on March 22, 1988.

### (d) Standards used in determining violation of section

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510,[1] of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

(Pub. L. 93–112, title V, §504, Sept. 26, 1973, 87 Stat. 394; Pub. L. 95–602, title I, §§119, 122(d)(2), Nov. 6, 1978, 92 Stat. 2982, 2987; Pub. L. 99–506, title I, §103(d)(2)(B), title X, §1002(e)(4), Oct. 21, 1986, 100 Stat. 1810, 1844; Pub. L. 100–259, §4, Mar. 22, 1988, 102 Stat. 29; Pub. L. 100–630, title II, §206(d), Nov. 7, 1988, 102 Stat. 3312; Pub. L. 102–569, title I, §102(p)(32), title V, §506, Oct. 29, 1992, 106 Stat. 4360, 4428; Pub. L. 103–382, title III, §394(l)(2), Oct. 20, 1994, 108 Stat. 4029; Pub. L. 105–220, title IV, §408(a)(3), Aug. 7, 1998, 112 Stat. 1203; Pub. L. 107–110, title X, §1076(u)(2), Jan. 8, 2002, 115 Stat. 2093.)

#### REFERENCES IN TEXT

The amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978, referred to in subsec. (a), mean the amendments made by Pub. L. 95–602. See 1978 Amendments note below.

The Americans with Disabilities Act of 1990, referred to in subsec. (d), is Pub. L. 101–336, July 26, 1990, 104 Stat. 327. Title I of the Act is classified generally to subchapter I (§12111 et seq.) of chapter 126 of Title 42, The Public Health and Welfare. Section 510 of the Act was renumbered section 511 by Pub. L. 110–325, §6(a)(2), Sept. 25, 2008, 122 Stat. 3558. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of Title 42 and Tables.

#### AMENDMENTS

2002—Subsec. (b)(2)(B). Pub. L. 107–110 substituted "section 7801 of title 20" for "section 8801 of title 20".

1998—Subsec. (a). Pub. L. 105–220 substituted "section 705(20)" for "section 706(8)".

1994—Subsec. (b)(2)(B). Pub. L. 103–382 substituted "section 8801 of title 20" for "section 2891(12) of title 20".

1992—Subsec. (a). Pub. L. 102–569, §102(p)(32), substituted "a disability" for "handicaps" and "disability" for "handicap" in first sentence.

Subsec. (d). Pub. L. 102–569, §506, added subsec. (d).

1988—Subsec. (a). Pub. L. 100–630, §206(d)(1), substituted "her or his handicap" for "his handicap".

Pub. L. 100–259, §4(1), designated existing provisions as subsec. (a).

[1] See References in Text note below.

Subsec. (b). Pub. L. 100–259, § 4(2), added subsec. (b).

Subsec. (b)(2)(B). Pub. L. 100–630, § 205(d)(2), substituted "section 2891(12) of title 20" for "section 2854(a)(10) of title 20".

Subsec. (c). Pub. L. 100–259, § 4(2), added subsec. (c).

1986—Pub. L. 99–506 substituted "individual with handicaps" for "handicapped individual" and "section 706(8) of this title" for "section 706(7) of this title".

1978—Pub. L. 95–602 substituted "section 706(7) of this title" for "section 706(6) of this title" and inserted provision prohibiting discrimination under any program or activity conducted by any Executive agency or by the United States Postal Service and requiring the heads of these agencies to promulgate regulations prohibiting discrimination.

EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–110 effective Jan. 8, 2002, except with respect to certain noncompetitive programs and competitive programs, see section 5 of Pub. L. 107–110, set out as an Effective Date note under section 6301 of Title 20, Education.

EXCLUSION FROM COVERAGE

Amendment by Pub. L. 100–259 not to be construed to extend application of this chapter to ultimate beneficiaries of Federal financial assistance excluded from coverage before Mar. 22, 1988, see section 7 of Pub. L. 100–259, set out as a Construction note under section 1687 of Title 20, Education.

ABORTION NEUTRALITY

Amendment by Pub. L. 100–259 not to be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal funds to perform or pay for an abortion, see section 8 of Pub. L. 100–259, set out as a note under section 1688 of Title 20, Education.

CONSTRUCTION OF PROHIBITION AGAINST DISCRIMINATION UNDER FEDERAL GRANTS

Rights or protections of this section not affected by any provision of Pub. L. 98–457, see section 127 of Pub. L. 98–457, set out as a note under section 5101 of Title 42, The Public Health and Welfare.

COORDINATION OF IMPLEMENTATION AND ENFORCEMENT OF PROVISIONS

For provisions relating to the coordination of implementation and enforcement of the provisions of this section by the Attorney General, see section 1–201 of Ex. Ord. No. 12250, Nov. 2, 1980, 45 F.R. 72995, set out as a note under section 2000d–1 of Title 42, The Public Health and Welfare.

EXECUTIVE ORDER NO. 11914

Ex. Ord. No. 11914, Apr. 28, 1976, 41 F.R. 17871, which related to nondiscrimination in federally assisted programs, was revoked by Ex. Ord. No. 12250, Nov. 2, 1980, 45 F.R. 72995, set out as a note under section 2000d–1 of Title 42, The Public Health and Welfare.

§ 794a. Remedies and attorney fees

(a)(1) The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e–5(f) through (k)) (and the application of section 706(e)(3) (42 U.S.C. 2000e–5(e)(3)) to claims of discrimination in compensation), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action rem-

edy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

(b) In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

(Pub. L. 93–112, title V, § 505, as added Pub. L. 95–602, title I, § 120(a), Nov. 6, 1978, 92 Stat. 2982; amended Pub. L. 111–2, § 5(c)(1), Jan. 29, 2009, 123 Stat. 6.)

REFERENCES IN TEXT

The Civil Rights Act of 1964, referred to in subsec. (a)(2), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241. Title VI of the Civil Rights Act of 1964 is classified generally to subchapter V (§ 2000d et seq.) of chapter 21 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of Title 42 and Tables.

AMENDMENTS

2009—Subsec. (a)(1). Pub. L. 111–2, § 5(c)(1)(A), inserted "(and the application of section 706(e)(3) (42 U.S.C. 2000e–5(e)(3)) to claims of discrimination in compensation)" after "(42 U.S.C. 2000e–5(f) through (k))".

Subsec. (a)(2). Pub. L. 111–2, § 5(c)(1)(B), inserted "(42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation)" after "1964".

EFFECTIVE DATE OF 2009 AMENDMENT

Amendment by Pub. L. 111–2 effective as if enacted May 28, 2007, and applicable to certain claims of discrimination in compensation pending on or after that date, see section 6 of Pub. L. 111–2, set out as a note under section 2000e–5 of Title 42, The Public Health and Welfare.

§ 794b. Removal of architectural, transportation, or communication barriers; technical and financial assistance; compensation of experts or consultants; authorization of appropriations

(a) The Secretary may provide directly or by contract with State vocational rehabilitation agencies or experts or consultants or groups thereof, technical assistance—

(1) to persons operating community rehabilitation programs; and

(2) with the concurrence of the Access Board established by section 792 of this title, to any public or nonprofit agency, institution, or organization;

for the purpose of assisting such persons or entities in removing architectural, transportation, or communication barriers. Any concurrence of the Access Board under paragraph (2) shall re-

notes under sections 12111, 12131, 12141, 12161, and 12181 of this title] may be cited as the 'Americans with Disabilities Act of 1990'."

FINDINGS AND PURPOSES OF PUB. L. 110–325

Pub. L. 110–325, §2, Sept. 25, 2008, 122 Stat. 3553, provided that:

"(a) FINDINGS.—Congress finds that—

"(1) in enacting the Americans with Disabilities Act of 1990 (ADA) [42 U.S.C. 12101 et seq.], Congress intended that the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide broad coverage;

"(2) in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers;

"(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973 [29 U.S.C. 701 et seq.], that expectation has not been fulfilled;

"(4) the holdings of the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

"(5) the holding of the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

"(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

"(7) in particular, the Supreme Court, in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress; and

"(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term 'substantially limits' as 'significantly restricted' are inconsistent with congressional intent, by expressing too high a standard.

"(b) PURPOSES.—The purposes of this Act [see Short Title of 2008 Amendment note above] are—

"(1) to carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' and 'clear, strong, consistent, enforceable standards addressing discrimination' by reinstating a broad scope of protection to be available under the ADA;

"(2) to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

"(3) to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

"(4) to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited

in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives';

"(5) to convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for 'substantially limits', and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

"(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term 'substantially limits' as 'significantly restricted' to be consistent with this Act, including the amendments made by this Act."

STUDY BY GENERAL ACCOUNTING OFFICE OF EXISTING DISABILITY-RELATED EMPLOYMENT INCENTIVES

Pub. L. 106–170, title III, §303(a), Dec. 17, 1999, 113 Stat. 1903, provided that, as soon as practicable after Dec. 17, 1999, the Comptroller General was to undertake a study to assess existing tax credits and other disability-related employment incentives under the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.) and other Federal laws, specifically addressing the extent to which such credits and other incentives would encourage employers to hire and retain individuals with disabilities; and that, not later than 3 years after Dec. 17, 1999, the Comptroller General was to transmit to the appropriate congressional committees a written report presenting the results of the study and any appropriate recommendations for legislative or administrative changes.

§12102. Definition of disability

As used in this chapter:

(1) Disability

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major life activities

(A) In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

**(3)** Regarded as having such an impairment

For purposes of paragraph (1)(C):

**(A)** An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

**(B)** Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

**(4)** Rules of construction regarding the definition of disability

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

**(A)** The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

**(B)** The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

**(C)** An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

**(D)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(E)(i)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

   **(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

   **(II)** use of assistive technology;

   **(III)** reasonable accommodations or auxiliary aids or services; or

   **(IV)** learned behavioral or adaptive neurological modifications.

**(ii)** The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

**(iii)** As used in this subparagraph—

   **(I)** the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

   **(II)** the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

(Pub. L. 101–336, §3, July 26, 1990, 104 Stat. 329; Pub. L. 110–325, §4(a), Sept. 25, 2008, 122 Stat. 3555.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

The ADA Amendments Act of 2008, referred to in par. (4)(B), is Pub. L. 110–325, Sept. 25, 2008, 122 Stat. 3553. Section 2 of the Act, relating to the findings and purposes of the Act, is set out as a note under section 12101 of this title. For complete classification of this Act to the Code, see Short Title of 2008 Amendment note under section 12101 of this title and Tables.

AMENDMENTS

2008—Pub. L. 110–325 amended section generally. Prior to amendment, section consisted of pars. (1) to (3) defining for purposes of this chapter "auxiliary aids and services", "disability", and "State".

EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–325 effective Jan. 1, 2009, see section 8 of Pub. L. 110–325, set out as a note under section 705 of Title 29, Labor.

## § 12103. Additional definitions

As used in this chapter:

**(1)** Auxiliary aids and services

The term "auxiliary aids and services" includes—

   **(A)** qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

   **(B)** qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;

   **(C)** acquisition or modification of equipment or devices; and

   **(D)** other similar services and actions.

**(2)** State

The term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands of the United States, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.''.

(Pub. L. 101–336, §4, as added Pub. L. 110–325, §4(b), Sept. 25, 2008, 122 Stat. 3556.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

EFFECTIVE DATE

Section effective Jan. 1, 2009, see section 8 of Pub. L. 110–325, set out as an Effective Date of 2008 Amendment note under section 705 of Title 29, Labor.

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

tion under this subchapter and under the Rehabilitation Act of 1973 [29 U.S.C. 701 et seq.] shall develop procedures to ensure that administrative complaints filed under this subchapter and under the Rehabilitation Act of 1973 are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under this subchapter and the Rehabilitation Act of 1973. The Commission, the Attorney General, and the Office of Federal Contract Compliance Programs shall establish such coordinating mechanisms (similar to provisions contained in the joint regulations promulgated by the Commission and the Attorney General at part 42 of title 28 and part 1691 of title 29, Code of Federal Regulations, and the Memorandum of Understanding between the Commission and the Office of Federal Contract Compliance Programs dated January 16, 1981 (46 Fed. Reg. 7435, January 23, 1981)) in regulations implementing this subchapter and Rehabilitation Act of 1973 not later than 18 months after July 26, 1990.

(Pub. L. 101–336, title I, § 107, July 26, 1990, 104 Stat. 336.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

The Rehabilitation Act of 1973, referred to in subsec. (b), is Pub. L. 93–112, Sept. 26, 1973, 87 Stat. 355, as amended, which is classified generally to chapter 16 (§ 701 et seq.) of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 701 of Title 29 and Tables.

SUBCHAPTER II—PUBLIC SERVICES

PART A—PROHIBITION AGAINST DISCRIMINATION AND OTHER GENERALLY APPLICABLE PROVISIONS

§ 12131. Definitions

As used in this subchapter:

(1) Public entity

The term "public entity" means—

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4)[1] of title 49).

(2) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

(Pub. L. 101–336, title II, § 201, July 26, 1990, 104 Stat. 337.)

_____
[1] See References in Text note below.

REFERENCES IN TEXT

Section 24102 of title 49, referred to in par. (1)(C), was subsequently amended, and section 24102(4) no longer defines "commuter authority". However, such term is defined elsewhere in that section.

CODIFICATION

In par. (1)(C), "section 24102(4) of title 49" substituted for "section 103(8) of the Rail Passenger Service Act" on authority of Pub. L. 103–272, § 6(b), July 5, 1994, 108 Stat. 1378, the first section of which enacted subtitles II, III, and V to X of Title 49, Transportation.

EFFECTIVE DATE

Section 205 of Pub. L. 101–336 provided that:

"(a) GENERAL RULE.—Except as provided in subsection (b), this subtitle [subtitle A (§§ 201–205) of title II of Pub. L. 101–336, enacting this part] shall become effective 18 months after the date of enactment of this Act [July 26, 1990].

"(b) EXCEPTION.—Section 204 [section 12134 of this title] shall become effective on the date of enactment of this Act."

EX. ORD. NO. 13217. COMMUNITY-BASED ALTERNATIVES FOR INDIVIDUALS WITH DISABILITIES

Ex. Ord. No. 13217, June 18, 2001, 66 F.R. 33155, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to place qualified individuals with disabilities in community settings whenever appropriate, it is hereby ordered as follows:

SECTION 1. Policy. This order is issued consistent with the following findings and principles:

(a) The United States is committed to community-based alternatives for individuals with disabilities and recognizes that such services advance the best interests of Americans.

(b) The United States seeks to ensure that America's community-based programs effectively foster independence and participation in the community for Americans with disabilities.

(c) Unjustified isolation or segregation of qualified individuals with disabilities through institutionalization is a form of disability-based discrimination prohibited by Title II of the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. 12101 [12131] et seq. States must avoid disability-based discrimination unless doing so would fundamentally alter the nature of the service, program, or activity provided by the State.

(d) In Olmstead v. L.C., 527 U.S. 581 (1999) (the "Olmstead decision"), the Supreme Court construed Title II of the ADA [42 U.S.C. 12131 et seq.] to require States to place qualified individuals with mental disabilities in community settings, rather than in institutions, whenever treatment professionals determine that such placement is appropriate, the affected persons do not oppose such placement, and the State can reasonably accommodate the placement, taking into account the resources available to the State and the needs of others with disabilities.

(e) The Federal Government must assist States and localities to implement swiftly the Olmstead decision, so as to help ensure that all Americans have the opportunity to live close to their families and friends, to live more independently, to engage in productive employment, and to participate in community life.

SEC. 2. Swift Implementation of the Olmstead Decision: Agency Responsibilities. (a) The Attorney General, the Secretaries of Health and Human Services, Education, Labor, and Housing and Urban Development, and the Commissioner of the Social Security Administration shall work cooperatively to ensure that the Olmstead decision is implemented in a timely manner. Specifically, the designated agencies should work with States to help them assess their compliance with the Olmstead decision and the ADA [42 U.S.C. 12101 et seq.] in providing services to qualified individuals with disabilities in

community-based settings, as long as such services are appropriate to the needs of those individuals. These agencies should provide technical guidance and work cooperatively with States to achieve the goals of Title II of the ADA [42 U.S.C. 12131 et seq.], particularly where States have chosen to develop comprehensive, effectively working plans to provide services to qualified individuals with disabilities in the most integrated settings. These agencies should also ensure that existing Federal resources are used in the most effective manner to support the goals of the ADA. The Secretary of Health and Human Services shall take the lead in coordinating these efforts.

(b) The Attorney General, the Secretaries of Health and Human Services, Education, Labor, and Housing and Urban Development, and the Commissioner of the Social Security Administration shall evaluate the policies, programs, statutes, and regulations of their respective agencies to determine whether any should be revised or modified to improve the availability of community-based services for qualified individuals with disabilities. The review shall focus on identifying affected populations, improving the flow of information about supports in the community, and removing barriers that impede opportunities for community placement. The review should ensure the involvement of consumers, advocacy organizations, providers, and relevant agency representatives. Each agency head should report to the President, through the Secretary of Health and Human Services, with the results of their evaluation within 120 days.

(c) The Attorney General and the Secretary of Health and Human Services shall fully enforce Title II of the ADA, including investigating and resolving complaints filed on behalf of individuals who allege that they have been the victims of unjustified institutionalization. Whenever possible, the Department of Justice and the Department of Health and Human Services should work cooperatively with States to resolve these complaints, and should use alternative dispute resolution to bring these complaints to a quick and constructive resolution.

(d) The agency actions directed by this order shall be done consistent with this Administration's budget.

SEC. 3. *Judicial Review.* Nothing in this order shall affect any otherwise available judicial review of agency action. This order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

GEORGE W. BUSH.

### § 12132. Discrimination

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

(Pub. L. 101–336, title II, § 202, July 26, 1990, 104 Stat. 337.)

### § 12133. Enforcement

The remedies, procedures, and rights set forth in section 794a of title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

(Pub. L. 101–336, title II, § 203, July 26, 1990, 104 Stat. 337.)

### § 12134. Regulations

#### (a) In general

Not later than 1 year after July 26, 1990, the Attorney General shall promulgate regulations in an accessible format that implement this part. Such regulations shall not include any matter within the scope of the authority of the Secretary of Transportation under section 12143, 12149, or 12164 of this title.

#### (b) Relationship to other regulations

Except for ''program accessibility, existing facilities'', and ''communications'', regulations under subsection (a) of this section shall be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, 1978), applicable to recipients of Federal financial assistance under section 794 of title 29. With respect to ''program accessibility, existing facilities'', and ''communications'', such regulations shall be consistent with regulations and analysis as in part 39 of title 28 of the Code of Federal Regulations, applicable to federally conducted activities under section 794 of title 29.

#### (c) Standards

Regulations under subsection (a) of this section shall include standards applicable to facilities and vehicles covered by this part, other than facilities, stations, rail passenger cars, and vehicles covered by part B of this subchapter. Such standards shall be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board in accordance with section 12204(a) of this title.

(Pub. L. 101–336, title II, § 204, July 26, 1990, 104 Stat. 337.)

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original ''this Act'', meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

##### EFFECTIVE DATE

Section effective July 26, 1990, see section 205(b) of Pub. L. 101–336, set out as a note under section 12131 of this title.

PART B—ACTIONS APPLICABLE TO PUBLIC TRANSPORTATION PROVIDED BY PUBLIC ENTITIES CONSIDERED DISCRIMINATORY

SUBPART I—PUBLIC TRANSPORTATION OTHER THAN BY AIRCRAFT OR CERTAIN RAIL OPERATIONS

### § 12141. Definitions

As used in this subpart:

#### (1) Demand responsive system

The term ''demand responsive system'' means any system of providing designated public transportation which is not a fixed route system.

#### (2) Designated public transportation

The term ''designated public transportation'' means transportation (other than pub-

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

## TITLE 42 - THE PUBLIC HEALTH AND WELFARE
### CHAPTER 21 - CIVIL RIGHTS
#### SUBCHAPTER I - GENERALLY

### § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(R.S. § 1979; Pub. L. 96–170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104–317, title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

### Codification

R.S. § 1979 derived from act Apr. 20, 1871, ch. 22, § 1, 17 Stat. 13.

Section was formerly classified to section 43 of Title 8, Aliens and Nationality.

### Amendments

1996—Pub. L. 104–317 inserted before period at end of first sentence ", except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable".

1979—Pub. L. 96–170 inserted "or the District of Columbia" after "Territory", and provisions relating to Acts of Congress applicable solely to the District of Columbia.

### Effective Date of 1979 Amendment

Amendment by Pub. L. 96–170 applicable with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after Dec. 29, 1979, see section 3 of Pub. L. 96–170, set out as a note under section 1343 of Title 28, Judiciary and Judicial Procedure.

- 1 -

(vi) order other corrective action with respect to the agency.

(B) TERMINATION OF COMPLIANCE ACTION.—If the Secretary takes action under subparagraph (A) with respect to a public housing agency, the Secretary shall—

(i) in the case of action under subparagraph (A)(i), resume payments of assistance amounts under section 1437g of this title to the agency in the full amount of the total allocations under section 1437g of this title for the agency at the time that the Secretary first determines that the agency will comply with the provisions of this chapter relating to the public housing program;

(ii) in the case of action under clause (ii) or (v) of subparagraph (A), make withheld amounts available as the Secretary considers appropriate to ensure that the agency complies with the provisions of this chapter relating to such program;

(iii) in the case of action under subparagraph (A)(iv), release such restrictions at the time that the Secretary first determines that the agency will comply with the provisions of this chapter relating to such program; or

(iv) in the case of action under subparagraph (vi), cease such action at the time that the Secretary first determines that the agency will comply with the provisions of this chapter relating to such program.

(5) The Secretary shall submit to the Congress annually, as a part of the report of the Secretary under section 3536 of this title, a report that—

(A) identifies the public housing agencies that have been designated as troubled under paragraph (2);

(B) describes the grounds on which such public housing agencies were designated as troubled and continue to be so designated;

(C) describes the agreements that have been entered into with such agencies under such paragraph;

(D) describes the status of progress under such agreements;

(E) describes any action that has been taken in accordance with paragraph (3), including an accounting of the authorized funds that have been expended to support such actions; and

(F) describes the status of any public housing agency designated as troubled with respect to the program for assistance from the Capital Fund under section 1437g(d) of this title and specifies the amount of assistance the agency received under such program.

(6)(A) To the extent that the Secretary determines such action to be necessary in order to ensure the accuracy of any certification made under this section, the Secretary shall require an independent auditor to review documentation or other information maintained by a public housing agency pursuant to this section to substantiate each certification submitted by the agency or corporation relating to the performance of that agency or corporation.

(B) The Secretary may withhold, from assistance otherwise payable to the agency or corporation under section 1437g of this title,

amounts sufficient to pay for the reasonable costs of any review under this paragraph.

(7) The Secretary shall apply the provisions of this subsection to resident management corporations in the same manner as applied to public housing agencies.

**(k) Administrative grievance procedure regulations; grounds of adverse action, hearing, examination of documents, representation, evidence, decision; judicial hearing; eviction and termination procedures**

The Secretary shall by regulation require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure under which tenants will—

(1) be advised of the specific grounds of any proposed adverse public housing agency action;

(2) have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (*l*) of this section;

(3) have an opportunity to examine any documents or records or regulations related to the proposed action;

(4) be entitled to be represented by another person of their choice at any hearing;

(5) be entitled to ask questions of witnesses and have others make statements on their behalf; and

(6) be entitled to receive a written decision by the public housing agency on the proposed action.

For any grievance concerning an eviction or termination of tenancy that involves any activity that threatens the health, safety, or right to peaceful enjoyment of the premises of other tenants or employees of the public housing agency or any violent or drug-related criminal activity on or off such premises, or any activity resulting in a felony conviction, the agency may (A) establish an expedited grievance procedure as the Secretary shall provide by rule under section 553 of title 5, or (B) exclude from its grievance procedure any such grievance, in any jurisdiction which requires that prior to eviction, a tenant be given a hearing in court which the Secretary determines provides the basic elements of due process (which the Secretary shall establish by rule under section 553 of title 5). Such elements of due process shall not include a requirement that the tenant be provided an opportunity to examine relevant documents within in the possession of the public housing agency. The agency shall provide to the tenant a reasonable opportunity, prior to hearing or trial, to examine any relevant documents, records, or regulations directly related to the eviction or termination.

**(*l*) Leases; terms and conditions; maintenance; termination**

Each public housing agency shall utilize leases which—

(1) have a term of 12 months and shall be automatically renewed for all purposes except for noncompliance with the requirements under section 1437j(c) of this title (relating to community service requirements); except that

**(j) Repealed. Pub. L. 105–276, title V, §550(a)(6), Oct. 21, 1998, 112 Stat. 2609**

**(k) Verification of income**

The Secretary shall establish procedures which are appropriate and necessary to assure that income data provided to public housing agencies and owners by families applying for or receiving assistance under this section is complete and accurate. In establishing such procedures, the Secretary shall randomly, regularly, and periodically select a sample of families to authorize the Secretary to obtain information on these families for the purpose of income verification, or to allow those families to provide such information themselves. Such information may include, but is not limited to, data concerning unemployment compensation and Federal income taxation and data relating to benefits made available under the Social Security Act [42 U.S.C. 301 et seq.], the Food and Nutrition Act of 2008 [7 U.S.C. 2011 et seq.], or title 38. Any such information received pursuant to this subsection shall remain confidential and shall be used only for the purpose of verifying incomes in order to determine eligibility of families for benefits (and the amount of such benefits, if any) under this section.

**(*l*), (m) Repealed. Pub. L. 98–181, title II, §209(a)(5), Nov. 30, 1983, 97 Stat. 1183**

**(n) Repealed. Pub. L. 105–276, title V, §550(a)(7), Oct. 21, 1998, 112 Stat. 2609**

**(*o*) Voucher program**

**(1) Authority**

**(A) In general**

The Secretary may provide assistance to public housing agencies for tenant-based assistance using a payment standard established in accordance with subparagraph (B). The payment standard shall be used to determine the monthly assistance that may be paid for any family, as provided in paragraph (2).

**(B) Establishment of payment standard**

Except as provided under subparagraph (D), the payment standard for each size of dwelling unit in a market area shall not exceed 110 percent of the fair market rental established under subsection (c) of this section for the same size of dwelling unit in the same market area and shall be not less than 90 percent of that fair market rental.

**(C) Set-aside**

The Secretary may set aside not more than 5 percent of the budget authority made available for assistance under this subsection as an adjustment pool. The Secretary shall use amounts in the adjustment pool to make adjusted payments to public housing agencies under subparagraph (A), to ensure continued affordability, if the Secretary determines that additional assistance for such purpose is necessary, based on documentation submitted by a public housing agency.

**(D) Approval**

The Secretary may require a public housing agency to submit the payment standard of the public housing agency to the Secretary for approval, if the payment standard is less than 90 percent of the fair market rental or exceeds 110 percent of the fair market rental.

**(E) Review**

The Secretary—

(i) shall monitor rent burdens and review any payment standard that results in a significant percentage of the families occupying units of any size paying more than 30 percent of adjusted income for rent; and

(ii) may require a public housing agency to modify the payment standard of the public housing agency based on the results of that review.

**(2) Amount of monthly assistance payment**

Subject to the requirement under section 1437a(a)(3) of this title (relating to minimum rental amount), the monthly assistance payment for a family receiving assistance under this subsection shall be determined as follows:

**(A) Tenant-based assistance; rent not exceeding payment standard**

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) does not exceed the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the rent (including the amount allowed for tenant-paid utilities) exceeds the greatest of the following amounts, rounded to the nearest dollar:

(i) 30 percent of the monthly adjusted income of the family.

(ii) 10 percent of the monthly income of the family.

(iii) If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the actual housing costs of the family, is specifically designated by that agency to meet the housing costs of the family, the portion of those payments that is so designated.

**(B) Tenant-based assistance; rent exceeding payment standard**

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) exceeds the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the applicable payment standard exceeds the greatest of amounts under clauses (i), (ii), and (iii) of subparagraph (A).

**(C) Families receiving project-based assistance**

For a family receiving project-based assistance, the rent that the family is required to pay shall be determined in accordance with section 1437a(a)(1) of this title, and the amount of the housing assistance payment shall be determined in accordance with subsection (c)(3) of this section.

**(3) 40 percent limit**

At the time a family initially receives tenant-based assistance under this section with respect to any dwelling unit, the total amount that a family may be required to pay for rent may not exceed 40 percent of the monthly adjusted income of the family.

**(4) Eligible families**

To be eligible to receive assistance under this subsection, a family shall, at the time a family initially receives assistance under this subsection, be a low-income family that is—

(A) a very low-income family;

(B) a family previously assisted under this subchapter;

(C) a low-income family that meets eligibility criteria specified by the public housing agency;

(D) a family that qualifies to receive a voucher in connection with a homeownership program approved under title IV of the Cranston-Gonzalez National Affordable Housing Act; or

(E) a family that qualifies to receive a voucher under section 223 or 226 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990 [12 U.S.C. 4113, 4116].

**(5) Annual review of family income**

**(A) In general**

Reviews of family incomes for purposes of this section shall be subject to the provisions of section 3544 of this title and shall be conducted upon the initial provision of housing assistance for the family and thereafter not less than annually.

**(B) Procedures**

Each public housing agency administering assistance under this subsection shall establish procedures that are appropriate and necessary to ensure that income data provided to the

agency and owners by families applying for or receiving assistance from the agency is complete and accurate. Each public housing agency shall, not less frequently than annually, conduct a review of the family income of each family receiving assistance under this subsection.

### (6) Selection of families and disapproval of owners

#### (A) Preferences

##### (i) Authority to establish

Each public housing agency may establish a system for making tenant-based assistance under this subsection available on behalf of eligible families that provides preference for such assistance to eligible families having certain characteristics, which may include a preference for families residing in public housing who are victims of a crime of violence (as such term is defined in section 16 of title 18) that has been reported to an appropriate law enforcement agency.

##### (ii) Content

Each system of preferences established pursuant to this subparagraph shall be based upon local housing needs and priorities, as determined by the public housing agency using generally accepted data sources, including any information obtained pursuant to an opportunity for public comment as provided under section 1437c–1(f) of this title and under the requirements applicable to the comprehensive housing affordability strategy for the relevant jurisdiction.

#### (B) Selection of tenants

Each housing assistance payment contract entered into by the public housing agency and the owner of a dwelling unit) [6] shall provide that the screening and selection of families for those units shall be the function of the owner. In addition, the public housing agency may elect to screen applicants for the program in accordance with such requirements as the Secretary may establish. That an applicant or participant is or has been a victim of domestic violence, dating violence, or stalking is not an appropriate basis for denial of program assistance or for denial of admission if the applicant otherwise qualifies for assistance or admission. Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

#### (C) PHA disapproval of owners

In addition to other grounds authorized by the Secretary, a public housing agency may elect not to enter into a housing assistance payments contract under this subsection with an owner who refuses, or has a history of refusing, to take action to terminate tenancy for activity engaged in by the tenant, any member of the tenant's household, any guest, or any other person under the control of any member of the household that—

(i) threatens the health or safety of, or right to peaceful enjoyment of the premises by, other tenants or employees of the public housing agency, owner, or other manager of the housing;

(ii) threatens the health or safety of, or right to peaceful enjoyment of the residences by, persons residing in the immediate vicinity of the premises; or

(iii) is drug-related or violent criminal activity.

### (7) Leases and tenancy

Each housing assistance payment contract entered into by the public housing agency and the owner of a dwelling unit—

(A) shall provide that the lease between the tenant and the owner shall be for a term of not less than 1 year, except that the public housing agency may approve a shorter term for an initial lease between the tenant and the dwelling unit owner if the public housing agency determines that such shorter term would improve housing opportunities for the tenant and if such shorter term is considered to be a prevailing local market practice;

(B) shall provide that the dwelling unit owner shall offer leases to tenants assisted under this

youths who have attained at least 18 years of age and not more than 21 years of age and who have left foster care at age 16 or older.

**(3) Allocation**

The amounts made available under this subsection shall be allocated by the Secretary through a national competition among applicants based on demonstrated need for the assistance under this subsection. To be considered for assistance, an applicant shall submit to the Secretary a written proposal containing a report from the public child welfare agency serving the jurisdiction of the applicant that describes how a lack of adequate housing in the jurisdiction is resulting in the initial or prolonged separation of children from their families, and how the applicant will coordinate with the public child welfare agency to identify eligible families and provide the families with assistance under this subsection.

**(4) Definitions**

For purposes of this subsection:

**(A) Applicant**

The term "applicant" means a public housing agency or any other agency responsible for administering assistance under this section.

**(B) Public child welfare agency**

The term "public child welfare agency" means the public agency responsible under applicable State law for determining that a child is at imminent risk of placement in out-of-home care or that a child in out-of-home care under the supervision of the public agency may be returned to his or her family.

**(y) Homeownership option**

**(1) Use of assistance for homeownership**

A public housing agency providing tenant-based assistance on behalf of an eligible family under this section may provide assistance for an eligible family that purchases a dwelling unit (including a unit under a lease-purchase agreement) that will be owned by 1 or more members of the family, and will be occupied by the family, if the family—

(A) is a first-time homeowner, or owns or is acquiring shares in a cooperative;

(B) demonstrates that the family has income from employment or other sources (other than public assistance, except that the Secretary may provide for the consideration of public assistance in the case of an elderly family or a disabled family), as determined in accordance with requirements of the Secretary, that is not less than twice the payment standard established by the public housing agency (or such other amount as may be established by the Secretary);

(C) except as provided by the Secretary, demonstrates at the time the family initially receives tenant-based assistance under this subsection that one or more adult members of the family have achieved employment for the period as the Secretary shall require;

(D) participates in a homeownership and housing counseling program provided by the agency; and

(E) meets any other initial or continuing requirements established by the public housing agency in accordance with requirements established by the Secretary.

**(2) Determination of amount of assistance**

**(A) Monthly expenses not exceeding payment standard**

If the monthly homeownership expenses, as determined in accordance with requirements established by the Secretary, do not exceed the payment standard, the monthly assistance payment shall be the amount by which the homeownership expenses exceed the highest of the following amounts, rounded to the nearest dollar:

(i) 30 percent of the monthly adjusted income of the family.

(ii) 10 percent of the monthly income of the family.

(iii) If the family is receiving payments for welfare assistance from a public agency, and a portion of those payments, adjusted in accordance with the actual housing costs of the family, is specifically designated by that agency to meet the housing costs of the family, the portion of those payments that is so designated.

**(B) Monthly expenses exceed payment standard**

If the monthly homeownership expenses, as determined in accordance with requirements established by the Secretary, exceed the payment standard, the monthly assistance payment shall be the amount by which the applicable payment standard exceeds the highest of the amounts under clauses (i), (ii), and (iii) of subparagraph (A).

**(3) Inspections and contract conditions**

**(A) In general**

Each contract for the purchase of a unit to be assisted under this section shall—
(i) provide for pre-purchase inspection of the unit by an independent professional; and
(ii) require that any cost of necessary repairs be paid by the seller.

**(B) Annual inspections not required**

The requirement under subsection (o)(8)(A)(ii) [12] of this section for annual inspections shall not apply to units assisted under this section.

**(4) Other authority of the Secretary**

The Secretary may—
(A) limit the term of assistance for a family assisted under this subsection; and
(B) modify the requirements of this subsection as the Secretary determines to be necessary to make appropriate adaptations for lease-purchase agreements.

**(5) Inapplicability of certain provisions**

Assistance under this subsection shall not be subject to the requirements of the following provisions:
(A) Subsection (c)(3)(B) [12] of this section.
(B) Subsection (d)(1)(B)(i) of this section.
(C) Any other provisions of this section governing maximum amounts payable to owners and amounts payable by assisted families.
(D) Any other provisions of this section concerning contracts between public housing agencies and owners.
(E) Any other provisions of this chapter that are inconsistent with the provisions of this subsection.

**(6) Reversion to rental status**

**(A) FHA-insured mortgages**

If a family receiving assistance under this subsection for occupancy of a dwelling defaults under a mortgage for the dwelling insured by the Secretary under the National Housing Act [12 U.S.C. 1701 et seq.], the family may not continue to receive rental assistance under this section unless the family (i) transfers to the Secretary marketable title to the dwelling, (ii) moves from the dwelling within the period established or approved by the Secretary, and (iii) agrees that any amounts the family is required to pay to reimburse the escrow account under section 1437u(d)(3) [12] of this title may be deducted by the public housing agency from the assistance payment otherwise payable on behalf of the family.

**(B) Other mortgages**

If a family receiving assistance under this subsection defaults under a mortgage not insured under the National Housing Act [12 U.S.C. 1701 et seq.], the family may not continue to receive rental assistance under this section unless it complies with requirements established by the

**68**

Case:Case:515-1456cumDentum1001t68950PagePage: 11Date Date: F09/080/025/201Entry EDtr594008941097

Secretary.

**(C) All mortgages**

A family receiving assistance under this subsection that defaults under a mortgage may not receive assistance under this subsection for occupancy of another dwelling owned by one or more members of the family.

**(7) Downpayment assistance**

**(A) Authority**

A public housing agency may, in lieu of providing monthly assistance payments under this subsection on behalf of a family eligible for such assistance and at the discretion of the public housing agency, provide assistance for the family in the form of a single grant to be used only as a contribution toward the downpayment required in connection with the purchase of a dwelling for fiscal year 2000 and each fiscal year thereafter to the extent provided in advance in appropriations Acts.

**(B) Amount**

The amount of a downpayment grant on behalf of an assisted family may not exceed the amount that is equal to the sum of the assistance payments that would be made during the first year of assistance on behalf of the family, based upon the income of the family at the time the grant is to be made.

**(8) "First-time homeowner" defined**

For purposes of this subsection, the term "first-time homeowner" means—

(A) a family, no member of which has had a present ownership interest in a principal residence during the 3 years preceding the date on which the family initially receives assistance for homeownership under this subsection; and

(B) any other family, as the Secretary may prescribe.

**(z) Termination of section 1437f contracts and reuse of recaptured budget authority**

**(1) General authority**

The Secretary may reuse any budget authority, in whole or part, that is recaptured on account of expiration or termination of a housing assistance payments contract only for one or more of the following:

**(A) Tenant-based assistance**

Pursuant to a contract with a public housing agency, to provide tenant-based assistance under this section to families occupying units formerly assisted under the terminated contract.

**(B) Project-based assistance**

Pursuant to a contract with an owner, to attach assistance to one or more structures under this section, for relocation of families occupying units formerly assisted under the terminated contract.

**(2) Families occupying units formerly assisted under terminated contract**

Pursuant to paragraph (1), the Secretary shall first make available tenant- or project-based assistance to families occupying units formerly assisted under the terminated contract. The Secretary shall provide project-based assistance in instances only where the use of tenant-based assistance is determined to be infeasible by the Secretary.

**(aa) Omitted**

**(bb) Transfer, reuse, and rescission of budget authority**

**(1) Transfer of budget authority**

If an assistance contract under this section, other than a contract for tenant-based assistance, is terminated or is not renewed, or if the contract expires, the Secretary shall, in order to provide

**69**

(ii) provides for payments to be made in equal amounts during the term of the loan, with no deferral and no balloon payments made; and

(iii) prohibits the cancellation of the balance upon the death of the lender.

In the case of a promissory note, loan, or mortgage that does not satisfy the requirements of clauses (i) through (iii), the value of such note, loan, or mortgage shall be the outstanding balance due as of the date of the individual's application for medical assistance for services described in subparagraph (C).

(J) For purposes of this paragraph with respect to a transfer of assets, the term "assets" includes the purchase of a life estate interest in another individual's home unless the purchaser resides in the home for a period of at least 1 year after the date of the purchase.

(2) An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that—

(A) the assets transferred were a home and title to the home was transferred to—

(i) the spouse of such individual;

(ii) a child of such individual who (I) is under age 21, or (II) (with respect to States eligible to participate in the State program established under subchapter XVI of this chapter) is blind or permanently and totally disabled, or (with respect to States which are not eligible to participate in such program) is blind or disabled as defined in section 1382c of this title;

(iii) a sibling of such individual who has an equity interest in such home and who was residing in such individual's home for a period of at least one year immediately before the date the individual becomes an institutionalized individual; or

(iv) a son or daughter of such individual (other than a child described in clause (ii)) who was residing in such individual's home for a period of at least two years immediately before the date the individual becomes an institutionalized individual, and who (as determined by the State) provided care to such individual which permitted such individual to reside at home rather than in such an institution or facility;

(B) the assets—

(i) were transferred to the individual's spouse or to another for the sole benefit of the individual's spouse,

(ii) were transferred from the individual's spouse to another for the sole benefit of the individual's spouse,

(iii) were transferred to, or to a trust (including a trust described in subsection (d)(4) of this section) established solely for the benefit of, the individual's child described in subparagraph (A)(ii)(II), or

(iv) were transferred to a trust (including a trust described in subsection (d)(4) of this section) established solely for the benefit of an individual under 65 years of age who is disabled (as defined in section 1382c(a)(3) of this title);

(C) a satisfactory showing is made to the State (in accordance with regulations promul-

gated by the Secretary) that (i) the individual intended to dispose of the assets either at fair market value, or for other valuable consideration, (ii) the assets were transferred exclusively for a purpose other than to qualify for medical assistance, or (iii) all assets transferred for less than fair market value have been returned to the individual; or

(D) the State determines, under procedures established by the State (in accordance with standards specified by the Secretary), that the denial of eligibility would work an undue hardship as determined on the basis of criteria established by the Secretary.

The procedures established under subparagraph (D) shall permit the facility in which the institutionalized individual is residing to file an undue hardship waiver application on behalf of the individual with the consent of the individual or the personal representative of the individual. While an application for an undue hardship waiver is pending under subparagraph (D) in the case of an individual who is a resident of a nursing facility, if the application meets such criteria as the Secretary specifies, the State may provide for payments for nursing facility services in order to hold the bed for the individual at the facility, but not in excess of payments for 30 days.

(3) For purposes of this subsection, in the case of an asset held by an individual in common with another person or persons in a joint tenancy, tenancy in common, or similar arrangement, the asset (or the affected portion of such asset) shall be considered to be transferred by such individual when any action is taken, either by such individual or by any other person, that reduces or eliminates such individual's ownership or control of such asset.

(4) A State (including a State which has elected treatment under section 1396a(f) of this title) may not provide for any period of ineligibility for an individual due to transfer of resources for less than fair market value except in accordance with this subsection. In the case of a transfer by the spouse of an individual which results in a period of ineligibility for medical assistance under a State plan for such individual, a State shall, using a reasonable methodology (as specified by the Secretary), apportion such period of ineligibility (or any portion of such period) among the individual and the individual's spouse if the spouse otherwise becomes eligible for medical assistance under the State plan.

(5) In this subsection, the term "resources" has the meaning given such term in section 1382b of this title, without regard to the exclusion described in subsection (a)(1) thereof.

**(d) Treatment of trust amounts**

(1) For purposes of determining an individual's eligibility for, or amount of, benefits under a State plan under this subchapter, subject to paragraph (4), the rules specified in paragraph (3) shall apply to a trust established by such individual.

(2)(A) For purposes of this subsection, an individual shall be considered to have established a trust if assets of the individual were used to form all or part of the corpus of the trust and if any of the following individuals established such trust other than by will:

(i) The individual.

(ii) The individual's spouse.

(iii) A person, including a court or administrative body, with legal authority to act in place of or on behalf of the individual or the individual's spouse.

(iv) A person, including any court or administrative body, acting at the direction or upon the request of the individual or the individual's spouse.

(B) In the case of a trust the corpus of which includes assets of an individual (as determined under subparagraph (A)) and assets of any other person or persons, the provisions of this subsection shall apply to the portion of the trust attributable to the assets of the individual.

(C) Subject to paragraph (4), this subsection shall apply without regard to—

(i) the purposes for which a trust is established,

(ii) whether the trustees have or exercise any discretion under the trust,

(iii) any restrictions on when or whether distributions may be made from the trust, or

(iv) any restrictions on the use of distributions from the trust.

(3)(A) In the case of a revocable trust—

(i) the corpus of the trust shall be considered resources available to the individual,

(ii) payments from the trust to or for the benefit of the individual shall be considered income of the individual, and

(iii) any other payments from the trust shall be considered assets disposed of by the individual for purposes of subsection (c) of this section.

(B) In the case of an irrevocable trust—

(i) if there are any circumstances under which payment from the trust could be made to or for the benefit of the individual, the portion of the corpus from which, or the income on the corpus from which, payment to the individual could be made shall be considered resources available to the individual, and payments from that portion of the corpus or income—

(I) to or for the benefit of the individual, shall be considered income of the individual, and

(II) for any other purpose, shall be considered a transfer of assets by the individual subject to subsection (c) of this section; and

(ii) any portion of the trust from which, or any income on the corpus from which, no payment could under any circumstances be made to the individual shall be considered, as of the date of establishment of the trust (or, if later, the date on which payment to the individual was foreclosed) to be assets disposed by the individual for purposes of subsection (c) of this section, and the value of the trust shall be determined for purposes of such subsection by including the amount of any payments made from such portion of the trust after such date.

(4) This subsection shall not apply to any of the following trusts:

(A) A trust containing the assets of an individual under age 65 who is disabled (as defined in section 1382c(a)(3) of this title) and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter.

(B) A trust established in a State for the benefit of an individual if—

(i) the trust is composed only of pension, Social Security, and other income to the individual (and accumulated income in the trust),

(ii) the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter; and

(iii) the State makes medical assistance available to individuals described in section 1396a(a)(10)(A)(ii)(V) of this title, but does not make such assistance available to individuals for nursing facility services under section 1396a(a)(10)(C) of this title.

(C) A trust containing the assets of an individual who is disabled (as defined in section 1382c(a)(3) of this title) that meets the following conditions:

(i) The trust is established and managed by a non-profit association.

(ii) A separate account is maintained for each beneficiary of the trust, but, for purposes of investment and management of funds, the trust pools these accounts.

(iii) Accounts in the trust are established solely for the benefit of individuals who are disabled (as defined in section 1382c(a)(3) of this title) by the parent, grandparent, or legal guardian of such individuals, by such individuals, or by a court.

(iv) To the extent that amounts remaining in the beneficiary's account upon the death of the beneficiary are not retained by the trust, the trust pays to the State from such remaining amounts in the account an amount equal to the total amount of medical assistance paid on behalf of the beneficiary under the State plan under this subchapter.

(5) The State agency shall establish procedures (in accordance with standards specified by the Secretary) under which the agency waives the application of this subsection with respect to an individual if the individual establishes that such application would work an undue hardship on the individual as determined on the basis of criteria established by the Secretary.

(6) The term "trust" includes any legal instrument or device that is similar to a trust but includes an annuity only to such extent and in such manner as the Secretary specifies.

**(e) Disclosure and treatment of annuities**

(1) In order to meet the requirements of this section for purposes of section 1396a(a)(18) of this title, a State shall require, as a condition for the provision of medical assistance for services described in subsection (c)(1)(C)(i) (relating

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**
  **CHAPTER 45 - FAIR HOUSING**
   **SUBCHAPTER I - GENERALLY**

### § 3604. Discrimination in the sale or rental of housing and other prohibited practices

As made applicable by section 3603 of this title and except as exempted by sections 3603 (b) and 3607 of this title, it shall be unlawful—

**(a)** To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

**(b)** To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

**(c)** To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

**(d)** To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

**(e)** For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

**(f)**
  **(1)** To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

   **(A)** that buyer or renter,[1]

   **(B)** a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

   **(C)** any person associated with that buyer or renter.

  **(2)** To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

   **(A)** that person; or

   **(B)** a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

   **(C)** any person associated with that person.

  **(3)** For purposes of this subsection, discrimination includes—

   **(A)** a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.[2]

   **(B)** a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; or

- 1 -

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(C)** in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to design and construct those dwellings in such a manner that—

**(i)** the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

**(ii)** all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

**(iii)** all premises within such dwellings contain the following features of adaptive design:

**(I)** an accessible route into and through the dwelling;

**(II)** light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

**(III)** reinforcements in bathroom walls to allow later installation of grab bars; and

**(IV)** usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

**(4)** Compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as "ANSI A117.1") suffices to satisfy the requirements of paragraph (3)(C)(iii).

**(5)** **(A)** If a State or unit of general local government has incorporated into its laws the requirements set forth in paragraph (3)(C), compliance with such laws shall be deemed to satisfy the requirements of that paragraph.

**(B)** A State or unit of general local government may review and approve newly constructed covered multifamily dwellings for the purpose of making determinations as to whether the design and construction requirements of paragraph (3)(C) are met.

**(C)** The Secretary shall encourage, but may not require, States and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraph (3)(C), and shall provide technical assistance to States and units of local government and other persons to implement the requirements of paragraph (3)(C).

**(D)** Nothing in this subchapter shall be construed to require the Secretary to review or approve the plans, designs or construction of all covered multifamily dwellings, to determine whether the design and construction of such dwellings are consistent with the requirements of paragraph 3(C).

**(6)** **(A)** Nothing in paragraph (5) shall be construed to affect the authority and responsibility of the Secretary or a State or local public agency certified pursuant to section 3610 (f)(3) of this title to receive and process complaints or otherwise engage in enforcement activities under this subchapter.

**(B)** Determinations by a State or a unit of general local government under paragraphs (5)(A) and (B) shall not be conclusive in enforcement proceedings under this subchapter.

**(7)** As used in this subsection, the term "covered multifamily dwellings" means—

**(A)** buildings consisting of 4 or more units if such buildings have one or more elevators; and

**(B)** ground floor units in other buildings consisting of 4 or more units.

**(8)** Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State, or other jurisdiction in which this subchapter shall be effective, that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this subchapter.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(9)** Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

*Footnotes*

[1] So in original. The comma probably should be a semicolon.

[2] So in original. The period probably should be a semicolon.

(Pub. L. 90–284, title VIII, § 804, Apr. 11, 1968, 82 Stat. 83; Pub. L. 93–383, title VIII, § 808(b)(1), Aug. 22, 1974, 88 Stat. 729; Pub. L. 100–430, §§ 6(a)–(b)(2), (e), 15, Sept. 13, 1988, 102 Stat. 1620, 1622, 1623, 1636.)

## Amendments

1988—Pub. L. 100–430, § 6(e), inserted "and other prohibited practices" in section catchline.

Subsecs. (a), (b). Pub. L. 100–430, § 6(b)(2), inserted "familial status," after "sex,".

Subsecs. (c) to (e). Pub. L. 100–430, § 6(b)(1), inserted "handicap, familial status," after "sex,".

Subsec. (f). Pub. L. 100–430, § 6(a), added subsec. (f).

Subsec. (f)(3)(A). Pub. L. 100–430, § 15, which directed the substitution of "except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted." for the period at the end of subpar. (A) was executed by making the substitution for a semicolon as the probable intent of Congress because subpar. (A) ended with a semicolon, not a period.

1974—Pub. L. 93–383 inserted ", sex" after "religion" wherever appearing in cls. (a) to (e).

## Effective Date of 1988 Amendment

Amendment by Pub. L. 100–430 effective on 180th day beginning after Sept. 13, 1988, see section 13(a) of Pub. L. 100–430, set out as a note under section 3601 of this title.

Case:Case15-15-1456cumDentument000168950P2agePage: 15Date Date: F0e/d28/0209/2015ntry Entry5940852741097

ADD



THE 189TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Massachusetts Laws    Bills    State Budget    People    Committees    Reports    Educate & Engage    Events
MyLegislature

Home    Bills & Laws    Laws    General Laws    PART I    TITLE III    CHAPTER 30A    Section 14

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

## General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT |
| | NEXT |

| TITLE III | LAWS RELATING TO STATE OFFICERS |
| | PREV    NEXT |

| CHAPTER 30A | STATE ADMINISTRATIVE PROCEDURE |
| | PREV    NEXT |

| Section 14 | Judicial review |
| | PREV    NEXT |

Section 14. Except so far as any provision of law expressly precludes judicial review, any person or appointing authority aggrieved by a final decision of any agency in an adjudicatory proceeding, whether such decision is affirmative or negative in form, shall be entitled to a judicial review thereof, as follows:?

Where a statutory form of judicial review or appeal is provided such statutory form shall govern in all respects, except as to standards for review. The standards for review shall be those set forth in paragraph (7) of this section, except so far as statutes provide for review by trial de novo. Insofar as the statutory form of judicial review or appeal is silent as to procedures provided in this section, the provisions of this section shall govern such procedures.

Where no statutory form of judicial review or appeal is provided, judicial review shall be obtained by means of a civil action, as follows:

(1) Proceedings for judicial review of an agency decision shall be instituted in the superior court for the county (a) where the plaintiffs or any of them reside or have their principal place of business within the commonwealth, or (b) where the agency has its principal office, or (c) of Suffolk. The court may grant a change of venue upon good cause shown. The action shall, except as otherwise provided by law, be commenced in the court within thirty days after receipt of notice of the final decision of the agency or if a petition for rehearing has been timely filed with the agency, within thirty days after receipt of notice of agency denial of such petition for rehearing. Upon application made within the thirty-day period or any extension thereof, the court may for good cause shown extend the time.

(2) Service shall be made upon the agency and each party to the agency proceeding in accordance with the Massachusetts Rules of Civil Procedure governing service of process. For the purpose of such service the agency upon request shall certify to the plaintiff the names and addresses of all such parties as disclosed by its records, and service upon parties so

**75**

certified shall be sufficient. All parties to the proceeding before the agency shall have the right to intervene in the proceeding for review. The court may in its discretion permit other interested persons to intervene.

(3) The commencement of an action shall not operate as a stay of enforcement of the agency decision, but the agency may stay enforcement, and the reviewing court may order a stay upon such terms as it considers proper.

(4) The agency shall, by way of answer, file in the court the original or a certified copy of the record of the proceeding under review. The record shall consist of (a) the entire proceedings, or (b) such portions thereof as the agency and the parties may stipulate, or (c) a statement of the case agreed to by the agency and the parties. The expense of preparing the record may be assessed as part of the costs in the case, and the court may, regardless of the outcome of the case, assess any one unreasonably refusing to stipulate to limit the record, for the additional expenses of preparation caused by such refusal. The court may require or permit subsequent corrections or additions to the record when deemed desirable.

(5) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the court.

(6) If application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material to the issues in the case, and that there was good reason for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon such conditions as the court deems proper. The agency may modify its findings and decision by reason of such additional evidence and shall file with the reviewing court, to become part of the record, the additional evidence, together with any modified or new findings or decision.

(7) The court may affirm the decision of the agency, or remand the matter for further proceedings before the agency; or the court may set aside or modify the decision, or compel any action unlawfully withheld or unreasonably delayed, if it determines that the substantial rights of any party may have been prejudiced because the agency decision is?

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Based upon an error of law; or

(d) Made upon unlawful procedure; or

(e) Unsupported by substantial evidence; or

(f) Unwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or

(g) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

The court shall make the foregoing determinations upon consideration of the entire record, or such portions of the record as may be cited by the parties. The court shall give due weight to

**76**

Case:15-1456   Document:00116895027   Page:159   Date Filed:09/29/2015   Entry ID:5941097

the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.

If the court finds that the action of the appointing authority in discharging, removing, suspending, laying off, lowering in rank or compensation or abolishing his position, or the action of the commission confirming the action taken by the appointing authority, was not justified, the employee shall be reinstated in his office or position without loss of compensation and the court shall assess reasonable costs against the employer.

Show / Hide Site Map

Copyright © 2015 The General Court, All Rights Reserved

Case:Case15-1456cumEntu0m168950Ph7age:Page: 1Gate Date: F09/28/029/201Entry EntrySI94085241097

ADD D

THE 189TH GENERAL COURT OF
## THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs

site search

Options

Massachusetts Laws   Bills   State Budget   People   Committees   Reports   Educate & Engage   Events

MyLegislature

Home   Bills & Laws   Laws   General Laws   PART I   TITLE XV   CHAPTER 93   Section 103

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

# General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT |
| | NEXT |
| TITLE XV | REGULATION OF TRADE |
| | PREV   NEXT |
| CHAPTER 93 | REGULATION OF TRADE AND CERTAIN ENTERPRISES |
| | NEXT |
| Section 103 | Equal rights; age and handicap; violations; remedies |
| | PREV   NEXT |

Section 103. (a) Any person within the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.

(b) Any person whose rights under the provisions of subsection (a) have been violated may commence a civil action for injunctive and other appropriate equitable relief, including, but not limited to, the award of compensatory and exemplary damages. Said civil action shall be instituted either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which the person whose conduct complained of resides or has his principal place of business.

(c) A violation of subsection (a) shall be established if, based upon the totality of circumstances, it is shown that any individual is denied any of the rights protected by subsection (a).

(d) An aggrieved person who prevails in an action authorized by subsection (b), in addition to other damages, shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be determined by the court.

Show / Hide Site Map

Copyright © 2015 The General Court, All Rights Reserved

**78**

THE 189TH GENERAL COURT OF

# THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs

site search

Options

Massachusetts Laws    Bills    State Budget    People    Committees    Reports    Educate & Engage    Events

MyLegislature

Home    Bills & Laws    Laws    General Laws    PART I    TITLE XXI    CHAPTER 151B    Section 4

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

## General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT |
| | NEXT |
| TITLE XXI | LABOR AND INDUSTRIES |
| | PREV   NEXT |
| CHAPTER 151B | UNLAWFUL DISCRIMINATION BECAUSE OF RACE, COLOR, RELIGIOUS CREED, NATIONAL ORIGIN, ANCESTRY OR SEX |
| | PREV   NEXT |
| Section 4 | Unlawful practices |
| | PREV   NEXT |

Section 4. It shall be an unlawful practice:

1. For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

1A. It shall be unlawful discriminatory practice for an employer to impose upon an individual as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of, his creed or religion as required by that creed or religion including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or holy day and the employer shall make reasonable accommodation to the religious needs of such individual. No individual who has given notice as hereinafter provided shall be required to remain at his place of employment during any day or days or portion thereof that, as a requirement of his religion, he observes as his sabbath or other holy day, including a reasonable time prior to and subsequent thereto for travel between his place of employment and his home, provided, however, that any employee intending to be absent from work when so required by his or her creed or religion shall notify his or her employer not less than ten days in advance of each absence, and that any such absence from work shall, wherever practicable in the judgment of the employer, be made up by an equivalent amount of time at some other mutually convenient time. Nothing under this subsection shall be deemed to require an employer to compensate an employee for such absence. "Reasonable Accommodation", as used in this subsection shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employee shall have the burden of proof as to the required practice of his creed or religion. As used in this subsection, the words "creed or religion" mean any sincerely held religious beliefs,

General Laws: CHAPTER 151B, Section 4

https://malegislature.gov/Laws/GeneralLaws/PartI/TitleXXI/Chapter...

ADD

Case:15-1415 Case:15-1456 Document:00116850 Document:00116850 Page:162 Page:162 Date Filed:09/28/2015 Date Filed:09/29/2015 Entry ID:5940897 Entry ID:5941097

without regard to whether such beliefs are approved, espoused, prescribed or required by an established church or other religious institution or organization.

Undue hardship, as used herein, shall include the inability of an employer to provide services which are required by and in compliance with all federal and state laws, including regulations or tariffs promulgated or required by any regulatory agency having jurisdiction over such services or where the health or safety of the public would be unduly compromised by the absence of such employee or employees, or where the employee's presence is indispensable to the orderly transaction of business and his or her work cannot be performed by another employee of substantially similar qualifications during the period of absence, or where the employee's presence is needed to alleviate an emergency situation. The employer shall have the burden of proof to show undue hardship.

1B. For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

1C. For the commonwealth or any of its political subdivisions, by itself or its agent, because of the age of any individual, to refuse to hire or employ or to bar or discharge from employment such individual in compensation or in terms, conditions or privileges of employment unless pursuant to any other general or special law.

1D. For an employer, an employment agency, the commonwealth or any of its political subdivisions, by itself or its agents, to deny initial employment, reemployment, retention in employment, promotion or any benefit of employment to a person who is a member of, applies to perform, or has an obligation to perform, service in a uniformed military service of the United States, including the National Guard, on the basis of that membership, application or obligation.

2. For a labor organization, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, or ancestry of any individual, or because of the handicap of any person alleging to be a qualified handicapped person, to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer unless based upon a bona fide occupational qualification.

3. For any employer or employment agency to print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry or record in connection with employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry, or the handicap of a qualified handicapped person or any intent to make any such limitation, specification or discrimination, or to discriminate in any way on the ground of race, color, religious creed, national origin, sex, gender identity, sexual orientation, age, genetic information, ancestry or the handicap of a qualified handicapped person, unless based upon a bona fide occupational qualification.

ADD
Case:Case15-1456 Document:00116895027 Page:163 Date Filed:09/28/2015 Entry ID:5940852 41097

3A. For any person engaged in the insurance or bonding business, or his agent, to make any inquiry or record of any person seeking a bond or surety bond conditioned upon faithful performance of his duties or to use any form of application in connection with the furnishing of such bond, which seeks information relative to the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of the person to be bonded.

3B. For any person whose business includes granting mortgage loans or engaging in residential real estate-related transactions to discriminate against any person in the granting of any mortgage loan or in making available such a transaction, or in the terms or conditions of such a loan or transaction, because of race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, children, national origin, genetic information, ancestry, age or handicap. Such transactions shall include, but not be limited to:

(1) the making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(2) the selling, brokering, or appraising of residential real estate.

In the case of age, the following shall not be an unlawful practice:

(1) an inquiry of age for the purpose of determining a pertinent element of credit worthiness;

(2) the use of an empirically derived credit system which considers age; provided, however, that such system is based on demonstrably and statistically sound data; and provided, further, that such system does not assign a negative factor or score to any applicant who has reached age sixty-two;

(3) the offering of credit life insurance or credit disability insurance, in conjunction with any mortgage loan, to a limited age group;

(4) the failure or refusal to grant any mortgage loan to a person who has not attained the age of majority;

(5) the failure or refusal to grant any mortgage loan the duration of which exceeds the life expectancy of the applicant as determined by the most recent Individual Annuity Mortality Table.

Nothing in this subsection prohibits a person engaged in the business of furnishing appraisals of real property from taking into consideration factors other than those hereinabove proscribed.

3C. For any person to deny another person access to, or membership or participation in, a multiple listing service, real estate brokers' organization, or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against such person in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, children, national origin,

genetic information, ancestry, age, or handicap.

4. For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

4A. For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

5. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

6. For the owner, lessee, sublessee, licensed real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other person having the right of ownership or possession or right to rent or lease, or sell or negotiate for the sale of such accommodations, or any agent or employee of such a person, or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or otherwise to deny to or withhold from any person or group of persons such accommodations because of the race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status of such person or persons or because such person is a veteran or member of the armed forces, or because such person is blind, or hearing impaired or has any other handicap; (b) to discriminate against any person because of his race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, ancestry, or marital status or because such person is a veteran or member of the armed forces, or because such person is blind, or hearing impaired or has any other handicap in the terms, conditions or privileges of such accommodations or the acquisitions thereof, or in the furnishings of facilities and services in connection therewith, or because such a person possesses a trained dog guide as a consequence of blindness, or hearing impairment; (c) to cause to be made any written or oral inquiry or record concerning the race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry or marital status of the person seeking to rent or lease or buy any such accommodation, or concerning the fact that such person is a veteran or a member of the armed forces or because such person is blind or hearing impaired or has any other handicap. The word "age" as used in this subsection shall not apply to persons who are minors nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in housing developments assisted under the federal low income housing tax credit and intended for use as housing for persons 55 years of age or over or 62 years of age or over, nor to residency in communities consisting of either a structure or structures constructed expressly for use as housing for persons 55 years of age or over or 62 years of age or over if the housing owner or manager register biennially with the department of housing and community development. For the purpose of this subsection, housing intended for occupancy by persons fifty-five or over and sixty-two or over shall comply with the provisions set forth in 42 USC 3601 et seq.

For purposes of this subsection, discrimination on the basis of handicap includes, but is not limited to, in connection with the design and construction of: (1) all units of a dwelling which has three or more units and an elevator which are constructed for first occupancy after March thirteenth, nineteen hundred and ninety-one; and (2) all ground floor units of other dwellings consisting of three or more units which are constructed for first occupancy after March thirteenth, nineteen hundred and ninety-one, a failure to design and construct such dwellings in such a manner that (i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons; (ii) all the doors are designed to allow passage into and within all premises within such dwellings and are sufficiently wide to allow passage by handicapped persons in wheelchairs; and (iii) all premises within such dwellings contain the following features of adaptive design; (a) an accessible route into and through the dwelling; (b) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (c) reinforcements in bathroom walls to allow later installation of grab bars; and (d) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

7. For the owner, lessee, sublessee, real estate broker, assignee or managing agent of other covered housing accommodations or of land intended for the erection of any housing accommodation included under subsection 10, 11, 12, or 13 of section one, or other person having the right of ownership or possession or right to rent or lease or sell, or negotiate for the sale or lease of such land or accommodations, or any agent or employee of such a person or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or lease or otherwise to deny or withhold from any person or group of persons such accommodations or land because of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed forces, blindness, hearing impairment, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment or other handicap of such person or persons; (b) to discriminate against any person because of his race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed services, blindness, or hearing impairment or other handicap, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment in the terms, conditions or privileges of such accommodations or land or the acquisition thereof, or in the furnishing of facilities and services in the connection therewith or (c) to cause to be made any written or oral inquiry or record concerning the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, marital status, veteran status or membership in the armed services, blindness, hearing impairment or other handicap or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment, of the person seeking to rent or lease or buy any such accommodation or land; provided, however, that this subsection shall not apply to the leasing of a single apartment or flat in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence. The word "age" as used in this subsection shall not apply to persons who are minors nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in housing developments assisted under the federal low income housing tax credit and intended for use as housing for persons 55 years of age or over or 62 years of age

83

Case:1 1-1456 Document:00116895093 Page:166 Date Filed: 09/28/2015 Entry ID:5941097

ADD.

or over, nor to residency in communities consisting of either a structure or structures constructed expressly for use as housing for persons 55 years of age or over or 62 years of age or over if the housing owner or manager register biennially with the department of housing and community development. For the purpose of this subsection, housing intended for occupancy by persons fifty-five or over and sixty-two or over shall comply with the provisions set forth in 42 USC 3601 et seq.

7A. For purposes of subsections 6 and 7 discrimination on the basis of handicap shall include but not be limited to:

(1) a refusal to permit or to make, at the expense of the handicapped person, reasonable modification of existing premises occupied or to be occupied by such person if such modification is necessary to afford such person full enjoyment of such premises; provided, however, that, in the case of publicly assisted housing, multiple dwelling housing consisting of ten or more units, or contiguously located housing consisting of ten or more units, reasonable modification shall be at the expense of the owner or other person having the right of ownership; provided, further, that, in the case of public ownership of such housing units the cost of such reasonable modification shall be subject to appropriation; and provided, further, that, in the case of a rental, the landlord may, where the modification to be paid for by the handicapped person will materially alter the marketability of the housing, condition permission for a modification on the tenant agreeing to restore or pay for the cost of restoring, the interior of the premises to the condition that existed prior to such modification, reasonable wear and tear excepted;

(2) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling; and

(3) discrimination against or a refusal to rent to a person because of such person's need for reasonable modification or accommodation.

Reasonable modification shall include, but not be limited to, making the housing accessible to mobility-impaired, hearing-impaired and sight-impaired persons including installing raised numbers which may be read by a sight-impaired person, installing a door bell which flashes a light for a hearing-impaired person, lowering a cabinet, ramping a front entrance of five or fewer vertical steps, widening a doorway, and installing a grab bar; provided, however, that for purposes of this subsection, the owner or other person having the right of ownership shall not be required to pay for ramping a front entrance of more than five steps or for installing a wheelchair lift.

Notwithstanding any other provisions of this subsection, an accommodation or modification which is paid for by the owner or other person having the right of ownership is not considered to be reasonable if it would impose an undue hardship upon the owner or other person having the right of ownership and shall therefore not be required. Factors to be considered shall include, but not be limited to, the nature and cost of the accommodation or modification needed, the extent to which the accommodation or modification would materially alter the marketability of the housing, the overall size of the housing business of the owner or other person having the right of ownership, including but not limited to, the number and type of housing units, size of budget and available assets, and the ability of the owner or other person having the right of ownership to recover the cost of the accommodation or modification through a federal tax deduction. Ten percent shall be the maximum number of units for which

9. For an employer, himself or through his agent, in connection with an application for employment, or the terms, conditions, or privileges of employment, or the transfer, promotion, bonding, or discharge of any person, or in any other matter relating to the employment of any person, to request any information, to make or keep a record of such information, to use any form of application or application blank which requests such information, or to exclude, limit or otherwise discriminate against any person by reason of his or her failure to furnish such information through a written application or oral inquiry or otherwise regarding: (i) an arrest, detention, or disposition regarding any violation of law in which no conviction resulted, or (ii) a first conviction for any of the following misdemeanors: drunkenness, simple assault, speeding, minor traffic violations, affray, or disturbance of the peace, or (iii) any conviction of a misdemeanor where the date of such conviction or the completion of any period of incarceration resulting therefrom, whichever date is later, occurred five or more years prior to the date of such application for employment or such request for information, unless such person has been convicted of any offense within five years immediately preceding the date of such application for employment or such request for information.

No person shall be held under any provision of any law to be guilty of perjury or of otherwise giving a false statement by reason of his failure to recite or acknowledge such information as he has a right to withhold by this subsection.

Nothing contained herein shall be construed to affect the application of section thirty-four of chapter ninety-four C, or of chapter two hundred and seventy-six relative to the sealing of records.

91/2. For an employer to request on its initial written application form criminal offender record information; provided, however, that except as otherwise prohibited by subsection 9, an employer may inquire about any criminal convictions on an applicant's application form if: (i) the applicant is applying for a position for which any federal or state law or regulation creates mandatory or presumptive disqualification based on a conviction for 1 or more types of criminal offenses; or (ii) the employer or an affiliate of such employer is subject to an obligation imposed by any federal or state law or regulation not to employ persons, in either 1 or more positions, who have been convicted of 1 or more types of criminal offenses.

9A. For an employer himself or through his agent to refuse, unless based upon a bonafide occupational qualification, to hire or employ or to bar or discharge from employment any person by reason of his or her failure to furnish information regarding his or her admission, on one or more occasions, voluntarily or involuntarily, to any public or private facility for the care and treatment of mentally ill persons, provided that such person has been discharged from such facility or facilities and can prove by a psychiatrist's certificate that he is mentally competent to perform the job or the job for which he is applying. No application for employment shall contain any questions or requests for information regarding the admission of an applicant, on one or more occasions, voluntarily or involuntarily, to any public or private facility for the care and treatment of mentally ill persons, provided that such applicant has been discharged from such public or private facility or facilities and is no longer under treatment directly related to such admission.

10. For any person furnishing credit, services or rental accommodations to discriminate against any individual who is a recipient of federal, state, or local public assistance, including medical assistance, or who is a tenant receiving federal, state, or local housing subsidies, including rental assistance or rental supplements, because the individual is such a recipient, or

**85**

because of any requirement of such public assistance, rental assistance, or housing subsidy program.

11. For the owner, sublessees, real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other covered housing accommodations, or other person having the right of ownership or possession or right to rent or lease or sell such accommodations, or any agent or employee of such person or organization of unit owners in a condominium or housing cooperative, to refuse to rent or lease or sell or otherwise to deny to or withhold from any person such accommodations because such person has a child or children who shall occupy the premises with such person or to discriminate against any person in the terms, conditions, or privileges of such accommodations or the acquisition thereof, or in the furnishing of facilities and services in connection therewith, because such person has a child or children who occupy or shall occupy the premises with such person; provided, however, that nothing herein shall limit the applicability of any local, state, or federal restrictions regarding the maximum number of persons permitted to occupy a dwelling. When the commission or a court finds that discrimination in violation of this paragraph has occurred with respect to a residential premises containing dangerous levels of lead in paint, plaster, soil, or other accessible material, notification of such finding shall be sent to the director of the childhood lead poisoning prevention program.

This subsection shall not apply to:

(1) Dwellings containing three apartments or less, one of which apartments is occupied by an elderly or infirm person for whom the presence of children would constitute a hardship. For purposes of this subsection, an "elderly person" shall mean a person sixty-five years of age or over, and an "infirm person" shall mean a person who is disabled or suffering from a chronic illness.

(2) The temporary leasing or temporary subleasing of a single family dwelling, a single apartment, or a single unit of a condominium or housing cooperative, by the owner of such dwelling, apartment, or unit, or in the case of a subleasing, by the sublessor thereof, who ordinarily occupies the dwelling, apartment, or unit as his or her principal place of residence. For purposes of this subsection, the term "temporary leasing" shall mean leasing during a period of the owner's or sublessor's absence not to exceed one year.

(3) The leasing of a single dwelling unit in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence.

11A. For an employer, by himself or his agent, to refuse to restore certain female employees to employment following their absence by reason of a maternity leave taken in accordance with section one hundred and five D of chapter one hundred and forty-nine or to otherwise fail to comply with the provisions of said section, or for the commonwealth and any of its boards, departments and commissions to deny vacation credit to any female employee for the fiscal year during which she is absent due to a maternity leave taken in accordance with said section or to impose any other penalty as a result of a maternity leave of absence.

12. For any retail store which provides credit or charge account privileges to refuse to extend such privileges to a customer solely because said customer had attained age sixty-two or over.

Case:Case:15-1456cument00116395027age:Page: 15ate Date: 09/08/09/29/20Entry EntryID:594085241097

ADD



Section 9. This chapter shall be construed liberally for the accomplishment of its purposes, and any law inconsistent with any provision of this chapter shall not apply, but nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination; but, as to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned.

Any person claiming to be aggrieved by a practice made unlawful under this chapter or under chapter one hundred and fifty-one C, or by any other unlawful practice within the jurisdiction of the commission, may, at the expiration of ninety days after the filing of a complaint with the commission, or sooner if a commissioner assents in writing, but not later than three years after the alleged unlawful practice occurred, bring a civil action for damages or injunctive relief or both in the superior or probate court for the county in which the alleged unlawful practice occurred or in the housing court within whose district the alleged unlawful practice occurred if the unlawful practice involves residential housing. The petitioner shall notify the commission of the filing of the action, and any complaint before the commission shall then be dismissed without prejudice, and the petitioner shall be barred from subsequently bringing a complaint on the same matter before the commission. Any person claiming to be aggrieved by an unlawful practice relative to housing under this chapter, but who has not filed a complaint pursuant to section five, may commence a civil action in the superior or probate court for the county in which the alleged unlawful practice occurred or in the housing court within whose district the alleged unlawful practice occurred; provided, however, that such action shall not be commenced later than one year after the alleged unlawful practice has occurred. An aggrieved person may also seek temporary injunctive relief in the superior, housing or probate court within such county at any time to prevent irreparable injury during the pendency of or prior to the filing of a complaint with the commission.

An action filed pursuant to this section shall be advanced for a speedy trial at the request of

the petitioner. If the court finds for the petitioner, it may award the petitioner actual and punitive damages. If the court finds for the petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorney's fees and costs unless special circumstances would render such an award unjust. The commission shall, upon the filing of any complaint with it, notify the aggrieved person of his rights under this section.

Any person claiming to be aggrieved by a practice concerning age discrimination in employment made unlawful by section four may bring a civil action under this section for damages or injunctive relief, or both, and shall be entitled to a trial by jury on any issue of fact in an action for damages regardless of whether equitable relief is sought by a party in such action. If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the act or practice complained of was committed with knowledge, or reason to know, that such act or practice violated the provisions of said section four. The provisions set forth in the first, second and third paragraphs shall be applicable to such complaint or action to the extent that such provisions do not conflict with the provisions set forth in this paragraph.

Copyright © 2015 The General Court, All Rights Reserved

(d) *Alien has a sponsor and a parent or a spouse with deemable resources.* Resources may be deemed to an alien from both a sponsor and a spouse or parent (if the alien is a child) provided that the sponsor and the spouse or parent are not the same person and the conditions for each rule are met.

(e) *Alien's sponsor is also the alien's ineligible spouse or parent.* If the sponsor is also the alien's ineligible spouse or parent who lives in the same household, the spouse-to-spouse or parent-to-child deeming rules apply instead of the sponsor-to-alien deeming rules. If the spouse or parent deeming rules cease to apply, the sponsor deeming rules will begin to apply. The spouse or parent rules may cease to apply if an alien child reaches age 18 or if either the sponsor who is the ineligible spouse or parent, or the alien moves to a separate household.

(f) *Alien's sponsor also is the ineligible spouse or parent of another SSI beneficiary.* If the sponsor is also the ineligible spouse or ineligible parent of an SSI beneficiary other than the alien, the sponsor's resources are deemed to the alien under the rules in paragraph (a), and to the eligible spouse or child under the rules in §§ 416.1202, 1205, 1234, 1236, and 1237.

[52 FR 8888, Mar. 20, 1987, as amended at 61 FR 1712, Jan. 23, 1996; 70 FR 41138, July 18, 2005; 73 FR 28036, May 15, 2008]

### § 416.1204a Deeming of resources where Medicaid eligibility is affected.

Section 416.1161a of this part describes certain circumstances affecting Medicaid eligibility in which the Department will not deem family income to an individual. The Department will follow the same standards, procedures, and limitations set forth in that section with respect to deeming of resources.

[49 FR 5747, Feb. 15, 1984]

### § 416.1205 Limitation on resources.

(a) *Individual with no eligible spouse.* An aged, blind, or disabled individual with no spouse is eligible for benefits under title XVI of the Act if his or her nonexcludable resources do not exceed $1,500 prior to January 1, 1985, and all other eligibility requirements are met.

An individual who is living with an ineligible spouse is eligible for benefits under title XVI of the Act if his or her nonexcludable resources, including the resources of the spouse, do not exceed $2,250 prior to January 1, 1985, and all other eligibility requirements are met.

(b) *Individual with an eligible spouse.* An aged, blind, or disabled individual who has an eligible spouse is eligible for benefits under title XVI of the Act if their nonexcludable resources do not exceed $2,250 prior to January 1, 1985, and all other eligibility requirements are met.

(c) *Effective January 1, 1985 and later.* The resources limits and effective dates for January 1, 1985 and later are as follows:

| Effective date | Individual | Individual and spouse |
|---|---|---|
| Jan. 1, 1985 | $1,600 | $2,400 |
| Jan. 1, 1986 | 1,700 | 2,550 |
| Jan. 1, 1987 | 1,800 | 2,700 |
| Jan. 1, 1988 | 1,900 | 2,850 |
| Jan. 1, 1989 | 2,000 | 3,000 |

[50 FR 38982, Sept. 26, 1985]

### § 416.1207 Resources determinations.

(a) *General.* Resources determinations are made as of the first moment of the month. A resource determination is based on what assets an individual has, what their values are, and whether or not they are excluded as of the first moment of the month.

(b) *Increase in value of resources.* If, during a month, a resource increases in value or an individual acquires an additional resource or replaces an excluded resource with one that is not excluded, the increase in the value of the resources is counted as of the first moment of the next month.

(c) *Decrease in value of resources.* If, during a month, a resource decreases in value or an individual spends a resource or replaces a resource that is not excluded with one that is excluded, the decrease in the value of the resources is counted as of the first moment of the next month.

(d) *Treatment of items under income and resource counting rules.* Items received in cash or in kind during a month are evaluated first under the income counting rules and, if retained until the first moment of the following

other income source, or directly with the family.

(6) Nondisclosure of Income information. Neither HUD nor the PHA may disclose income information obtained from a SWICA directly to an owner (unless a PHA is the owner). Disclosure of income information obtained from the SSA or IRS is restricted under 26 U.S.C. § 6103(l)(7) and 42 U.S.C. 3544.

(c) *Opportunity to contest.* HUD, the PHA, or the owner (or mortgagee, as applicable) shall promptly notify any assistance applicant or participant in writing of any adverse findings made on the basis of the information verified in accordance with paragraph (b) of this section. The assistance applicant or participant may contest the findings in the same manner as applies to other information and findings relating to eligibility factors under the applicable program. Termination, denial, suspension, or reduction of assistance shall be carried out in accordance with requirements and procedures applicable to the individual covered program, and shall not occur until the expiration of any notice period provided by the statute or regulations governing the program.

[61 FR 11113, Mar. 18, 1996, as amended at 65 FR 16715, Mar. 29, 2000; 74 FR 68934, Dec. 29, 2009]

§ 5.238  Criminal and civil penalties.

Persons who violate the provisions of 42 U.S.C. 3544 or 26 U.S.C. 6103(l)(7) with respect to the use and disclosure of income information may be subject to civil or criminal penalties under 42 U.S.C. 3544(c)(3), 26 U.S.C. 7213(a), or 18 U.S.C. 1905.

§ 5.240  Family disclosure of income information to the responsible entity and verification.

(a) This section applies to families that reside in dwelling units with assistance under the public housing program, the Section 8 tenant-based assistance programs, or for which project-based assistance is provided under the Section 8, Section 202, or Section 811 program.

(b) The family must promptly furnish to the responsible entity any letter or other notice by HUD to a member of the family that provides information

concerning the amount or verification of family income.

(c) The responsible entity must verify the accuracy of the income information received from the family, and change the amount of the total tenant payment, tenant rent or Section 8 housing assistance payment, or terminate assistance, as appropriate, based on such information.

[65 FR 16715, Mar. 29, 2000]

## Subpart C—Pet Ownership for the Elderly or Persons With Disabilities

AUTHORITY: 42 U.S.C. 1701r–1 and 3535(d).

GENERAL REQUIREMENTS

§ 5.300  Purpose.

(a) This subpart implements section 227 of the Housing and Urban-Rural Recovery Act of 1983 (12 U.S.C. 1701r–1) as it pertains to projects for the elderly or persons with disabilities under:

(1) The housing programs administered by the Assistant Secretary for Housing-Federal Housing Commissioner;

. (2) Projects assisted under the programs contained in chapter VIII of this title 24; and

(3) The public housing program.

(b) [Reserved]

[61 FR 5202, Feb. 9, 1996, as amended at 65 FR 16715, Mar. 29, 2000]

§ 5.303  Exclusion for animals that assist, support, or provide service to persons with disabilities.

(a) This subpart C does not apply to animals that are used to assist, support, or provide service to persons with disabilities. Project owners and PHAs may not apply or enforce any policies established under this subpart against animals that are necessary as a reasonable accommodation to assist, support, or provide service to persons with disabilities. This exclusion applies to animals that reside in projects for the elderly or persons with disabilities, as well as to animals that visit these projects.

(b) Nothing in this subpart C:

(1) Limits or impairs the rights of persons with disabilities;

52

Program for the Elderly (24 CFR 891, subpart B); Section 202 Direct Loans for Housing for the Elderly and Persons with Disabilities (24 CFR part 891, subpart E) and the Section 811 Supportive Housing for Persons with Disabilities (24 CFR part 891, subpart C). Unless specified in the regulations for each of the programs listed in paragraph (d) of this section or in another regulatory section of this part 5, subpart F, the regulations in part 5, subpart F, generally are not applicable to these programs; and

(e) Determining earned income disregard for persons with disabilities, as provided in §5.617, for the following programs: HOME Investment Partnerships Program (24 CFR part 92); Housing Opportunities for Persons with AIDS (24 CFR part 574); Supportive Housing Program (McKinney Act Homeless Assistance) (24 CFR part 583); and the Housing Choice Voucher Program (24 CFR part 982).

[66 FR 6222, Jan. 19, 2001]

§5.603  Definitions.

As used in this subpart:

(a) *Terms found elsewhere in part 5*—(1) *Subpart A.* The terms *1937 Act, elderly person, public housing, public housing agency (PHA), responsible entity* and *Section 8* are defined in §5.100.

(2) *Subpart D.* The terms "disabled family", "elderly family", "family", "live-in aide", and "person with disabilities" are defined in §5.403.

(b) The following terms shall have the meanings set forth below:

*Adjusted income.* See §5.611.

*Annual income.* See §5.609.

*Child care expenses.* Amounts anticipated to be paid by the family for the care of children under 13 years of age during the period for which annual income is computed, but only where such care is necessary to enable a family member to actively seek employment, be gainfully employed, or to further his or her education and only to the extent such amounts are not reimbursed. The amount deducted shall reflect reasonable charges for child care. In the case of child care necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income.

*Dependent.* A member of the family (except foster children and foster adults) other than the family head or spouse, who is under 18 years of age, or is a person with a disability, or is a full-time student.

*Disability assistance expenses.* Reasonable expenses that are anticipated, during the period for which annual income is computed, for attendant care and auxiliary apparatus for a disabled family member and that are necessary to enable a family member (including the disabled member) to be employed, provided that the expenses are neither paid to a member of the family nor reimbursed by an outside source.

*Economic self-sufficiency program.* Any program designed to encourage, assist, train, or facilitate the economic independence of HUD-assisted families or to provide work for such families. These programs include programs for job training, employment counseling, work placement, basic skills training, education, English proficiency, workfare, financial or household management, apprenticeship, and any program necessary to ready a participant for work (including a substance abuse or mental health treatment program), or other work activities.

*Extremely low income family.* A family whose annual income does not exceed 30 percent of the median income for the area, as determined by HUD, with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 30 percent of the median income for the area if HUD finds that such variations are necessary because of unusually high or low family incomes.

*Full-time student.* A person who is attending school or vocational training on a full-time basis.

*Imputed welfare income.* See §5.615.

*Low income family.* A family whose annual income does not exceed 80 percent of the median income for the area, as determined by HUD with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 80 percent of the median income for the area on the basis of HUD's findings that such variations are necessary because of unusually high or low family incomes.

78

**Office of the Secretary, HUD**

§ 5.603

*Medical expenses.* Medical expenses, including medical insurance premiums, that are anticipated during the period for which annual income is computed, and that are not covered by insurance.

*Monthly adjusted income.* One twelfth of adjusted income.

*Monthly income.* One twelfth of annual income.

*Net family assets.* (1) Net cash value after deducting reasonable costs that would be incurred in disposing of real property, savings, stocks, bonds, and other forms of capital investment, excluding interests in Indian trust land and excluding equity accounts in HUD homeownership programs. The value of necessary items of personal property such as furniture and automobiles shall be excluded.

(2) In cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust. Any income distributed from the trust fund shall be counted when determining annual income under § 5.609.

(3) In determining net family assets, PHAs or owners, as applicable, shall include the value of any business or family assets disposed of by an applicant or tenant for less than fair market value (including a disposition in trust, but not in a foreclosure or bankruptcy sale) during the two years preceding the date of application for the program or reexamination, as applicable, in excess of the consideration received therefor. In the case of a disposition as part of a separation or divorce settlement, the disposition will not be considered to be for less than fair market value if the applicant or tenant receives important consideration not measurable in dollar terms.

(4) For purposes of determining annual income under § 5.609, the term "net family assets" does not include the value of a home currently being purchased with assistance under part 982, subpart M of this title. This exclusion is limited to the first 10 years after the purchase date of the home.

*Owner* has the meaning provided in the relevant program regulations. As used in this subpart, where appro-

priate, the term "owner" shall also include a "borrower" as defined in part 891 of this title.

*Responsible entity.* For § 5.611, in addition to the definition of "responsible entity" in § 5.100, and for § 5.617, in addition to only that part of the definition of "responsible entity" in § 5.100 which addresses the Section 8 program covered by § 5.617 (public housing is not covered by § 5.617), "responsible entity" means:

(1) For the HOME Investment Partnerships Program, the participating jurisdiction, as defined in 24 CFR 92.2;

(2) For the Rent Supplement Payments Program, the owner of the multifamily project;

(3) For the Rental Assistance Payments Program, the owner of the Section 236 project;

(4) For the Housing Opportunities for Persons with AIDS (HOPWA) program, the applicable "State" or "unit of general local government" or "nonprofit organization" as these terms are defined in 24 CFR 574.3, that administers the HOPWA Program;

(5) For the Shelter Plus Care Program, the "Recipient" as defined in 24 CFR 582.5;

(6) For the Supportive Housing Program, the "recipient" as defined in 24 CFR 583.5;

(7) For the Section 202 Supportive Housing Program for the Elderly, the "Owner" as defined in 24 CFR 891.205;

(8) For the Section 202 Direct Loans for Housing for the Elderly and Persons with Disabilities), the "Borrower" as defined in 24 CFR 891.505; and

(9) For the Section 811 Supportive Housing Program for Persons with Disabilities, the "owner" as defined in 24 CFR 891.305.

*Tenant rent.* The amount payable monthly by the family as rent to the unit owner (Section 8 owner or PHA in public housing). (This term is not used in the Section 8 voucher program.)

*Total tenant payment.* See § 5.613.

*Utility allowance.* If the cost of utilities (except telephone) and other housing services for an assisted unit is not included in the tenant rent but is the responsibility of the family occupying the unit, an amount equal to the estimate made or approved by a PHA or

79

§ 5.609                                               24 CFR Subtitle A (4–1–12 Edition)

HUD of the monthly cost of a reasonable consumption of such utilities and other services for the unit by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment.

*Utility reimbursement.* The amount, if any, by which the utility allowance for a unit, if applicable, exceeds the total tenant payment for the family occupying the unit. (This definition is not used in the Section 8 voucher program, or for a public housing family that is paying a flat rent.)

*Very low income family.* A family whose annual income does not exceed 50 percent of the median family income for the area, as determined by HUD with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 50 percent of the median income for the area if HUD finds that such variations are necessary because of unusually high or low family incomes.

*Welfare assistance.* Welfare or other payments to families or individuals, based on need, that are made under programs funded, separately or jointly, by Federal, State or local governments (including assistance provided under the Temporary Assistance for Needy Families (TANF) program, as that term is defined under the implementing regulations issued by the Department of Health and Human Services at 45 CFR 260.31).

*Work activities.* See definition at section 407(d) of the Social Security Act (42 U.S.C. 607(d)).

[61 FR 54498, Oct. 18, 1996, as amended at 65 FR 16716, Mar. 29, 2000; 65 FR 55161, Sept. 12, 2000; 66 FR 6223, Jan. 19, 2001; 67 FR 47432, July 18, 2002]

FAMILY INCOME

### § 5.609  Annual income.

(a) *Annual income* means all amounts, monetary or not, which:

(1) Go to, or on behalf of, the family head or spouse (even if temporarily absent) or to any other family member; or

(2) Are anticipated to be received from a source outside the family during the 12-month period following admission or annual reexamination effective date; and

(3) Which are not specifically excluded in paragraph (c) of this section.

(4) Annual income also means amounts derived (during the 12-month period) from assets to which any member of the family has access.

(b) Annual income includes, but is not limited to:

(1) The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services;

(2) The net income from the operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family;

(3) Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation is permitted only as authorized in paragraph (b)(2) of this section. Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from all net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD;

(4) The full amount of periodic amounts received from Social Security, annuities, insurance policies, retirement funds, pensions, disability or death benefits, and other similar types of periodic receipts, including a lump-sum amount or prospective monthly

80

**Office of the Secretary, HUD** §5.609

amounts for the delayed start of a periodic amount (except as provided in paragraph (c)(14) of this section);

(5) Payments in lieu of earnings, such as unemployment and disability compensation, worker's compensation and severance pay (except as provided in paragraph (c)(3) of this section);

(6) *Welfare assistance payments.* (i) Welfare assistance payments made under the Temporary Assistance for Needy Families (TANF) program are included in annual income only to the extent such payments:

(A) Qualify as assistance under the TANF program definition at 45 CFR 260.31; and

(B) Are not otherwise excluded under paragraph (c) of this section.

(ii) If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustment by the welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare assistance income to be included as income shall consist of:

(A) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

(B) The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph shall be the amount resulting from one application of the percentage.

(7) Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from organizations or from persons not residing in the dwelling;

(8) All regular pay, special pay and allowances of a member of the Armed Forces (except as provided in paragraph (c)(7) of this section).

(9) For section 8 programs only and as provided in 24 CFR 5.612, any financial assistance, in excess of amounts received for tuition, that an individual receives under the Higher Education Act of 1965 (20 U.S.C. 1001 *et seq.*), from private sources, or from an institution of higher education (as defined under

the Higher Education Act of 1965 (20 U.S.C. 1002)), shall be considered income to that individual, except that financial assistance described in this paragraph is not considered annual income for persons over the age of 23 with dependent children. For purposes of this paragraph, "financial assistance" does not include loan proceeds for the purpose of determining income.

(c) Annual income does not include the following:

(1) Income from employment of children (including foster children) under the age of 18 years;

(2) Payments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are unable to live alone);

(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and settlement for personal or property losses (except as provided in paragraph (b)(5) of this section);

(4) Amounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member;

(5) Income of a live-in aide, as defined in §5.403;

(6) Subject to paragraph (b)(9) of this section, the full amount of student financial assistance paid directly to the student or to the educational institution;

(7) The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

(8)(i) Amounts received under training programs funded by HUD;

(ii) Amounts received by a person with a disability that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

(iii) Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and which are made solely to

81

allow participation in a specific program;

(iv) Amounts received under a resident service stipend. A resident service stipend is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the PHA or owner, on a part-time basis, that enhances the quality of life in the development. Such services may include, but are not limited to, fire patrol, hall monitoring, lawn maintenance, resident initiatives coordination, and serving as a member of the PHA's governing board. No resident may receive more than one such stipend during the same period of time;

(v) Incremental earnings and benefits resulting to any family member from participation in qualifying State or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives, and are excluded only for the period during which the family member participates in the employment training program;

(9) Temporary, nonrecurring or sporadic income (including gifts);

(10) Reparation payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

(11) Earnings in excess of $480 for each full-time student 18 years old or older (excluding the head of household and spouse);

(12) Adoption assistance payments in excess of $480 per adopted child;

(13) [Reserved]

(14) Deferred periodic amounts from supplemental security income and social security benefits that are received in a lump sum amount or in prospective monthly amounts.

(15) Amounts received by the family in the form of refunds or rebates under State or local law for property taxes paid on the dwelling unit;

(16) Amounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services

and equipment needed to keep the developmentally disabled family member at home; or

(17) Amounts specifically excluded by any other Federal statute from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs that includes assistance under any program to which the exclusions set forth in 24 CFR 5.609(c) apply. A notice will be published in the FEDERAL REGISTER and distributed to PHAs and housing owners identifying the benefits that qualify for this exclusion. Updates will be published and distributed when necessary.

(d) *Annualization of income.* If it is not feasible to anticipate a level of income over a 12-month period (*e.g.*, seasonal or cyclic income), or the PHA believes that past income is the best available indicator of expected future income, the PHA may annualize the income anticipated for a shorter period, subject to a redetermination at the end of the shorter period.

[61 FR 54498, Oct. 18, 1996, as amended at 65 FR 16716, Mar. 29, 2000; 67 FR 47432, July 18, 2002; 70 FR 77743, Dec. 30, 2005]

§ 5.611 Adjusted income.

Adjusted income means annual income (as determined by the responsible entity, defined in §5.100 and §5.603) of the members of the family residing or intending to reside in the dwelling unit, after making the following deductions:

(a) *Mandatory deductions.* In determining adjusted income, the responsible entity must deduct the following amounts from annual income:

(1) $480 for each dependent;

(2) $400 for any elderly family or disabled family;

(3) The sum of the following, to the extent the sum exceeds three percent of annual income:

(i) Unreimbursed medical expenses of any elderly family or disabled family; and

(ii) Unreimbursed reasonable attendant care and auxiliary apparatus expenses for each member of the family who is a person with disabilities, to the extent necessary to enable any member of the family (including the member who is a person with disabilities) to be

82

**Office of the Secretary, HUD** §5.615

employed. This deduction may not exceed the earned income received by family members who are 18 years of age or older and who are able to work because of such attendant care or auxiliary apparatus; and

(4) Any reasonable child care expenses necessary to enable a member of the family to be employed or to further his or her education.

(b) *Additional deductions.* (1) For public housing, a PHA may adopt additional deductions from annual income. The PHA must establish a written policy for such deductions.

(2) For the HUD programs listed in §5.601(d), the responsible entity shall calculate such other deductions as required and permitted by the applicable program regulations.

[66 FR 6223, Jan. 19, 2001]

### §5.612 Restrictions on assistance to students enrolled in an institution of higher education.

No assistance shall be provided under section 8 of the 1937 Act to any individual who:

(a) Is enrolled as a student at an institution of higher education, as defined under section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002);

(b) Is under 24 years of age;

(c) Is not a veteran of the United States military;

(d) Is unmarried;

(e) Does not have a dependent child;

(f) Is not a person with disabilities, as such term is defined in section 3(b)(3)(E) of the 1937 Act and was not receiving assistance under section 8 of the 1937 Act as of November 30, 2005; and

(g) Is not otherwise individually eligible, or has parents who, individually or jointly, are not eligible on the basis of income to receive assistance under section 8 of the 1937 Act.

[70 FR 77743, Dec. 30, 2005, as amended at 73 FR 49333, Aug. 21, 2008]

### §5.613 Public housing program and Section 8 tenant-based assistance program: PHA cooperation with welfare agency.

(a) This section applies to the public housing program and the Section 8 tenant-based assistance program.

(b) The PHA must make best efforts to enter into cooperation agreements with welfare agencies under which such agencies agree:

(1) To target public assistance, benefits and services to families receiving assistance in the public housing program and the Section 8 tenant-based assistance program to achieve self-sufficiency;

(2) To provide written verification to the PHA concerning welfare benefits for families applying for or receiving assistance in these housing assistance programs.

[65 FR 16717, Mar. 29, 2000]

### §5.615 Public housing program and Section 8 tenant-based assistance program: How welfare benefit reduction affects family income.

(a) *Applicability.* This section applies to covered families who reside in public housing (part 960 of this title) or receive Section 8 tenant-based assistance (part 982 of this title).

(b) *Definitions.* The following definitions apply for purposes of this section:

*Covered families.* Families who receive welfare assistance or other public assistance benefits ("welfare benefits") from a State or other public agency ("welfare agency") under a program for which Federal, State, or local law requires that a member of the family must participate in an economic self-sufficiency program as a condition for such assistance.

*Economic self-sufficiency program.* See definition at §5.603.

*Imputed welfare income.* The amount of annual income not actually received by a family, as a result of a specified welfare benefit reduction, that is nonetheless included in the family's annual income for purposes of determining rent.

*Specified welfare benefit reduction.*

(1) A reduction of welfare benefits by the welfare agency, in whole or in part, for a family member, as determined by the welfare agency, because of fraud by a family member in connection with the welfare program; or because of welfare agency sanction against a family member for noncompliance with a welfare agency requirement to participate in an economic self-sufficiency program.

83

composition at least annually. The "effective date" of an examination or reexamination refers to:

(1) In the case of an examination for admission, the effective date of the lease; and

(2) In the case of a reexamination of an existing participant, the effective date of the redetermined housing assistance payment with respect to the Rental Voucher program and the effective date of the redetermined total tenant payment in all other cases.

(b) *Verification.* (1) As a condition of admission to, or continued occupancy of, any assisted unit, the PHA or owner, as applicable, shall require the family head and other such family members as it designates to execute a HUD-approved release and consent form (including any release and consent as required under 24 CFR part 760) authorizing any depository or private source of income, or any Federal, State or local agency, to furnish or release to the PHA or owner, as applicable, and to HUD such information as the HA or owner, as applicable, and HUD determines to be necessary.

(2) The PHA or owner shall also require the family to submit directly documentation determined to be necessary. Information or documentation shall be considered necessary if it is required for purposes of determining or auditing a family's eligibility to receive housing assistance, for determining the family's annual income, adjusted income or total tenant payment.

(3) The use or disclosure of information obtained from a family or from another source pursuant to this release and consent shall be limited to purposes directly connected with administration of this subpart or applying for assistance.

(Approved by the Office of Management and Budget under control numbers 2502–0204 and 2577–0083.)

[61 FR 54498, Oct. 18, 1996, as amended at 62 FR 27125, May 16, 1997]

EFFECTIVE DATE NOTE: At 65 FR 16718, Mar. 29, 2000, §5.617 was removed, effective Apr. 28, 2000.

FAMILY PAYMENT

§ 5.628   Total tenant payment.

(a) *Determining total tenant payment (TTP).* Total tenant payment is the highest of the following amounts, rounded to the nearest dollar:

(1) 30 percent of the family's monthly adjusted income;

(2) 10 percent of the family's monthly income;

(3) If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of those payments which is so designated; or

(4) The minimum rent, as determined in accordance with §5.630.

(b) *Determining TTP if family's welfare assistance is ratably reduced.* If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under paragraph (a)(3) of this section is the amount resulting from one application of the percentage.

[65 FR 16718, Mar. 29, 2000]

EFFECTIVE DATE NOTE: At 65 FR 16718, Mar. 29, 2000, §5.628 was added, effective Apr. 28, 2000.

§ 5.630   Minimum rent.

(a) *Minimum rent.* (1) The PHA must charge a family no less than a minimum monthly rent established by the responsible entity, except as described in paragraph (b) of this section.

(2) For the public housing program and the section 8 moderate rehabilitation, and certificate or voucher programs, the PHA may establish a minimum rent of up to $50.

(3) For other section 8 programs, the minimum rent is $25.

(b) *Financial hardship exemption from minimum rent.* (1) *When is family exempt from minimum rent?* The responsible entity must grant an exemption from payment of minimum rent if the family is unable to pay the minimum rent

78

*Replacement cost of the completed facility* means the current cost of construction and equipment for a newly constructed housing facility of the size and type being altered. Construction and equipment costs do not include the cost of land, demolition, site improvements, non-dwelling facilities and administrative costs for project development activities.

*Secretary* means the Secretary of Housing and Urban Development.

*Section 504* means section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, as it applies to programs or activities receiving Federal financial assistance.

*Substantial impairment* means a significant loss of the integrity of finished materials, design quality, or special character resulting from a permanent alteration.

[53 FR 20233, June 2, 1988; 54 FR 8188, Feb. 27, 1989]

### § 8.4 Discrimination prohibited.

(a) No qualified individual with handicaps shall, solely on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance from the Department.

(b)(1) A recipient, in providing any housing, aid, benefit, or service in a program or activity that receives Federal financial assistance from the Department may not, directly or through contractual, licensing, or other arrangements, solely on the basis of handicap:

(i) Deny a qualified individual with handicaps the opportunity to participate in, or benefit from, the housing, aid, benefit, or service;

(ii) Afford a qualified individual with handicaps an opportunity to participate in, or benefit from, the housing, aid, benefit, or service that is not equal to that afforded to others;

(iii) Provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate housing, aid, benefits, or services to individuals with handicaps or to any class of individuals with handicaps from that provided to others unless such action is necessary to provide qualified individuals with handicaps with housing, aid, benefits, or services that are as effective as those provided to others.

(v) Aid or perpetuate discrimination against a qualified individual with handicaps by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any housing, aid, benefit, or service to beneficiaries in the recipient's federally assisted program or activity;

(vi) Deny a qualified individual with handicaps the opportunity to participate as a member of planning or advisory boards;

(vii) Deny a dwelling to an otherwise qualified buyer or renter because of a handicap of that buyer or renter or a person residing in or intending and eligible to reside in that dwelling after it is sold, rented or made available; or

(viii) Otherwise limit a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid, benefit, or service.

(2) For purposes of this part, housing, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for individuals with handicaps and non-handicapped persons, but must afford individuals with handicaps equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement.

(3) A recipient may not deny a qualified individual with handicaps the opportunity to participate in any federally assisted program or activity that is not separate or different despite the existence of permissibly separate or different programs or activities.

(4) In any program or activity receiving Federal financial assistance from the Department, a recipient may not, directly or through contractual or other arrangements, utilize criteria or

142

methods of administration the purpose or effect of which would:

(i) Subject qualified individuals with handicaps to discrimination solely on the basis of handicap;

(ii) Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap involved in the program or activity, unless the recipient can demonstrate that the criteria or methods of administration are manifestly related to the accomplishment of an objective of a program or activity; or

(iii) Perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

(5) In determining the site or location of a federally assisted facility, an applicant for assistance or a recipient may not make selections the purpose or effect of which would:

(i) Exclude qualified individuals with handicaps from, deny them the benefits of, or otherwise subject them to discrimination under, any program or activity that receives Federal financial assistance from the Department, or

(ii) Defeat or substantially impair the accomplishment of the objectives of the program or activity with respect to qualified individuals with handicaps.

(6) As used in this section, the housing, aid, benefit, or service provided under a program or activity receiving Federal financial assistance includes any housing, aid, benefit, or service provided in or through a facility that has been constructed, altered, leased or rented, or otherwise acquired, in whole or in part, with Federal financial assistance.

(c)(1) Non-handicapped persons may be excluded from the benefits of a program if the program is limited by Federal statute or executive order to individuals with handicaps. A specific class of individuals with handicaps may be excluded from a program if the program is limited by Federal statute or Executive order to a different class of individuals.

(2) Certain Department programs operate under statutory definitions of *handicapped person* that are more restrictive than the definition of *indi-*

*vidual with handicaps* contained in §8.3 (see appendix B). Those definitions are not superseded or otherwise affected by this regulation.

(d) Recipients shall administer programs and activities receiving Federal financial assistance in the most integrated setting appropriate to the needs of qualified individuals with handicaps.

(e) The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement that, based on handicap, imposes inconsistent or contradictory prohibitions or limits upon the eligibility of qualified individuals with handicaps to receive services or to practice any occupation or profession.

(f) The enumeration of specific forms of prohibited discrimination in paragraphs (b) through (e) of this section does not limit the general prohibition in paragraph (a) of this section.

[53 FR 20233, June 2, 1988; 53 FR 28115, July 26, 1988]

§8.5 [Reserved]

§8.6 Communications.

(a) The recipient shall take appropriate steps to ensure effective communication with applicants, beneficiaries, and members of the public.

(1) The recipient shall furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate in, and enjoy the benefits of, a program or activity receiving Federal financial assistance.

(i) In determining what auxiliary aids are necessary, the recipient shall give primary consideration to the requests of the individual with handicaps.

(ii) The recipient is not required to provide individually prescribed devices, readers for personal use or study, or other devices of a personal nature.

(2) Where a recipient communicates with applicants and beneficiaries by telephone, telecommunication devices for deaf persons (TDD's) or equally effective communication systems shall be used.

(b) The recipient shall adopt and implement procedures to ensure that interested persons (including persons with impaired vision or hearing) can

143

therein of individuals with physical handicaps.

(c) This section does not require recipients to make building alterations that have little likelihood of being accomplished without removing or altering a load-bearing structural member.

(d) For purposes of this section, section 4.1.4(11) of UFAS may not be used to waive or lower the minimum of five percent accessible units required by §8.22(b) or to apply the minimum only to projects of 15 or more dwelling units.

(e) Except as otherwise provided in this paragraph, the provisions of §§8.21 (a) and (b), 8.22 (a) and (b), 8.23, 8.25(a) (1) and (2), and 8.29 shall apply to facilities that are designed, constructed or altered after July 11, 1988. If the design of a facility was commenced before July 11, 1988, the provisions shall be followed to the maximum extent practicable, as determined by the Department. For purposes of this paragraph, the date a facility is constructed or altered shall be deemed to be the date bids for the construction or alteration of the facility are solicited. For purposes of the Urban Development Action Grant (UDAG) program, the provisions shall apply to the construction or alteration of facilities that are funded under applications submitted after July 11, 1988. If the UDAG application was submitted before July 11, 1988, the provisions shall apply, to the maximum extent practicable, as determined by the Department.

[53 FR 20233, June 2, 1988, as amended at 61 FR 5203, Feb. 9, 1996]

§8.33 Housing adjustments.

A recipient shall modify its housing policies and practices to ensure that these policies and practices do not discriminate, on the basis of handicap, against a qualified individual with handicaps. The recipient may not impose upon individuals with handicaps other policies, such as the prohibition of assistive devices, auxiliary alarms, or guides in housing facilities, that have the effect of limiting the participation of tenants with handicaps in the recipient's federally assisted housing program or activity in violation of this part. Housing policies that the recipient can demonstrate are essential to

the housing program or activity will not be regarded as discriminatory within the meaning of this section if modifications to them would result in a fundamental alteration in the nature of the program or activity or undue financial and administrative burdens.

## Subpart D—Enforcement

§8.50 Assurances required.

(a) *Assurances.* An applicant for Federal financial assistance for a program or activity to which this part applies shall submit an assurance to HUD, or in the case of a subrecipient to a primary recipient, on a form specified by the responsible civil rights official, that the program or activity will be operated in compliance with this part. An applicant may incorporate these assurances by reference in subsequent applications to the Department.

(b) *Duration of obligation.* (1) In the case of Federal financial assistance extended in the form of real property or to provide real property or structures on the property, the assurance will obligate the recipient or, in the case of a subsequent transfer, the transferee, for the period during which the real property or structures are used for the purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits.

(2) In the case of Federal financial assistance extended to provide personal property, the assurance will obligate the recipient for the period during which it retains ownership or possession of the property.

(3) In all other cases the assurance will obligate the recipient for the period during which Federal financial assistance is extended.

(c) *Covenants.* (1) Where Federal financial assistance is provided in the form of real property or interest in the property from the Department, the instrument effecting or recording this transfer shall contain a covenant running with the land to assure nondiscrimination for the period during which the real property is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits.

151

is required, the agency shall take the necessary corrective actions.

(b) The agency shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments (both oral and written).

(c) The agency shall, for at least three years following the completion of the self-evaluation, maintain on file and make available for public inspection:

(1) A list of interested persons;

(2) A description of the areas examined and any problems identified; and

(3) A description of any modifications made or to be made.

### §9.111 Notice.

The agency shall make available to employees, applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the programs or activities conducted by the agency. The agency shall make such information available to such persons in such manner as the Secretary finds necessary to apprise them of the protections against discrimination assured them by section 504 and this part. All publications and recruitment materials distributed to participants, beneficiaries, applicants or employees shall include a statement that the agency does not discriminate on the basis of disability. The notice shall include the name of the person or office responsible for the implementation of section 504.

### §§9.112–9.129 [Reserved]

### §9.130 General prohibitions against discrimination.

(a) No qualified individual with disabilities shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the agency.

(b)(1) The agency, in providing any housing, aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with disabilities the opportunity to participate in or benefit from the housing, aid, benefit, or service;

(ii) Afford a qualified individual with disabilities an opportunity to participate in or benefit from the housing, aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with disabilities with any housing, aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate housing, aid, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with housing, aid, benefits, or services that are as effective as those provided to others;

(v) Deny a qualified individual with disabilities the opportunity to participate as a member of planning or advisory boards;

(vi) Deny a dwelling to an otherwise qualified buyer or renter because of a disability of that buyer or renter or a person residing in or intending to reside in that dwelling after it is sold, rented or made available; or

(vii) Otherwise limit a qualified individual with disabilities in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the housing, aid, benefit, or service.

(2) For purposes of this part, housing, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for individuals with disabilities and for persons without disabilities, but must afford individuals with disabilities equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement.

(3) The agency may not deny a qualified individual with disabilities the opportunity to participate in programs or

163

activities that are not separate or different, despite the existence of programs or activities that are permissibly separate or different for persons with disabilities.

(4) The agency may not, directly or through contractual or other arrangements, utilize criteria or methods of administration the purpose or effect of which would:

(i) Subject qualified individuals with disabilities to discrimination on the basis of disability; or

(ii) Defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with disabilities.

(5) The agency may not, in determining the site or location of a facility, make selections the purpose or effect of which would:

(i) Exclude individuals with disabilities from, deny them the benefits of, or otherwise subject them to discrimination under any program or activity conducted by the agency; or

(ii) Defeat or substantially impair the accomplishment of the objectives of a program or activity with respect to individuals with disabilities.

(6) The agency, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(7) The agency may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may the agency establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. However, the programs or activities of entities that are licensed or certified by the agency are not, themselves, covered by this part.

(c)(1) Notwithstanding any other provision of this part, persons without disabilities may be excluded from the benefits of a program if the program is limited by Federal statute or Executive order to individuals with disabilities. A specific class of individuals with disabilities may be excluded from a program if the program is limited by

Federal statute or Executive order to a different class of individuals.

(2) Certain agency programs operate under statutory definitions of "persons with disabilities" that are more restrictive than the definition of "individual with disabilities" contained in § 9.103. Those definitions are not superseded or otherwise affected by this regulation.

(d) The agency shall administer programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e) The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement that, based on disability, imposes inconsistent or contradictory prohibitions or limits upon the eligibility of qualified individuals with disabilities to receive services or to practice any occupation or profession.

(f) The enumeration of specific forms of prohibited discrimination in paragraphs (b) and (d) of this section does not limit the general prohibition in paragraph (a) of this section.

§ 9.131 Direct threat.

(a) This part does not require the agency to permit an individual to participate in, or benefit from the goods, services, facilities, privileges, advantages and accommodations of that agency when that individual poses a direct threat to the health or safety of others.

(b) "Direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

(c) In determining whether an individual poses a direct threat to the health or safety of others, the agency must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

part of such a restoration agreement a provision requiring that the tenant pay into an interest bearing escrow account, over a reasonable period, a reasonable amount of money not to exceed the cost of the restorations. The interest in any such account shall accrue to the benefit of the tenant.

(b) A landlord may condition permission for a modification on the renter providing a reasonable description of the proposed modifications as well as reasonable assurances that the work will be done in a workmanlike manner and that any required building permits will be obtained.

(c) The application of paragraph (a) of this section may be illustrated by the following examples:

*Example (1):* A tenant with a handicap asks his or her landlord for permission to install grab bars in the bathroom at his or her own expense. It is necessary to reinforce the walls with blocking between studs in order to affix the grab bars. It is unlawful for the landlord to refuse to permit the tenant, at the tenant's own expense, from making the modifications necessary to add the grab bars. However, the landlord may condition permission for the modification on the tenant agreeing to restore the bathroom to the condition that existed before the modification, reasonable wear and tear excepted. It would be reasonable for the landlord to require the tenant to remove the grab bars at the end of the tenancy. The landlord may also reasonably require that the wall to which the grab bars are to be attached be repaired and restored to its original condition, reasonable wear and tear excepted. However, it would be unreasonable for the landlord to require the tenant to remove the blocking, since the reinforced walls will not interfere in any way with the landlord's or the next tenant's use and enjoyment of the premises and may be needed by some future tenant.

*Example (2):* An applicant for rental housing has a child who uses a wheelchair. The bathroom door in the dwelling unit is too narrow to permit the wheelchair to pass. The applicant asks the landlord for permission to widen the doorway at the applicant's own expense. It is unlawful for the landlord to refuse to permit the applicant to make the modification. Further, the landlord may *not*, in usual circumstances, condition permission for the modification on the applicant paying for the doorway to be narrowed at the end of the lease because a wider doorway will not interfere with the landlord's or the next tenant's use and enjoyment of the premises.

### § 100.204   Reasonable accommodations.

(a) It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

(b) The application of this section may be illustrated by the following examples:

*Example (1):* A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a *no pets* policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.

*Example (2):* Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a *first come first served* basis. John applies for housing in Progress Gardens. John is mobility impaired and is unable to walk more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of § 100.204 for the owner or manager of Progress Gardens to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have great difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

### § 100.205   Design and construction requirements.

(a) Covered multifamily dwellings for first occupancy after March 13, 1991 shall be designed and constructed to have at least one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. For purposes of this section, a covered multifamily dwelling shall be deemed to be designed and constructed for first occupancy on or before March 13, 1991, if the dwelling is occupied by that date, or if the last building permit or renewal thereof for the dwelling is issued by a

(A) The tenant, and any other noncompliant resident, enter into a written agreement with the PHA, in the form and manner required by the PHA, to cure such noncompliance, and in fact cure such noncompliance in accordance with such agreement; or

(B) The family provides written assurance satisfactory to the PHA that the tenant or other noncompliant resident no longer resides in the unit.

(iii) State that the tenant may request a grievance hearing on the PHA determination, in accordance with part 966, subpart B of this chapter, and that the tenant may exercise any available judicial remedy to seek timely redress for the PHA's nonrenewal of the lease because of such determination.

(c) *Tenant agreement to comply with service requirement.* If the tenant or another family member has violated the service requirement, the PHA may not renew the lease upon expiration of the term unless:

(1) The tenant, and any other noncompliant resident, enter into a written agreement with the PHA, in the form and manner required by the PHA, to cure such noncompliance by completing the additional hours of community service or economic self-sufficiency activity needed to make up the total number of hours required over the twelve-month term of the new lease, and

(2) All other members of the family who are subject to the service requirement are currently complying with the service requirement or are no longer residing in the unit.

**§960.609 Prohibition against replacement of PHA employees.**

In implementing the service requirement under this subpart, the PHA may not substitute community service or self-sufficiency activities performed by residents for work ordinarily performed by PHA employees, or replace a job at any location where residents perform activities to satisfy the service requirement.

## Subpart G—Pet Ownership in Public Housing

SOURCE: 65 FR 42522, July 10, 2000, unless otherwise noted.

**§960.701 Purpose.**

The purpose of this subpart is, in accordance with section 31 of the United States Housing Act of 1937 (42 U.S.C. 1437z–3), to permit pet ownership by residents of public housing, subject to compliance with reasonable requirements established by the public housing agency (PHA) for pet ownership.

**§960.703 Applicability.**

This subpart applies to public housing as that term is defined in section 3(b) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b)), except that such term does not include public housing developments for the elderly or persons with disabilities. Regulations that apply to pet ownership in such developments are located in part 5, subpart C, of this title.

**§960.705 Animals that assist, support, or provide service to persons with disabilities.**

(a) This subpart G does not apply to animals that assist, support or provide service to persons with disabilities. PHAs may not apply or enforce any policies established under this subpart against animals that are necessary as a reasonable accommodation to assist, support or provide service to persons with disabilities. This exclusion applies to such animals that reside in public housing, as that term is used in §960.703, and such animals that visit these developments.

(b) Nothing in this subpart G:

(1) Limits or impairs the rights of persons with disabilities;

(2) Authorizes PHAs to limit or impair the rights of persons with disabilities; or

(3) Affects any authority that PHAs may have to regulate service animals that assist, support or provide service to persons with disabilities, under Federal, State, or local law.

**§960.707 Pet ownership.**

(a) *Ownership Conditions.* A resident of a dwelling unit in public housing, as that term is used in §960.703, may own one or more common household pets or have one or more common household pets present in the dwelling unit of such resident, subject to the reasonable

393

(b) The PHA is subject to the audit requirements in 24 CFR part 44.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995]

### § 982.160 HUD determination to administer a local program.

If the Assistant Secretary for Public and Indian Housing determines that there is no PHA organized, or that there is no PHA able and willing to implement the provisions of this part for an area, HUD (or an entity acting on behalf of HUD) may enter into HAP contracts with owners and perform the functions otherwise assigned to PHAs under this part with respect to the area.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995]

### § 982.161 Conflict of interest.

(a) Neither the PHA nor any of its contractors or subcontractors may enter into any contract or arrangement in connection with the tenant-based programs in which any of the following classes of persons has any interest, direct or indirect, during tenure or for one year thereafter:

(1) Any present or former member or officer of the PHA (except a participant commissioner);

(2) Any employee of the PHA, or any contractor, subcontractor or agent of the PHA, who formulates policy or who influences decisions with respect to the programs;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the programs; or

(4) Any member of the Congress of the United States.

(b) Any member of the classes described in paragraph (a) of this section must disclose their interest or prospective interest to the PHA and HUD.

(c) The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

### § 982.162 Use of HUD-required contracts and other forms.

(a) The PHA must use program contracts and other forms required by HUD headquarters, including:

(1) The consolidated ACC between HUD and the PHA;

(2) The HAP contract between the PHA and the owner; and

(3) The tenancy addendum required by HUD (which is included both in the HAP contract and in the lease between the owner and the tenant).

(b) Required program contracts and other forms must be word-for-word in the form required by HUD headquarters. Any additions to or modifications of required program contracts or other forms must be approved by HUD headquarters.

[60 FR 34695, July 3, 1995, as amended at 64 FR 26642, May 14, 1999]

### § 982.163 Fraud recoveries.

Under 24 CFR part 792, the PHA may retain a portion of program fraud losses that the PHA recovers from a family or owner by litigation, court-order or a repayment agreement.

[60 FR 34695, July 3, 1995; 60 FR 34840, Aug. 23, 1995]

## Subpart E—Admission to Tenant-Based Program

### § 982.201 Eligibility and targeting.

(a) *When applicant is eligible: general.* The PHA may only admit an eligible family to the program. To be eligible, the applicant must be a "family;" must be income-eligible in accordance with paragraph (b) of this section and 24 CFR part 5, subpart F; must be a citizen or a noncitizen who has eligible immigration status as determined in accordance with 24 CFR part 5, subpart E.

(b) *Income*—(1) *Income-eligibility.* To be income-eligible, the applicant must be a family in any of the following categories:

(i) A "very low income" family;

(ii) A low-income family that is "continuously assisted" under the 1937 Housing Act;

(iii) A low-income family that meets additional eligibility criteria specified in the PHA administrative plan. Such

additional PHA criteria must be consistent with the PHA plan and with the consolidated plans for local governments in the PHA jurisdiction;

(iv) A low-income family that qualifies for voucher assistance as a nonpurchasing family residing in a HOPE 1 (HOPE for public housing homeownership) or HOPE 2 (HOPE for homeownership of multifamily units) project. (Section 8(o)(4)(D) of the 1937 Act (42 U.S.C. 1437f(o)(4)(D));

(v) A low-income or moderate-income family that is displaced as a result of the prepayment of the mortgage or voluntary termination of an insurance contract on eligible low-income housing as defined in §248.101 of this title;

(vi) A low-income family that qualifies for voucher assistance as a nonpurchasing family residing in a project subject to a resident homeownership program under §248.173 of this title.

(2) *Income-targeting.* (i) Not less than 75 percent of the families admitted to a PHA's tenant-based voucher program during the PHA fiscal year from the PHA waiting list shall be extremely low income families. Annual income of such families shall be verified within the period described in paragraph (e) of this section.

(ii) A PHA may admit a lower percent of extremely low income families during a PHA fiscal year (than otherwise required under paragraph (b)(2)(i) of this section) if HUD approves the use of such lower percent by the PHA, in accordance with the PHA plan, based on HUD's determination that the following circumstances necessitate use of such lower percent by the PHA:

(A) The PHA has opened its waiting list for a reasonable time for admission of extremely low income families residing in the same metropolitan statistical area (MSA) or non-metropolitan county, both inside and outside the PHA jurisdiction;

(B) The PHA has provided full public notice of such opening to such families, and has conducted outreach and marketing to such families, including outreach and marketing to extremely low income families on the Section 8 and public housing waiting lists of other PHAs with jurisdiction in the same MSA or non-metropolitan county;

(C) Notwithstanding such actions by the PHA (in accordance with paragraphs (b)(2)(ii)(A) and (B) of this section), there are not enough extremely low income families on the PHA's waiting list to fill available slots in the program during any fiscal year for which use of a lower percent is approved by HUD; and

(D) Admission of the additional very low income families other than extremely low income families to the PHA's tenant-based voucher program will substantially address worst case housing needs as determined by HUD.

(iii) If approved by HUD, the admission of a portion of very low income welfare-to-work (WTW) families that are not extremely low income families may be disregarded in determining compliance with the PHA's income-targeting obligations under paragraph (b)(2)(i) of this section. HUD will grant such approval only if and to the extent that the PHA has demonstrated to HUD's satisfaction that compliance with such targeting obligations with respect to such portion of WTW families would interfere with the objectives of the welfare-to-work voucher program. If HUD grants such approval, admission of that portion of WTW families is not counted in the base number of families admitted to a PHA's tenant-based voucher program during the fiscal year for purposes of income targeting.

(iv) Conversion of assistance for a participant in the PHA certificate program to assistance in the PHA voucher program does not count as an "admission," and is not subject to targeting under paragraph (b)(2)(i) of this section.

(v) Admission of families as described in paragraphs (b)(1)(ii) or (b)(1)(v) of this section is not subject to targeting under paragraph (b)(2)(i) of this section.

(vi) If the jurisdictions of two or more PHAs that administer the tenant-based voucher program cover an identical geographic area, such PHAs may elect to be treated as a single PHA for purposes of targeting under paragraph (b)(2)(i) of this section. In such a case, the PHAs shall cooperate to assure that aggregate admissions by such

PHAs comply with the targeting requirement. If such PHAs do not have a single fiscal year, HUD will determine which PHA's fiscal year is used for this purpose.

(vii) If a family initially leases a unit outside the PHA jurisdiction under portability procedures at admission to the voucher program on or after the merger date, such admission shall be counted against the targeting obligation of the initial PHA (unless the receiving PHA absorbs the portable family into the receiving PHA voucher program from the point of admission).

(3) The annual income (gross income) of a participant family is used both for determination of income-eligibility under paragraph (b)(1) of this section and for targeting under paragraph (b)(2)(i) of this section. In determining annual income of a participant family which includes persons with disabilities, the determination must include the disallowance of increase in annual income as provided in 24 CFR 5.617, if applicable.

(4) The applicable income limit for issuance of a voucher when a family is selected for the program is the highest income limit (for the family size) for areas in the PHA jurisdiction. The applicable income limit for admission to the program is the income limit for the area where the family is initially assisted in the program. At admission, the family may only use the voucher to rent a unit in an area where the family is income eligible.

(c) *Family composition.* (1) A "family" may be a single person or a group of persons.

(2) A "family" includes a family with a child or children.

(3) A group of persons consisting of two or more elderly persons or disabled persons living together, or one or more elderly or disabled persons living with one or more live-in aides is a family. The PHA determines if any other group of persons qualifies as a "family".

(4) A single person family may be:

(i) An elderly person.

(ii) A displaced person.

(iii) A disabled person.

(iv) Any other single person.

(5) A child who is temporarily away from the home because of placement in foster care is considered a member of the family.

(d) *Continuously assisted.* (1) An applicant is continuously assisted under the 1937 Housing Act if the family is already receiving assistance under any 1937 Housing Act program when the family is admitted to the voucher program.

(2) The PHA must establish policies concerning whether and to what extent a brief interruption between assistance under one of these programs and admission to the voucher program will be considered to break continuity of assistance under the 1937 Housing Act.

(e) *When PHA verifies that applicant is eligible.* The PHA must receive information verifying that an applicant is eligible within the period of 60 days before the PHA issues a voucher to the applicant.

(f) *Decision to deny assistance*—(1) *Notice to applicant.* The PHA must give an applicant prompt written notice of a decision denying admission to the program (including a decision that the applicant is not eligible, or denying assistance for other reasons). The notice must give a brief statement of the reasons for the decision. The notice must also state that the applicant may request an informal review of the decision, and state how to arrange for the informal review.

(2) For description of the grounds for denying assistance because of action or inaction by the applicant, see § 982.552(b) and (c) (requirement and authority to deny admission) and § 982.553(a) (crime by family members).

[59 FR 36682, July 18, 1994, as amended at 60 FR 34717, July 3, 1995; 61 FR 13627, Mar. 27, 1996; 64 FR 26642, May 14, 1999; 64 FR 49658, Sept. 14, 1999; 64 FR 56911, Oct. 21, 1999; 66 FR 6226, Jan. 19, 2001; 66 FR 8174, Jan. 30, 2001; 67 FR 6820, Feb. 13, 2002; 70 FR 77744, Dec. 30, 2005]

## § 982.202   How applicants are selected: General requirements.

(a) *Waiting list admissions and special admissions.* The PHA may admit an applicant for participation in the program either:

(1) As a special admission (see § 982.203).

(2) As a waiting list admission (see § 982.204 through § 982.210).

**Department of Justice** §35.130

shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part.

§§35.108–35.129 [Reserved]

## Subpart B—General Requirements

### §35.130 General prohibitions against discrimination.

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(vi) Deny a qualified individual with a disability the opportunity to partici-

pate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability,

551

**ADD.**

nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

(f) A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the non-

discriminatory treatment required by the Act or this part.

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

§ 35.131  Illegal use of drugs.

(a) *General.* (1) Except as provided in paragraph (b) of this section, this part does not prohibit discrimination against an individual based on that individual's current illegal use of drugs.

(2) A public entity shall not discriminate on the basis of illegal use of drugs against an individual who is not engaging in current illegal use of drugs and who—

(i) Has successfully completed a supervised drug rehabilitation program or has otherwise been rehabilitated successfully;

(ii) Is participating in a supervised rehabilitation program; or

(iii) Is erroneously regarded as engaging in such use.

(b) *Health and drug rehabilitation services.* (1) A public entity shall not deny health services, or services provided in connection with drug rehabilitation, to an individual on the basis of that individual's current illegal use of drugs, if the individual is otherwise entitled to such services.

(2) A drug rehabilitation or treatment program may deny participation to individuals who engage in illegal use of drugs while they are in the program.

(c) *Drug testing.* (1) This part does not prohibit a public entity from adopting or administering reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual who formerly engaged in the illegal use of drugs is not now engaging in current illegal use of drugs.

(2) Nothing in paragraph (c) of this section shall be construed to encourage, prohibit, restrict, or authorize the conduct of testing for the illegal use of drugs.

552

The language of Rule 7.1 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

## Rule 8. General Rules of Pleading

(a) Claim for Relief. A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

(b) Defenses; Admissions and Denials.

(1) *In General.* In responding to a pleading, a party must:

(A) state in short and plain terms its defenses to each claim asserted against it; and

(B) admit or deny the allegations asserted against it by an opposing party.

 (2) *Denials—Responding to the Substance.* A denial must fairly respond to the substance of the allegation.

(3) *General and Specific Denials.* A party that intends in good faith to deny all the allegations of a pleading—including the jurisdictional grounds—may do so by a general denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted.

(4) *Denying Part of an Allegation.* A party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest.

(5) *Lacking Knowledge or Information.* A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial.

(6) *Effect of Failing to Deny.* An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied. If a responsive pleading is not required, an allegation is considered denied or avoided.

(c) Affirmative Defenses.

(1) *In General.* In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

- accord and satisfaction;
- arbitration and award;
- assumption of risk;
- contributory negligence;
- duress;
- estoppel;
- failure of consideration;
- fraud;
- illegality;
- injury by fellow servant;
- laches;
- license;
- payment;

81

ADD

- release;
- res judicata;
- statute of frauds;
- statute of limitations; and
- waiver.

(2) *Mistaken Designation.* If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.

(d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.

(1) *In General.* Each allegation must be simple, concise, and direct. No technical form is required.

(2) *Alternative Statements of a Claim or Defense.* A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

(3) *Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency.

(e) Construing Pleadings. Pleadings must be construed so as to do justice.

**Notes**

(As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 28, 2010, eff. Dec. 1, 2010.)

**Notes of Advisory Committee on Rules—1937**

*Note to Subdivision (a).* See [former] Equity Rules 25 (Bill of Complaint—Contents), and 30 (Answer—Contents—Counterclaim). Compare 2 Ind.Stat.Ann. (Burns, 1933) §§2–1004, 2–1015; 2 Ohio Gen.Code Ann. (Page, 1926) §§11305, 11314; Utah Rev.Stat.Ann. (1933), §§104–7–2, 104–9–1.

See Rule 19(c) for the requirement of a statement in a claim for relief of the names of persons who ought to be parties and the reason for their omission.

See Rule 23(b) for particular requirements as to the complaint in a secondary action by shareholders.

*Note to Subdivision (b).* 1. This rule supersedes the methods of pleading prescribed in U.S.C., Title 19, §508 (Persons making seizures pleading general issue and providing special matter); U.S.C., Title 35, [former] §§40d (Providing under general issue, upon notice, that a statement in application for an extended patent is not true), 69 [now 282] (Pleading and proof in actions for infringement) and similar statutes.

2. This rule is, in part, [former] Equity Rule 30 (Answer—Contents—Counterclaim), with the matter on denials largely from the Connecticut practice. See Conn.Practice Book (1934) §§107, 108, and 122; Conn.Gen.Stat. (1930) §§5508–5514. Compare the English practice, *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 19, r.r. 17–20.

*Note to Subdivision (c).* This follows substantially English Rules Under the Judicature Act (The Annual Practice, 1937) O. 19, r. 15 and N.Y.C.P.A. (1937) §242, with "surprise" omitted in this rule.

*Note to Subdivision (d).* The first sentence is similar to [former] Equity Rule 30

argument.  If neither party appears, the case will be decided on the briefs, unless the court orders otherwise.

**(f) Submission on Briefs.**  The parties may agree to submit a case for decision on the briefs, but the court may direct that the case be argued.

**(g) Use of Physical Exhibits at Argument; Removal.**  Counsel intending to use physical exhibits other than documents at the argument must arrange to place them in the courtroom on the day of the argument before the court convenes.  After the argument, counsel must remove the exhibits from the courtroom, unless the court directs otherwise.  The clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them.

### Local Rule 34.0. Oral Argument

**(a) Party's Statement.**  *Any party who desires  to do so may include, either in the opening or answering brief as the case may be, a statement limited to one-half page setting forth the reasons why oral argument should, or need not, be heard.  If such a statement is included, it must be inserted in the brief immediately after the Table of Contents and Table of Authorities and immediately before the first page of the brief and must be captioned "REASONS WHY ORAL ARGUMENT SHOULD [NEED NOT] BE HEARD" as  appropriate.  The inclusion of this statement will not be counted in computing the maximum permitted length of the brief.*

**(b) Notice of Argument.**  *If the court concludes that oral argument is unnecessary based on the standards set forth in Fed. R. App. P. 34(a)(2), counsel shall be so advised.  The court's decision to dispense with oral argument may be announced at the time that a decision on the merits is rendered.*

**(c) Argument.**

    *(1) Presentation.*  *Parties may expect the court to have some familiarity with the briefs.  Normally the court will permit no more than 15 minutes per side for oral argument.  It is counsel's responsibility to keep track of time.  Where more than one counsel argues on one side of a case, it is counsel's further responsibility to assure a fair division of the total time allotted.  One or more cases posing the same issues, arising from the same factual context, will be treated as a single case for the purposes of this rule.*

    *(2) Rebuttal.*  *Allowance of time for rebuttal is within the discretion of the presiding judge, but often appellant will be allowed to reserve a few minutes on request made at the outset of opening argument.  However, counsel is expected to cover all anticipated issues in opening argument.  Reserved rebuttal time is for the purpose of answering contentions made in the other side's oral argument.  Any time allowed to be reserved by the presiding judge will be deducted from that party's allotted time for opening argument.*

60

**CONSTITUTION**

**Historical Note**

The One hundred and tenth Article of Amendment was adopted by joint sessions of the General Court in the years 1976 and 1978, and was approved by the people on the seventh day of November, 1978.

### Art. CXI.   Assignment or admission to public schools

ART. CXI.   No student shall be assigned to or denied admittance to a public school on the basis of race, color, national origin or creed.

**Historical Note**

The One hundred and eleventh Article of Amendment was adopted by joint sessions of the General Court in the years 1975 and 1977, and was approved by the people on the seventh day of November, 1978.

### Art. CXII.   Real property; classification and taxation

ART. CXII.   Article IV of chapter 1 of Part the Second of the Constitution is hereby amended by inserting after the words "and to impose and levy proportional and reasonable assessments, rates and taxes, upon all the inhabitants of, and persons resident, and estates lying, within said Commonwealth" the words:—, except that, in addition to the powers conferred under Articles XLI and XCIX of the Amendments, the general court may classify real property according to its use in no more than four classes and to assess, rate and tax such property differently in the classes so established, but proportionately in the same class, and except that reasonable exemptions may be granted.

**Historical Note**

The One hundred and twelfth Article of Amendment was adopted by joint sessions of the General Court in the years 1975 and 1977, and was approved by the people on the seventh day of November, 1978.

**Law Review Commentaries**

A new system of property taxation. Richard A. Goren (1980) 65 Mass.L.Rev. 209.

Real estate taxation, legislation, classification amendment. Richard A. Goren, 26 Ann.Surv. Mass.L. 478 (1979).

### Art. CXIII.   City or town charters; submission

ART. CXIII.   The first sentence of the sixth paragraph of Section 3 of Article II of the Amendments to the Constitution of the Commonwealth, as appearing in Article LXXXIX of said Amendments, is hereby amended by striking out the words "ten months" and inserting in place thereof the words:—eighteen months.

**Historical Note**

The One hundred and thirteenth Article of Amendment was adopted by joint sessions of the General Court in the years 1976 and 1977, and was approved by the people on the seventh day of November, 1978.

### Art. CXIV.   Handicapped persons; discrimination

ART. CXIV.   No otherwise qualified handicapped individual shall, solely by reason of his handicap, he excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth.

**Historical Note**

The One hundred and fourteenth Article of Amendment was adopted by joint sessions of the General Court in the years 1977 and 1980, and was approved by the people on the fourth day of November, 1980.

**Notes of Decisions**

Redress  1

**Violations  2**

___

**1.   Redress**

Former employee's complaint, alleging that employer had required him to work without reasonable accommodation of his physical handicap and had ultimately discharged him based on age or handicap, would have stated cause of action under the Civil Rights Act; accordingly, employee had adequate way of vindicating rights and

---

(Left column margin text:)

CONSTITUTION

how representative art are drawn, and Op.Atty.Gen., Sept.

s

e redistricting plans veral legislative dis- ations from the ten allowed under one hich were pervasive ffected a substantial tts voters, were not olicy of respect for ries.   Black Political , D.Mass.1988,   679

of Com. (1978)  376 375 Mass. 246.

ent to the Constitu- is adopted in place

rs 1975 and 1977, and ple on the seventh day

ttion of the Common- ERAL PROVISION", y section 4 of Article ollowing subheading: t]

ears 1976 and 1977, and eople on the seventh day

ie Amendments to the ut the second sentence

, 1976 and 1977, and was le on the seventh day of

ls for recreational uses is hereby annulled and

---

# Brookline Housing Authority

### 90 Longwood Avenue, Brookline, MA 02446
### Tel: 617-277-2022  Fax: 617-277-1462  TTD: 1-800-545-1833, Ext. 213

Welcome    What's New    Family Housing    Elderly/Disabled Housing    Section 8    FAQ    For Residents    Contact Us    Download

Forms    Business Opportunities

## SECTION 8 - HOUSING CHOICE VOUCHERS

### **  NEWS FLASH **

News Flash!

You can now do the following:

** apply online **

** view and change your existing application **

** view your status **

** view important notices and latest news **

Go to   MASSNAHRO.ORG/S8    and follow prompts!

**For Landlords**

Go to  www.hmsforweb.com/pal  to view landlord direct deposit information.

Please  see or download  a copy of a brochure that may answer some of your questions about the Section 8 Housing Voucher Program.

This program cannot exist without the participation of landlords. We realize this and we are here to assist you or answer any questions you may have.

**Payment Standards/Utility Allowances for Brookline**

Payment Standards click here

Utility Allowances click here

**If You Move**

Please remember to notify either MassNAHRO or Brookline Housing Authority in writing if your address changes. If MassNahro or Brookline Housing Authority does not receive a reply to an up-to-date or a notification of an available voucher letter, your application will be removed from the list. It is your responsibility to keep the address on your application current.

If you no longer need a HCV, please also notify MassNAHRO or BHA so that we may remove your name from the list.

## What is the Section 8 HCV Program?

The Section 8 HCV Program is a Federally funded, subsidized-rental program that allows recipients of a voucher to rent safe and sanitary housing in the private sector. The voucher holder pays part of the rent, which is determined by the household's monthly adjusted gross income, the rent payment standard for the area, and the apartment's rent. The tenant is not allowed to pay more than 40% of the household's adjusted gross income towards the rent and utilities on an initial lease-up, but must pay at least 30% of the household's adjusted gross income. The Brookline Housing Authority administers the

Case:Case:1515-145Documen000t:168t:950Page:Page: F117ate Date: F09/08/20/15Entry Entry:59400852341097

voucher and, with funds received from the Department of Housing and Urban Development (HUD), pays the remainder of the rent amount directly to the landlord. The HCV recipient may use the voucher to find a unit in any part of the United States and Puerto Rico.

For a more detailed explanation HCV program, please visit www.hud.gov/offices/pih/programs/hcv/about/fact_sheet.cfm .

## Who is Eligible for a Housing Choice Voucher?

Very low-income elderly, disabled, singles and families are eligible to apply for a HCV. The Fiscal Year 2014 gross household-income allowed for this program (for Brookline Housing Authority ONLY) is as follows:

HCV Gross Household Income Limits By Household Size for BHA ONLY:

| 1 person | 2 person | 3 person | 4 person | 5 person | 6 person | 7 person | 8 person |
|---|---|---|---|---|---|---|---|
| $19,800 | $22,600 | $25,450 | $28,2500 | $30,550 | $32,800 | $36,030 | $40,090 |

Besides the above income limits, the BHA does credit report, landlord history and Nationwide CORI (Criminal Offender Record Information) checks on applicant and family members 14 years and older whose application is approaching the top the waiting list.

## How to Apply for a Section 8 Housing Choice Voucher

Brookline Housing Authority is one of a growing list of Massachusetts' housing authorities who have joined Massachusetts' Centralized Waiting List. When one of the over 91 public housing authorities who belong to the Centralized Waiting List has Housing Choice Vouchers available, that community draws its own applications from the Centralized Waiting List (remember that HCVs are mobile so that a voucher received in one community may be used to find housing in another). For more information about the Section 8 Housing Choice Voucher Centralized Waiting List and to learn which Authorities are or are not participants, go to the Centralized Waiting List.

You may download a copy of a preliminary application for the centralized waiting list by clicking here or by going to http://massnahro.org/media/preapp312.pdf. (You must have Adobe Reader on your computer in order to download this and other forms from the BHA website. You may download this free software by going to or clicking www.adobe.com. ) You may also have an application sent or faxed to you by calling the Brookline Housing Authority at 617-277-1885 or writing to us at
90 Longwood Avenue, Brookline, MA 02446.

Staff - 617-277-2022
Carole Brown, Director of Leased Housing & Occupancy
cbrown@brooklinehousing.org

For general questions or an application call Ext. 317. Requests for your status on the waiting list must be in writing. Section 8 applicants who are unable to mail address changes and status requests are encouraged to email them S8Applications@brooklinehousing.org.

Dalizis Joseph, Ext. 319
djoseph@brooklinehousing.org
Lea Rios, Ext. 323
lrios@brooklinehousing.org

Janice McNiff, Ext. 314
jmcniff@brooklinehousing.org

## How Long is the Wait for a Housing Choice Voucher?

Like all subsidized housing the wait for a voucher may be years. The waiting time depends upon how long the waiting list is, if the applicant has a preference and how many vouchers become available. Brookline Housing Authority has 619 Housing Choice Vouchers.

We strongly suggest that you apply to as many types of subsidized or affordable housing waiting lists as possible. We have provided links to agencies that assist in the search for affordable housing on the Download page. The information that these agencies offer is extremely helpful.

## Violence Against Women Act (VAWA)

In January 2006, President Bush signed a law known as the Violence Against Women (VAWA) and the Department of Justice Reauthorization Act of 2005. Portions of this law create new protections for victims of domestic violence, dating violence and stalking who are residents in public housing or who are assisted with section 8 rental assistance.

You may view or download BHA's Section 8 Administrative Plan section on VAWA and the notification sent tenants by clicking here .

## Services For BHA HCV

## Holders Living in Brookline

BHA staff has partnered with other

Case:Case515-1456cumDocument0001689502Page:Page: 198 Date Filed:09/28/2015/2015Entry ID:Entry594085241097 ADD-3

Completed Section 8 preliminary applications may be mailed, faxed or emailed with signature, or brought to Brookline Housing Authority or any housing authority that participates in the Centralized Waiting List.

Incomplete Section 8 preliminary applications will be returned to you.

## Family Self-Sufficiency Program

We do not have an active program at this time.

## Fraud and Abuse of Program

The vast majority of residents on our subsidized programs follow DHCD or HUD rules and regulations. A few, as happens in every aspect of life, choose to take advantage of our programs and commit fraud.

The BHA vigorously investigates fraud and aggressively prosecutes the perpetrators. When fraud is discovered, housing assistance may be terminated, restitution will be sought and, in some cases, information is handed over to the appropriate authorities for possible criminal prosecution.

We advise that residents who have or are committing fraud or know of someone that may be in violation of the program's regulations to contact their manager or program representative so that a less drastic resolution than loss of residency/subsidy and prosecution may be considered.

agencies to provided social services, educational opportunities, resume writing and employment search assistance as well as other programs for Section 8 Housing Choice Voucher holders that live in the Town of Brookline. Please look at our For Residents page in this site to review the services we offer.

**Examples of Fraud:**

Unauthorized occupant in unit or failure to report former occupant has left household

Failure to report all income for all family members or to report income in a timely manner

Subsidized unit is not principle place of residence or subleasing of unit

Illegally renting from a family member

---

Welcome  What's New  Family Housing  Elderly/Disabled Housing  Section 8  FAQ  For Residents  Contact Us  Download Forms
Newsletter  Employment Opportunities  Volunteers & Benefactors  Modernization

**116**

ADD
Case:Case15-1456cumDentu0001.6B9502P.age:P1age: 1Date P1ate Pate: F09/28/09/29/2015ntry ED15:94008241097

 **FY 2014** INCOME LIMITS DOCUMENTATION SYSTEM

HUD.gov  HUD User Home  Data Sets  Fair Market Rents  Section 8 Income Limits  MTSP Income Limits  HUD LIHTC Database

## FY 2014 Income Limits Summary

| FY 2014 Income Limit Area | Median Income | FY 2014 Income Limit Category | Persons in Family | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| **Brookline town** | $94,100 | Very Low (50%) Income Limits ($) | 32,950 | 37,650 | 42,350 | **47,050** | 50,850 | 54,600 | 58,350 | 62,150 |
| | | Extremely Low (30%) Income Limits ($)* | 19,800 | 22,600 | 25,450 | **28,250** | 30,550 | 32,800 | 36,030 | 40,090 |
| | | Low (80%) Income Limits ($) | 47,450 | 54,200 | 61,000 | **67,750** | 73,200 | 78,600 | 84,050 | 89,450 |

**Selecting any of the buttons labeled "Explanation" will display detailed calculation steps for each of the various parameters.**

NOTE: Brookline town is part of the **Boston-Cambridge-Quincy, MA-NH HUD Metro FMR Area**, so all information presented here applies to all of the **Boston-Cambridge-Quincy, MA-NH HUD Metro FMR Area**. The **Boston-Cambridge-Quincy, MA-NH HUD Metro FMR Area** contains the following areas: **ESSEX COUNTY, MA** TOWNS OF Amesbury Town city, MA; Beverly city, MA; Danvers town, MA; Essex town, MA; Gloucester city, MA; Hamilton town, MA; Ipswich town, MA; Lynn city, MA; Lynnfield town, MA; Manchester-by-the-Sea town, MA; Marblehead town, MA; Middleton town, MA; Nahant town, MA; Newbury town, MA; Newburyport city, MA; Peabody city, MA; Rockport town, MA; Rowley town, MA; Salem city, MA; Salisbury town, MA; Saugus town, MA; Swampscott town, MA; Topsfield town, MA; Wenham town, MA;
**MIDDLESEX COUNTY, MA** TOWNS OF Acton town, MA; Arlington town, MA; Ashby town, MA; Ashland town, MA; Ayer town, MA; Bedford town, MA; Belmont town, MA; Boxborough town, MA; Burlington town, MA; Cambridge city, MA; Carlisle town, MA; Concord town, MA; Everett city, MA; Framingham town, MA; Holliston town, MA; Hopkinton town, MA; Hudson town, MA; Lexington town, MA; Lincoln town, MA; Littleton town, MA; Malden city, MA; Marlborough city, MA; Maynard town, MA; Medford city, MA; Melrose city, MA; Natick town, MA; Newton city, MA; North Reading town, MA; Reading town, MA; Sherborn town, MA; Shirley town, MA; Somerville city, MA; Stoneham town, MA; Stow town, MA; Sudbury town, MA; Townsend town, MA; Wakefield town, MA; Waltham city, MA; Watertown town, MA; Wayland town, MA; Weston town, MA; Wilmington town, MA; Winchester town, MA; Woburn city, MA;
**NORFOLK COUNTY, MA** TOWNS OF Bellingham town, MA; Braintree Town city, MA; Brookline town, MA;

Case:Case515-1458 Document:00116895027 Page:200 Date Filed:09/28/2015 Entry ID:5941097
ADD

Canton town, MA; Cohasset town, MA; Dedham town, MA; Dover town, MA; Foxborough town, MA;
Franklin Town city, MA; Holbrook town, MA; Medfield town, MA; Medway town, MA; Millis town, MA;
Milton town, MA; Needham town, MA; Norfolk town, MA; Norwood town, MA; Plainville town, MA; Quincy
city, MA; Randolph town, MA; Sharon town, MA; Stoughton town, MA; Walpole town, MA; Wellesley town,
MA; Westwood town, MA; Weymouth Town city, MA; Wrentham town, MA;
**PLYMOUTH COUNTY, MA** TOWNS OF Carver town, MA; Duxbury town, MA; Hanover town, MA;
Hingham town, MA; Hull town, MA; Kingston town, MA; Marshfield town, MA; Norwell town, MA;
Pembroke town, MA; Plymouth town, MA; Rockland town, MA; Scituate town, MA; Wareham town, MA;
**SUFFOLK COUNTY, MA** TOWNS OF Boston city, MA; Chelsea city, MA; Revere city, MA; Winthrop Town
city, MA;
**ROCKINGHAM COUNTY, NH** TOWNS OF Seabrook town, NH; South Hampton town, NH; and South
Hampton town, NH.


* The FY 2014 Consolidated Appropriations Act changed the definition of extremely low-income to be the
greater of 30/50ths (60 percent) of the Section 8 very low-income limit or the poverty guideline as
established by the Department of Health and Human Services (HHS), provided that this amount is not
greater than the Section 8 50% very low-income limit. Consequently, the extremely low (30%) income
limits may equal the very low (50%) income limits.

Income Limit areas are based on FY 2014 Fair Market Rent (FMR) areas. For information on FMRs, please
see our associated FY 2014 Fair Market Rent documentation system.

For last year's Median Family Income and Income Limits, please see here:



Select a different county or county equivalent in
Massachusetts:

Brewster town
Bridgewater town
Brimfield town
Brockton city
Brookfield town
Brookline town

Select county or county equivalent

Select any FY2014 HUD Metropolitan FMR Area's
Income Limits:

Boston-Cambridge-Quincy, MA-NH HUD Metro FMR Area

Select HMFA Income Limits Area

Or press below to start over and select a different
state:

Select a new state

Update URL For bookmarking or E-Mailing

Prepared by the Economic and Market Analysis Division, HUD.

7420.10G

# VOUCHER PROGRAM GUIDEBOOK
# Housing Choice

*Produced for:*



**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**
**Washington, DC 20410-6000**
**www.hud.gov/pih**

April 2001

ADD

The contents of this guidebook are the
views of the contractor and do not
necessarily reflect the views or policy of
the Department of Housing and Urban
Development or the U.S. Government.

*Prepared by:*

Quadel Consulting Corporation
1250 Eye Street, NW
Washington, DC  20005



Case:Case:15-1456cumDentum00168950P7agePage:203e DateFiledF0ed0/80/29/201Entry EntryID:5940852741097

# CHAPTER 5
## ELIGIBILITY AND DENIAL OF ASSISTANCE

### 5.1   CHAPTER OVERVIEW

This chapter outlines HUD's requirements for participation in the housing choice voucher program and provides guidance to PHAs in establishing additional criteria. The PHA should strive for objectivity and consistency when applying these criteria to evaluate the eligibility of families who apply for assistance. PHAs must provide families applying for assistance the opportunity to explain their circumstances, furnish additional information if required, and receive an explanation from the PHA of the basis for any decision regarding their eligibility.

### 5.2   ELIGIBILITY REQUIREMENTS

There are four factors which affect eligibility:

- _Family definition_.  Only applicants who meet a PHA's definition of family are eligible.

- _Income limits_.  The household's annual income may not exceed the applicable income limit as established by HUD.

- _Citizenship status_.  The applicant must meet the documentation requirements of citizenship or eligible immigration status.

- _Eviction for drug-related criminal activity_.  Persons evicted from public housing or any Section 8 program for drug-related criminal activity are ineligible for assistance for at least three years from the date of the eviction.

The PHA's administrative plan must contain procedures for determining eligibility and denial of assistance.

**Definition of Family**

_Program Requirements_

Each applicant for assistance under the housing choice voucher program must meet the PHA's definition of family. Within guidelines provided by HUD, a PHA has discretion in its definition of what constitutes a family.

A family is either a single person or a group of persons and includes:

- A household with or without children. A child who is temporarily away from home due to placement in foster care should be considered a member of the family.

---

_Housing Choice Voucher Program Guidebook_          5-1

- An elderly family, which is defined as a family whose head, co-head, spouse, or sole member is at least 62 years of age; or two or more persons, each of whom are at least 62, living together; or one or more persons who are at least 62 living with one or more live-in aides.

- A disabled family, which means a family whose head, co-head, spouse, or sole member is a person with disabilities; or two or more persons with disabilities; or one or more persons with disabilities with one or more live-in aides.

- A displaced family, which is a family in which each member or the sole member is a person displaced by governmental action, or whose dwelling has been extensively damaged or destroyed as a result of a disaster declared or otherwise formally recognized by federal disaster relief laws.

- A remaining member of a tenant family is a family member of an assisted tenant family who remains in the unit when other members of the family have left the unit.

- A single person who is not an elderly or displaced person, or a person with disabilities, or the remaining member of a tenant family.

*PHA Discretionary Policies and Procedures*

The PHA is responsible for defining family in its administrative plan. A PHA must include the HUD guidelines listed above in its definition.

**Income Limits**

HUD establishes income limits by family size for the area in which the PHA is located. The income limits are published annually in a HUD Notice and are generally effective on the date of publication. The income limits are available on the Internet at www.huduser.com at the "datasets" portal.

There are two income limits that are used to determine eligibility for the housing choice voucher program and a third that is used to ensure that the PHA has met its target for assisting the neediest families in the community.

The *very low-income limit,* which is set at 50 percent of the area median income, is the income limit generally used to determine initial program eligibility.

The *low income-limit,* set at 80 percent of the area median income, is used for families whose incomes fall above the very low-income limits but who are considered to be eligible for assistance because they are:

- Continuously assisted under the public housing or Section 8 programs;

- Non-purchasing households in the following homeownership programs: HOPE 1, HOPE 2, or other HUD-assisted multifamily home ownership programs covered under 24 CFR 284.173;

- Displaced as a result of the prepayment of a mortgage or voluntary termination of a mortgage insurance contract.

A PHA may adopt local policies permitting the admission of additional categories of low-income families to address essential local housing needs.

HUD also publishes an *extremely low-income limit* that is set at 30 percent of the area median income. Each PHA must ensure that 75 percent of its admissions in each PHA fiscal year are families whose incomes are at or below the extremely low-income limit. Rules pertaining to "targeting" assistance to extremely low-income families are discussed under preferences in Chapter 4.

> **PHA DISCRETION IN LOW-INCOME ELIGIBILITY**
>
> One example of a policy a PHA might adopt to permit admission of low-income families is a policy aimed at reducing total subsidy cost. For instance: two sisters want to live together. Individually they meet the very low-income limit. Together they exceed the very low income limit, but not the low-income limit. It will be cheaper to house them in a two-bedroom unit rather than in two one-bedroom units.

### Applying Income Limits

Annual Income is compared to the applicable income limit to determine eligibility.

A family's income must be within the income limits for the PHA's jurisdiction at the time the family receives a voucher to search for housing. In addition, the family, when it is first admitted, must select a unit in an area in which the family meets the income limit for the housing choice voucher program.

A PHA with more than one set of income limits within its jurisdiction should use the highest income limit within its jurisdiction when determining initial household eligibility. However, a family whose income is above the limits in one or more areas of that PHA's jurisdiction may lease only in an area where the family is income eligible when it executes its first lease assisted under the voucher program. Similarly, a family exercising portability when first admitted to the program must lease in an area where it is within the eligibility income limit.

### Citizenship Status

*Limits on Assistance to Non-Citizens*

Eligibility for federal housing assistance is limited to U.S. citizens and applicants who have eligible immigration status. Eligible immigrants are persons who qualify for one of the immigrant categories in Table 5-1. Persons claiming eligible immigration status must present appropriate immigration documents, which must be verified by the PHA through the Immigration and Naturalization Service (INS).

123



New England

U.S. Department of Housing and Urban Development

Office of Public Housing
Boston Hub
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street
Boston, Massachusetts 02222-1092

New England PIH Advisory Letter # 07 – 05
April 18, 2007

Subject: Special-Needs Trusts (SNT) Disbursements

Dear Executive Director,

     This advisory letter is provided to clarify the treatment of Special-Needs Trusts a/k/a Supplemental-Needs Trusts and their affect on income and rent calculations in our Office of Public Housing programs. Please apply this discussion to all of the programs administered through this office.

     A Special-Needs Trust a/k/a a Supplemental-Needs Trust is a trust established to provide supplemental income for a disabled beneficiary who is receiving or may be eligible to receive government benefits. This type of irrevocable trust is often used by parents or guardians of disabled children to ensure the beneficiary's eligibility or continued eligibility for government benefits.

### SNT as an asset

     Pursuant to HUD regulations at 24 CFR 5.603(b)(2), the corpus (principal) of an applicant's or participant's SNT is not considered an asset.

### SNT distributions as income

     Distributions from the trust will be counted when determining annual income under 24 CFR 5.609. Annual income under 24 CFR 5.609 includes all amounts, both monetary or not, received by the applicant or made on the applicant's behalf, which is not excluded under 5.609(c) or deducted from annual income under 24 CFR 5.611.

     Annual income includes the full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services; the net income from the operation of a business or profession; interest, dividends, and other net income of any kind from real or personal property. For a complete listing of items that are included in annual income please refer to 24 CFR 5.609(b).

     Annual income does not include items such as income from employment of children (including foster children) under the age of 18 years; payments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are

2

unable to live alone); Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and settlement for personal or property losses. For a complete listing of items that are excluded from income please refer to 24 CFR 5.609(c).

Under HUD's current regulations some expenditures should be counted as income, while others may fall under an income exclusion or deduction.

<u>SNT distributions excluded or deducted</u>

Not all distributions from a SNT should be counted towards an applicant's annual income. The regulations at 24 CFR 5.609(c) and 24 CFR 5.611 allow several types of expenditures, such as unreimbursed attendant care expenses exceeding three percent of the applicant's annual income and temporary or sporadic payments, to be excluded or deducted from the applicant's annual income for eligibility or continued eligibility purposes. Those amounts and expenditures that do not fall under an exclusion or deduction are presumed by the regulations to be available for housing expenses and are therefore counted towards annual income. Unlike Medicaid, HUD is not reimbursed for benefits provided with excess trust corpus at the end of the beneficiary's lifetime; this accounts for some differences in the treatment of SNT income between the HUD and Medicaid regulations.

SNT distributions can come in many categories including: trust administration fees, taxes, attendant care expenses, rent payments, and various non-food and non-shelter expenditures made on behalf of the beneficiary. Some of these expenditures should be counted as income, while others may fall under an income exclusion or deduction.

<u>Example</u>

For example, any expenditure made for one-time trust administrative fees such as costs related to the set-up of the SNT would likely be excluded from annual income under 24 C.F.R. §5.609(c)(9), because they are a nonrecurring payment. Whereas, expenditures made for regularly occurring administrative fees, such as the trustee's compensation, would count as annual income. Additionally, expenditures made to pay taxes and rental payments would be counted towards annual income, because they were made on beneficiary's behalf[1] and do not fall under any exception or deduction. The expenditures made for attendant care expenses, on the other hand, are deductible from income to the extent they meet the requirements of §5.611(a)(3)(ii).

The ultimate determination of whether each of the above expenditures counts towards annual income or falls within an exclusion or deduction is to be made by the Public Housing Authority. Further, more complete information about some expenditures may be necessary for an accurate determination. To the extent that a beneficiary may be rendered ineligible for rental housing by certain trust expenditures, such as the trust expenses that are required as a matter of law, you may pursue a waiver request with our office.

---

[1] See 24 C.F.R §5.609(a)(1).

3

Please share this important information with your housing authority occupancy staff so that they can make proper determinations of how to treat disbursements from Special Needs Trusts.

Sincerely,

Donna J. Ayala
Director

1APH Official
1APH Chron

1APH Schindler     1APH Cwieka